## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

RALLS CORPORATION,                )
318 Cooper Circle                   )
Peachtree City, GA 30269       )
                                  )
            *Plaintiff,*        )
     v.                      )
                                  )
COMMITTEE ON FOREIGN      )
INVESTMENT IN THE UNITED STATES, )
1500 Pennsylvania Avenue, N.W.   )
Washington, D.C. 20220        )    Case No. _____
                                  )
         and            )
                                  )
TIMOTHY F. GEITHNER,        )
in his official capacity as         )
Secretary of the Treasury and     )
Chairperson of the Committee on   )
Foreign Investment in the United States, )
1500 Pennsylvania Avenue, N.W.   )
Washington, D.C. 20220        )
                                  )
         *Defendants.*      )
_____)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, Ralls Corporation, by and through its undersigned attorneys, alleges as follows:

## INTRODUCTION

1.      This is a civil action challenging the issuance of an order by the Committee on Foreign Investment in the United States ("CFIUS") as violating the Administrative Procedure Act and the United States Constitution.  CFIUS is an interagency committee established under Section 721 of the Defense Production Act of 1950, as amended, 50 U.S.C. app. § 2170 ("Section 721").  Its purpose is to review transactions that could result in the control of a U.S.

business by a foreign person in order to determine the effect of such transactions on the national security of the United States.

2.      CFIUS's powers under Section 721 and related executive orders and regulations are limited.  It may only review certain "covered transactions" that could result in foreign control of a person engaged in interstate commerce in the United States.  It may not bar a covered transaction from taking place.  And, like all agencies, it may not arbitrarily or capriciously render determinations absent any evidence or explanation or by unexpectedly and inexplicably abandoning a prior position or policy, and it may not engage in the unconstitutional deprivation of property absent due process.

3.      CFIUS violated the foregoing principles and well-established law when it issued an order subjecting plaintiff Ralls Corporation to draconian obligations in connection with Ralls's acquisition of four small Oregon companies whose assets consisted solely of windfarm development rights, including land rights to construct the windfarms, power purchase agreements, and necessary government permits.  Without identifying any evidence or providing any explanation, CFIUS concluded that the acquisition was a "covered transaction" subject to its authority and that "there are national security risks to the United States that arise as a result of" the acquisition.  Moreover, rather than propose measures that would have mitigated the purported (yet unidentified) national security risks, CFIUS—again without any evidence or explanation—instead required Ralls immediately to cease all construction and operations and remove all items from the relevant properties; prohibited Ralls from having any access to the properties; and forbade Ralls from selling the properties until all items had been removed, CFIUS was notified of the buyer, and CFIUS did not object to the buyer.  CFIUS asserted that these obligations were enforceable via injunctive relief, civil penalties, and criminal penalties.

4.      Ralls brings this action to obtain a declaration that CFIUS's conduct was unlawful and unauthorized and to enjoin enforcement of its order.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 2201.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (e).

## PARTIES

7.      Plaintiff Ralls Corporation ("Ralls") is a Delaware corporation that is privately owned by two Chinese nationals, Messrs. Dawei Duan and Jialiang Wu.  Mr. Duan is the CFO of the Sany Group ("Sany"), a Chinese global manufacturing company.  Mr. Wu is a Vice President of Sany and also the General Manager of Sany Electric Company, Ltd. ("Sany Electric"), a wholly-owned Chinese subsidiary of Sany.

8.      Defendant CFIUS is a "multi agency committee" established pursuant to Executive Order No. 11858 (May 7, 1975) in order to "carry out" Section 721.  50 U.S.C. app. § 2170(k)(1).

9.      Defendant Timothy F. Geithner, the Secretary of the Treasury, is the Chairperson of CFIUS.   Section 721 provides that the Secretary of the Treasury "shall serve as the chairperson" of CFIUS.  *Id.* § 2170(k)(3).  Mr. Geithner is sued in his official capacity.

## FACTS

## I.      THE COMMITTEE ON FOREIGN INVESTMENT IN THE UNITED STATES

10.      CFIUS is an interagency committee that reviews transactions that could result in the control of a U.S. business by a foreign person in order to determine the effect of such transactions on the national security of the United States.

11.      CFIUS's authority derives from Section 721, *see* 50 U.S.C. app. § 2170(k), and

Executive Order 11858 (May 7, 1975), as amended by Executive Order 13456 (Jan. 23, 2008).

12.     The Secretary of the Treasury serves as Chairperson of CFIUS and is also a member.  The other members of CFIUS are the heads of the following eight departments and offices:  Department of Justice, Department of Homeland Security, Department of Commerce, Department of Defense, Department of State, Department of Energy, Office of the U.S. Trade Representative, and Office of Science and Technology Policy.

13.     The Director of National Intelligence and the Secretary of Labor are non-voting members of CFIUS.

14.     Additionally, the following five offices observe and sometimes participate in CFIUS's activities:  Office of Management and Budget, Council of Economic Advisors, National Security Council, National Economic Council, and Homeland Security Council.

15.     Section 721 authorizes CFIUS to "review" and "investigat[e]" a "covered transaction" to determine its effects on national security.  50 U.S.C. app. § 2170(b)(1)(A)(i), (2)(A).

16.     Section 721 defines "covered transaction" as "any merger, acquisition, or takeover … by or with any foreign person which could result in foreign control of any person engaged in interstate commerce in the United States."  *Id*. § 2170(a)(3).

17.     The CFIUS process begins when parties to a proposed or pending covered transaction jointly file a voluntary notice with CFIUS or when CFIUS decides to review a covered transaction *sua sponte*.

18.     If the parties file a voluntary notice, the voluntary notice must include the information required by 31 C.F.R. § 800.402, including "a summary setting forth the essentials of the transaction" and information about the parties involved.  The notice must also include

detailed information about foreign persons and foreign governments involved in the transaction.

19.     Upon receiving the voluntary notice, CFIUS "shall review the covered transaction to determine the effects of the transaction on the national security of the United States."  50 U.S.C. app. § 2170(b)(1)(A)(i).  In so doing, CFIUS "shall consider" eleven factors specified in subsection (f) of Section 721.  *Id.* § 2170(b)(1)(A)(ii), (f).

20.     CFIUS's review "shall be completed before the end of the 30-day period beginning on the date of the acceptance of" the voluntary notice.  *Id.* § 2170(b)(1)(E).

21.     CFIUS may request additional information from the parties during the 30-day review period, and the parties must provide the requested information within three business days.

22.     In addition to reviewing covered transactions, CFIUS "shall," under certain circumstances, also "conduct an investigation of the effects of a covered transaction on the national security of the United States."  *Id.* § 2170(b)(2)(A).  The circumstances triggering an investigation are defined in Section 721 and 31 C.F.R. § 800.503.  Any such investigation must be completed within 45 days of its commencement.  50 U.S.C. app. § 2170(b)(2)(C).

23.     CFIUS may "negotiate, enter into or impose, and enforce any agreement or condition with any party to the covered transaction in order to mitigate any threat to the national security of the United States that arises as a result of the covered transaction."  *Id.* § 2170(*l*)(1)(A).

24.     Section 721 also provides that the President "may take such action for such time as the President considers appropriate to suspend or prohibit any covered transaction that threatens to impair the national security of the United States."  *Id.* § 2170(d)(1).  The President "shall announce the decision on whether or not to take action … not later than 15 days after the date on which an investigation … is completed."  *Id.* § 2170(d)(2).  The President may take such

action only if, among other things, he finds that existing provisions of law, other than Section 721 and the International Emergency Economic Powers Act, do not, in his judgment, provide adequate and appropriate authority for the President to protect the national security.

25.     Executive Order 11858 (as amended by Executive Order 13456) also provides that CFIUS "shall send a report to the President requesting the President's decision with respect to a review or investigation of a transaction" in the following three circumstances:  (i) CFIUS "recommends that the President suspend or prohibit the transaction"; (ii) CFIUS "is unable to reach a decision on whether to recommend that the President suspend or prohibit the transaction"; or (iii) CFIUS "requests that the President make a determination with regard to the transaction."

26.     31 C.F.R. § 800.506 provides that "upon completion or termination of any investigation," CFIUS "shall send a report to the President requesting the President's decision" under the same three circumstances as Executive Order 11858.

## II.     THE TERNA-RALLS TRANSACTION

27.     Terna Energy USA Holding Corporation ("Terna") is a Delaware corporation formed in December 2010 to acquire and act as a holding company for wind energy projects in the United States.  Terna is a subsidiary of Terna Energy SA, a publicly traded renewable energy company listed on the Athens Stock Exchange.

28.     Prior to March 2012, Terna held the membership interests in four Oregon windfarm projects, all Oregon limited liability companies:  Pine City Windfarm, LLC; Mule Hollow Windfarm, LLC; High Plateau Windfarm, LLC; and Lower Ridge Windfarm, LLC (collectively, the "Project Companies").  The Project Companies were originally formed in 2009 by Oregon Windfarms, LLC, an Oregon limited liability company owned by U.S. citizens.

29.     The Project Companies' assets consisted solely of the land rights to construct the windfarms, power purchase agreements, transmission interconnection agreements and ancillary agreements with other companies, agreements for the management and use of shared interconnection facilities with the owners of nearby windfarms, and the government permits necessary to construct a commercial windfarm.

30.     In March 2012, Terna sold its membership interests in the Project Companies to Intelligent Wind Energy, LLC ("IWE"), a Delaware limited liability company that was owned by U.S. Innovative Renewable Energy, LLC ("USIRE"), a Delaware limited liability company owned by a U.S. citizen.  USIRE then sold IWE to Ralls.

31.     Ralls's primary business purpose to date has been to try and identify U.S. market opportunities and help develop wind energy projects for which Sany Electric's wind turbine generators can be used.

32.     Once constructed, Ralls's windfarms will consist of four separate 10 megawatt ("MW") windfarms with a total of twenty 2.0 MW wind turbine generators (five turbines per windfarm), plus related systems to allow for power production and interconnection to the PacifiCorp transmission grid in the western United States under long-term contracts with PacifiCorp.

33.     The Project Companies will not control or have access to PacifiCorp's transmission grid.

34.     PacifiCorp itself owns thousands of MWs of wind energy generating facilities, and nearly 10,600 MW of total generating assets.  Once constructed, Ralls's 40 MW of wind-generated power will comprise approximately 0.37% of PacifiCorp's total generating capacity, and approximately 2.3% of its wind energy generating capacity.

35.     In 2010 and 2011—prior to Ralls's acquisition of the Project Companies—the Federal Aviation Administration ("FAA") issued "Determinations of No Hazard" for each of the twenty planned turbines at the locations where the Project Companies' windfarms were to be sited.  An FAA "Determination of No Hazard" is tantamount to FAA approval.

36.     The FAA's review process included review by the Department of Defense.  The purpose of the Department of Defense review is to "prevent, minimize, or mitigate adverse impacts on military operations, readiness and testing."   Mission Statement of the DOD Siting Clearinghouse, Office of the Deputy Under Secretary of Defense, Installations and Environment.

37.     Shortly after Ralls acquired the Project Companies, the United States Navy expressed concerns with regard to the location of one of the four windfarm projects, the "Lower Ridge Windfarm."

38.     The Navy advocated moving the Lower Ridge Windfarm to "reduce airspace conflicts between the Lower Ridge wind turbines and low-level military aircraft training."

39.     Although the Navy indicated that it had no authority to require such a move, Ralls agreed, at significant expense and effort, to move the Lower Ridge Windfarm to a new location.

40.     Moving the Lower Ridge Windfarm to its new location required Ralls to obtain additional approvals from the Oregon Public Utility Commission.  The Navy wrote to the Oregon Public Utility Commission on Ralls's behalf, emphasizing its concern that the placement of the wind turbines at either location "may have negative security implications" but recommending that the requested approvals issue.  In the same letter, the Navy added that it "appreciat[ed]" Ralls's "cooperation and consideration" in agreeing to move the Lower Ridge Windfarm, particularly given Ralls's "time constraints" in completing the windfarms.

### III.     CFIUS'S PROHIBITION OF THE TERNA-RALLS TRANSACTION

41.     On June 28, 2012, Ralls and Terna submitted a voluntary notice to CFIUS informing CFIUS of Ralls's recent acquisition of the Project Companies.  Ralls included all of the information required by 31 C.F.R. § 800.402(c), including facts set forth above.

42.     In the weeks that followed submission of the voluntary notice, CFIUS asked Ralls and Terna a number of follow-up questions, as to all of which Ralls and Terna timely provided responses.

43.     On July 25, 2012, CFIUS issued an Order Establishing Interim Mitigation Measures regarding the Terna-Ralls transaction on July 25, 2012 ("Order").  *See* Ex. A.

44.     The Order stated that CFIUS had determined that the Terna-Ralls transaction was a "covered transaction" and that "there are national security risks to the United States that arise as a result of the Transaction."  *Id.* at 1.

45.     The Order stated that, as a result of the CFIUS determination, the "Companies," which the Order defined as Ralls and the Project Companies:

- "Shall immediately cease all Construction and Operations, and shall not undertake any further Construction and Operations, at the Properties" (defined as any of the sites on which the Project Companies proposed to construct windfarms);

- "Shall remove all stockpiled or stored items from the Properties no later than July 30, 2012, and shall not deposit, stockpile, or store any new items at the Properties"; and

- "Shall immediately cease all access, and shall not have any access, to the Properties."  *Id.*

46.     The Order added that "[n]otwithstanding the foregoing, U.S. citizens contracted

by the Companies and approved by CFIUS may access the site until July 30, 2012, solely for the purposes of removing any items from the Properties in compliance with" the Order. *Id.* at 1-2.

47.     As authority for its action, CFIUS cited "Section 721, and Executive Order 11858 of May 7, 1975, as amended by Executive Order 13456, 73 Fed. Reg. 4677 (Jan. 23, 2008)." *Id.* at 1.  CFIUS cited no other authority for its action.

48.     The Order provided that it "is enforceable, through injunctive relief, criminal or civil penalty, or otherwise, pursuant to section 721, the Executive Order, the CFIUS regulations, 18 U.S.C. § 1001, or any other applicable law." *Id.* at 2.

49.     On July 26, 2012, in a good-faith effort to address CFIUS's concerns, Ralls informed CFIUS that it was considering selling the Project Companies, with several American buyers having expressed interest.  Ralls believed that a sale of the Project Companies would address CFIUS's concerns in issuing the Order, and it requested CFIUS's guidance on the matter.

50.     In response to Ralls's good-faith effort, on August 2, 2012, CFIUS issued an Amended Order Establishing Interim Mitigation Measures ("Amended Order").  *See* Ex. B.

51.     The Amended Order expanded the definition of "Companies" to include the Project Companies, Ralls and its subsidiaries, and the Sany Group (including Sany Electric and Sany Heavy Industries). *Id.* at 1.

52.     The Amended Order also added more prohibitions to the previous Order, stating that in addition to the prior prohibitions, the Companies:

- "[S]hall not deposit, stockpile, or store any new items at the Properties, any lay down site identified by the Companies in any information or communication submitted to CFIUS, or at any location that is closer to the R-5701 Restricted

Airspace than the lay down site that is farthest from the R-5701 Restricted Airspace";

- "Shall not sell or otherwise transfer or propose, or otherwise facilitate the sale or transfer to any third party for use or installation at the Properties of any items made or otherwise produced by the Sany Group"; and

- "Shall not complete a sale or transfer of the Project Companies or their assets to any third party until:

  o All items deposited, installed, or affixed (including concrete foundations) on the Properties subsequent to the acquisition by Ralls of the Project Companies have been removed from the Properties;

  o the Companies notify CFIUS of the intended recipient or buyer;

  o the Companies have not received an objection from CFIUS within 10 business days of notification." *Id.* at 2.

53.    As with the previous Order, the Amended Order cited as authority for its directives "Section 721, and Executive Order 11858 of May 7, 1975, as amended by Executive Order 13456, 73 Fed. Reg. 4677 (Jan. 23, 2008)." *Id.* at 1.  As before, the Amended Order cited no other authority for its directives.

54.    Also as with the previous Order, the Amended Order provided that it "is enforceable, through injunctive relief, criminal or civil penalty, or otherwise, pursuant to section 721, the Executive Order, the CFIUS regulations, 18 U.S.C. § 1001, or any other applicable law." *Id.* at 3.

**COUNT I**
**(Violation of the Administrative Procedure Act—Exceeding Statutory**
**Authority by Prohibiting Transaction and Regulating Foreign Trade)**

55.     Plaintiff realleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

56.     The Declaratory Judgment Act provides that, in a case of actual controversy within its jurisdiction, a United States court may declare the rights and other legal relations of any interested party seeking such declaration.  28 U.S.C. § 2201(a).

57.     The Administrative Procedure Act ("APA") provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

58.     The APA also provides that "final agency action for which there is no other adequate remedy in a court" is "subject to judicial review."  *Id.* § 704.

59.     The APA further provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions" found to be, *inter alia*, "(A) arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law."  *Id.* § 706(2).

60.     CFIUS constitutes an "agency" whose final actions are reviewable under the APA.

61.     The Amended Order constitutes "final agency action" that is subject to judicial review.  CFIUS has consummated its decisionmaking process by determining that the Terna-Ralls transaction is a "covered transaction," that there are national security risks to the United

States that arise as a result of the transaction, and that severe, prohibitive, and immediate restrictions are necessary to prevent these purported national security risks.  Furthermore, the Amended Order determines Ralls's rights and obligations, and legal consequences flow from the Amended Order:  it expressly provides for its enforcement in court, and violating its terms could expose Ralls to significant penalties.  Accordingly, this case is ripe for judicial review.

62.    Ralls is suffering legal wrong as a result of the Amended Order because CFIUS lacks statutory authority to prohibit the Terna-Ralls transaction, versus proposing measures that mitigate any national security risks.

63.    CFIUS's powers under Section 721 are limited; it may only "negotiate, enter into or impose, and enforce" an agreement or condition "in order to mitigate any threat to the national security of the United States that arises as a result of the covered transaction."  *Id.* § 2170(*l*)(1)(A).

64.    By ordering Ralls immediately to cease all construction at the project sites, remove all equipment from the sites, and cease all access to the sites (including communications with persons at the sites), CFIUS has not merely mitigated any national security risks associated with the transaction; its actions are tantamount to prohibiting the transaction entirely, a power CFIUS does not possess under statute or regulation.

65.    Section 721 purports to provide only the President with the extraordinary authority to suspend or prohibit a transaction, not CFIUS.  By issuing the Amended Order, CFIUS has improperly arrogated this extraordinary power to itself.

66.    CFIUS has also exceeded its statutory authority by purporting to restrict transactions that are not within its purview.  Section 1(d) of the Amended Order bars Ralls from "sell[ing] or otherwise transfer[ring] … *to any third party* for use or installation at" the

windfarms "any *items* made or otherwise produced by the Sany Group."  Ex. B, at 2 (emphases

added).  But Section 721 limits CFIUS's oversight to transactions "by or with any foreign person

which could result in *foreign control* of *any person*."  50 U.S.C. app. § 2170(a)(3) (emphases

added).  Because future transactions in which Ralls sells or transfers "items made or otherwise

produced by the Sany Group" would not "result in foreign control of any person," CFIUS lacks

the authority to impose restrictions on (much less outright bar) such transactions.

68.     Similarly, Section 1(e) of the Amended Order bars Ralls from "complet[ing] a

sale or transfer of the Project Companies or their assets *to any third party*" absent CFIUS

approval.  Ex. B, at 2 (emphasis added).  But CFIUS lacks the authority to impose restrictions on

Ralls regarding the future sale or transfer of the Project Companies or their assets "to any third

party," even if it were an American party.  CFIUS's jurisdiction extends only to transactions

"which could result in foreign control."

68.     CFIUS's limited authority to review transactions resulting in foreign ownership

does not give it the power to regulate foreign trade.  Because the obligations in sections 1(d) and

1(f) of the Amended Order do so, CFIUS has exceeded its statutory authority in issuing the

Amended Order, in violation of the APA.

69.     To the extent CFIUS may seek further action by the President regarding this

transaction, that action would not prevent judicial review of the Amended Order.  Among other

things, any such Presidential action would render CFIUS's action capable of repetition, yet

evading review, permitting judicial review of the Amended Order.

70.     The physical and regulatory takings of Ralls's property interests constitute

unconstitutional takings in violation of the U.S. Constitution and deprive Ralls of its property

interests absent due process, or at a minimum raise grave doubts about the constitutionality of the

government action, though this constitutional question is avoided by a judicial determination that CFIUS violated the APA in issuing the Amended Order.

71.     Likewise, just as federal courts will construe statutes where possible to avoid serious doubt of their constitutionality, so too CFIUS has an obligation to exercise its powers in a way that does not raise serious constitutional concerns.  CFIUS's actions in violation of its statutory authority result in a constitutionally problematic prohibition that is avoided by finding CFIUS's conduct in violation of the APA.

## COUNT II
### (Violation of the Administrative Procedure Act—Arbitrary and Capricious Agency Action)

72.     Plaintiff realleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

73.     Ralls is suffering legal wrong as a result of the Amended Order because the Amended Order arbitrarily and capriciously offers literally no evidence or explanation for its determination that the Terna-Ralls transaction is a "covered transaction," its determination that national security risks to the United States arise as a result of the transaction, its determination to impose prohibitive restrictions on the Terna-Ralls transaction tantamount to barring it outright, or its determination to impose categorical restrictions when less burdensome alternatives are available under existing provisions of law that adequately and appropriately protect national security.

74.     The Amended Order instead simply recites, in a conclusory manner, that Ralls's acquisition of the Project Companies "constitutes a 'covered transaction' for purposes of Section 721," and that "there are national security risks to the United States that arise as a result of the Transaction," and imposes a list of draconian obligations.

75.     This failure to provide any explanation or evidence for CFIUS's conclusions is a violation of the APA's requirement of reasoned decisionmaking, particularly given the lengthy and detailed list of factors that CFIUS must consider when determining whether a transaction could harm national security.  *See* 50 U.S.C. app. § 2170(b)(1)(A)(ii), (f).

76.     The Amended Order also provides no explanation why CFIUS ignored readily available, adequate, and appropriate alternative measures short of outright prohibiting the transaction, including mitigation measures and invocation of 10 U.S.C. § 2663(d), which provides the Secretary of the Navy with authority to acquire interests in land, such as the interests in the properties on which the Project would be located, when the need is urgent, the acquisition is needed in the interest of national defense, and the acquisition is required to maintain the operational integrity of a military installation.

77.     The Amended Order also constitutes arbitrary and capricious action because it prohibitively restricts Ralls's acquisition of the Project Companies after the federal government previously assented to the transaction.   Prior to Ralls's acquisition, the FAA provided "Determinations of No Hazard" (which included Department of Defense review), and shortly after Ralls's acquisition, the Navy objected to the location of one windfarm but assented after Ralls relocated it at its own cost.  The Amended Order rescinds the Navy's prior assent and invalidates the FAA's prior approval, without offering any explanation for this sudden shift in course.

78.     The Amended Order is further arbitrary and capricious in prohibiting Ralls's future sales of Sany Group items that would be used at the properties (Section 1(d)) and in prohibiting Ralls's future sales of the Project Companies or their assets to any third party absent CFIUS approval (Section 1(e)).   These restrictions and remedies are entirely unrelated to

CFIUS's limited power to review covered transactions and mitigate purported national security risks.

79.     As a result of this and all other legal wrongs wrought by the Amended Order, Ralls has incurred significant injury.  Ralls is immediately prohibited from undertaking any further construction or operations on its property, it must immediately remove all of its belongings from the property, it may not use the property for storage, it is prohibited from accessing the property, it is prohibited from selling or transferring the primary goods to be used in erecting the windfarms, and it is not permitted to sell or transfer the other assets of the Project Companies to any third party until all items are removed (including the concrete foundations that it has expended funds to install), the companies notify CFIUS, and CFIUS does not object. Accordingly, the Amended Order has, *inter alia*, eviscerated Ralls's property rights to construct the windfarms, its power purchase agreements, its transmission interconnection agreements and ancillary agreements with PacifiCorp, its agreements for the managements and use of shared interconnection facilities with the owners of nearby windfarms, and its government permits necessary to operate the windfarms.

80.     The Amended Order also imminently threatens the loss of approximately $25 million in federal renewable energy investment tax incentives to Ralls and its subsidiaries.  Ralls may only obtain these incentives if the windfarms are completed and placed in service by December 31, 2012.  So long as the Amended Order remains in place, Ralls cannot place the windfarms in service by December 31, 2012.

81.     To the extent CFIUS may seek further action by the President regarding this transaction, that action would not prevent judicial review of the Amended Order.  Among other things, any such Presidential action would render CFIUS's action capable of repetition, yet

evading review, permitting judicial review of the Amended Order.

82.     The physical and regulatory takings of Ralls's property interests constitute unconstitutional takings in violation of the U.S. Constitution and deprive Ralls of its property interests absent due process, or at a minimum raise grave doubts about the constitutionality of the government action, though this constitutional question is avoided by a judicial determination that CFIUS violated the APA in issuing the Amended Order.

83.     Likewise, just as federal courts will construe statutes where possible to avoid serious doubt of their constitutionality, so too CFIUS has an obligation to exercise its powers in a way that does not raise serious constitutional concerns.  It is arbitrary and capricious for CFIUS to fail to consider adequate and available alternatives, including recourse to provisions of existing law, that would accommodate the government's security concerns without raising problems under the Constitution, and for CFIUS to give no explanation or provide any factual support for its decision to reject these alternatives in favor of a constitutionally problematic prohibition.

### COUNT III
### (Unconstitutional Deprivation of Property Without Due Process)

84.     Plaintiff realleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

85.     The Fifth Amendment to the United States Constitution states that "[n]o person shall be … deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.

86.     Ralls has numerous valid property interests and property rights tied up in the windfarm projects that are subject to the Amended Order, including land rights to construct the windfarms, power purchase agreements, transmission interconnection agreements and ancillary

agreements with PacifiCorp, agreements for the managements and use of shared interconnection facilities with the owners of nearby windfarms, government permits necessary to operate the windfarms, and some $25 million in federal revenue from renewable energy investment tax credits.

87.     CFIUS's issuance of the Amended Order, and the intrusiveness and severity of the Amended Order, effect numerous deprivations of Ralls's property.  Ralls is prohibited from undertaking any further construction or operations on its property, it must remove all of its belongings from the property, it may not use the property for storage, it is prohibited from accessing the property, it is prohibited from selling or transferring the primary goods to be used in erecting the windfarms, and it is not permitted to sell or transfer the other assets of the Project Companies to any third party until all items are removed, the companies notify CFIUS, and CFIUS does not object.

88.     The Amended Order effectively extinguishes Ralls's property rights.  Ralls cannot use its property for the purpose for which it was acquired; in fact, it cannot use its property for any purpose whatsoever, nor may it benefit from the various rights it has acquired or from the renewable energy investment tax credits.

89.     The economic impact of the Amended Order on Ralls is severe.  The Amended Order has eliminated all or nearly all of Ralls's value in the Project Companies.

90.     Ralls had significant reasonable investment-backed expectations with respect to the Project Companies.  Ralls reasonably relied on the regulatory scheme in place at the time of its investment decisions because in 2010 and 2011, before Ralls acquired the property in question, the FAA issued "Determinations of No Hazard," which approvals included review by the Department of Defense.  For the same reason, Ralls had no reasonable basis for foreseeing

that CFIUS would prohibit the transaction, particularly after the Navy facilitated further approvals for placement of Ralls's windfarms.

91.     The character of CFIUS's action does not justify its conduct.  CFIUS had a number of less invasive measures it could have implemented to mitigate whatever national security risks it thought to exist (which the Amended Order does not articulate), not least that the Navy could have purchased Ralls's interest in the land rights owned by the Project Companies under 10 U.S.C. § 2663(d).

92.     Prior to issuance of the Order and Amended Order, CFIUS did not disclose to Ralls any of the evidence it had obtained during its review, nor did it offer Ralls any opportunity to respond to that evidence.  At no point did Ralls have any occasion to view or rebut any record or portion thereof that CFIUS compiled in reaching its determination, nor was it given meaningful notice or hearing prior to CFIUS's determination.

93.     The Order and Amended Order themselves do not identify any of the evidence upon which CFIUS relied in reaching its determination, nor do they provide any explanation for CFIUS's determination.

94.     As a result, CFIUS's issuance of the Order and Amended Order deprived Ralls of its property absent due process of law, in violation of the Fifth Amendment to the U.S. Constitution.

95.     CFIUS's rote invocation of "national security risks" does not alleviate the absence of due process.  Well-established law provides that even where national security concerns are at play, a party subject to administrative action is still entitled to due process.  *See, e.g.*, *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 613 F.3d 220 (D.C. Cir. 2010); *Nat's Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192 (D.C. Cir. 2001).

96. To the extent CFIUS may seek further action by the President regarding this transaction, that action would not prevent judicial review of the Amended Order. Among other things, any such Presidential action would render CFIUS's action capable of repetition, yet evading review, permitting judicial review of the Amended Order.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully prays for the following relief:

1. an order and judgment declaring that CFIUS violated the APA in issuing the Amended Order, and enjoining enforcement of the Amended Order;

2. an order and judgment declaring that CFIUS lacks the authority to issue an order prohibiting the Terna-Ralls transaction or regulating future transactions not resulting in foreign control of a person, and enjoining CFIUS from attempting to do so;

3. an order and judgment declaring arbitrary and capricious CFIUS's determinations that the Terna-Ralls transaction is a "covered transaction," that it presents "national security risks to the United States," that the Terna-Ralls transaction should be subject to numerous draconian obligations set forth in the Amended Order, and that no less burdensome measure should be considered or imposed; and enjoining enforcement of the Amended Order;

4. an order and judgment declaring that the Amended Order deprives Ralls of its property without due process, and enjoining enforcement of the Amended Order;

5. an order and judgment enjoining CFIUS from taking any action that would frustrate or eliminate the jurisdiction of this Court;

6. costs and attorneys' fees pursuant to any applicable statute or authority; and

7. any other relief that this Court deems just and appropriate.

Respectfully submitted,

  /s/  Paul D. Clement
Paul D. Clement (D.C. Bar No. 433215)
Viet D. Dinh (D.C. Bar No. 456608)
H. Christopher Bartolomucci (D.C. Bar No. 453423)
George W. Hicks, Jr. (D.C. Bar No. 499223)
Brian J. Field (D.C. Bar No. 985577)
BANCROFT PLLC
1919 M Street, N.W., Suite 470
Washington, D.C. 20036
(202) 234-0090

Steven S. Honigman (D.C. Bar No. 201020)
500 East 77th Street
New York, New York 10162
(202) 549-4917

*Counsel for Plaintiff Ralls Corporation*

Dated:  September 12, 2012