**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| RALLS CORPORATION, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| v. | ) | |
| | ) | |
| COMMITTEE ON FOREIGN | ) | |
| INVESTMENT IN THE UNITED STATES, | ) | |
| | ) | Case No. 1:12-cv-01513-ABJ |
| and | ) | |
| | ) | |
| TIMOTHY F. GEITHNER, | ) | |
| in his official capacity as | ) | |
| Secretary of the Treasury and | ) | |
| Chairperson of the Committee on | ) | |
| Foreign Investment in the United States, | ) | |
| | ) | |
| *Defendants*. | ) | |

_____)

**MEMORANDUM IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 3

    A.    THE COMMITTEE ON FOREIGN INVESTMENT IN THE
UNITED STATES ............................................................................... 3

    B.    THE BUTTER CREEK PROJECTS AND THE TERNA-RALLS
TRANSACTION ................................................................................. 6

    C.    CFIUS'S PROHIBITION OF THE TERNA-RALLS TRANSACTION............. 10

ARGUMENT ............................................................................................................ 14

I.    RALLS IS LIKELY TO SUCCEED ON THE MERITS. .................................. 15

    A.    CFIUS Has Violated the Administrative Procedure Act. ..................... 15

        1.    CFIUS Exceeded Its Authority Because It Can Only Impose
Measures to Mitigate National Security Risks, Not Prohibit a
Transaction or Regulate Foreign Trade. ..................................... 17

        2.    CFIUS's Determination Was Arbitrary and Capricious. .......... 21

            a.    CFIUS Provided No Evidence or Explanation Why the
Terna-Ralls Transaction Is a "Covered Transaction" or
Raises "National Security Risks."................................. 21

            b.    CFIUS Gave No Explanation for Imposing Draconian
Restrictions on the Transaction Instead of Less
Burdensome Alternatives That Mitigate National
Security Risks. ............................................................ 24

            c.    CFIUS Restricted the Transaction After the Federal
Government Previously Assented to It. ......................... 27

            d.    CFIUS Imposed Restrictions and Remedies Wholly
Unrelated to Its Power to Review Covered Transactions
and Mitigate National Security Risks. ......................... 29

    B.    CFIUS Has Unconstitutionally Deprived Ralls of Its Property Absent
Due Process.......................................................................................... 30

        1.    Ralls Has Been Deprived of Numerous Property Interests by
the Amended Order.................................................................... 31

2.     The Near-Total Absence of Process Leading Up to the Order Is
Not Even Close to What Is "Due" Here.................................................... 33

II.    RALLS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF
TEMPORARY INJUNCTIVE RELIEF. ......................................................................... 38

III.   THE BALANCE OF THE EQUITIES FAVORS RALLS................................................ 43

IV.    TEMPORARY INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST. .................... 44

CONCLUSION.................................................................................................................................... 45

# TABLE OF AUTHORITIES

## Cases

*3883 Conn. LLC v. District of Columbia*, 336 F.3d 1068 (D.C. Cir. 2003) ................................. 32

*Alexander v. Alexandria*, 9 U.S. (5 Cranch) 1 (1809).................................................. 19

*Allergan, Inc. v. Shalala*, No. 94-1223, 1994 U.S. Dist. LEXIS 21716
 (D.D.C. Nov. 10, 1994)............................................................................ 41

*Allied Local & Reg'l Mfrs. Caucus v. U.S. EPA*, 215 F.3d 61 (D.C. Cir. 2000) ......................... 24

*American Mfrs. Mutual Ins. Co. v. Sullivan*, 526 U.S. 40 (1999)................................... 30

*American Airlines, Inc. v. TSA*, 665 F.3d 170 (D.C. Cir. 2011) ...................................... 17

*American Methyl Corp. v. EPA*, 749 F.2d 826 (D.C. Cir. 1984) ................................... 18

*Arkema Inc. v. EPA*, 618 F.3d 1 (D.C. Cir. 2010) ...................................................... 28

*Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972) ..................................... 31

*Bennett v. Spear*, 520 U.S. 154 (1997) .................................................................. 16

*Berge v. United States*, ___ F. Supp. 2d ___, 2012 WL 3039736
 (D.D.C. July 26, 2012)............................................................................ 30

*Botany Worsted Mills v. United States*, 278 U.S. 282 (1929)........................................ 18

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281 (1974) ...................... 23

*Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20 (D.D.C. 1997) .................................. 40, 44

*Citizens for Responsibility and Ethics in Wash. v. Cheney*, 577 F. Supp. 2d 328
 (D.D.C. 2008) ...................................................................................... 43

*City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153 (D.C. Cir. 1987) ............................. 26

*CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995)...................... 38

*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986) .......................... 26

*County of L.A. v. Shalala*, 192 F.3d 1005 (D.C. Cir. 1999).......................................... 23

*Cresote Council v. Johnson*, 555 F. Supp. 2d 36 (D.D.C. 2008).................................... 44

*DIRECTV, Inc. v. FCC*, 110 F.3d 816 (D.C. Cir. 1997)............................................. 22

*E. Tenn. Natural Gas Co. v. Sage*, 361 F.3d 808 (4th Cir. 2004) .................................................. 41

*Elrod v. Burns,* 427 U.S. 347 (1976) ........................................................................................ 42

*EME Homer City Generation, L.P. v. EPA*, ___ F.3d ___, 2012 WL 3570721
    (D.C. Cir. Aug. 21, 2012) ......................................................................................... 28

*Ethyl Corp. v. EPA*, 51 F.3d 1053 (D.C. Cir. 1995) ................................................................. 18

*Express One Int'l, Inc. v. USPS*, 814 F. Supp. 87 (D.D.C. 1992) ........................................... 38

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .............................................. 27, 28

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ........................................ 17

*FEC v. Rose*, 806 F.2d 1081 (D.C. Cir. 1986) .................................................................. 22, 23

*Feinerman v. Bernardi*, 558 F. Supp. 2d 36 (D.D.C. 2008) .................................................... 15

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*,
    549 F.3d 1079 (7th Cir. 2008) .................................................................................. 42

*Gordon v. Holder*, 826 F. Supp. 2d 279 (D.D.C. 2011) ..................................................... 42, 44

*Greater Boston Television Corp. v. FCC*, 444 F.2d 841 (D.C. Cir. 1970) ............................... 23

*Green Bay & Miss. Canal Co. v. Patten Paper Co.*, 172 U.S. 58 (1898) .................................. 31

*Hall v. Johnson*, 599 F. Supp. 2d 1 (D.D.C. 2009) ................................................................. 14

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ......................................................................... 23, 24

*Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1 (D.D.C. 2008) ........................................ 42

*Hodel v. Va. Surface Mining & Reclamantion Ass'n*, 452 U.S. 264 (1981) ...................... 34, 38

*Housing Study Group v. Kemp*, 736 F. Supp. 321 (D.D.C. 1990) ........................................... 38

*In re People's Mojahedin Org. of Iran*, 680 F. 3d 832 (D.C. Cir. 2012) .................................. 37

*Judicial Watch, Inc. v. Dep't of Homeland Sec.*, 514 F. Supp. 2d 7 (D.D.C. 2007) .......... 42, 43

*LG Elecs. U.S.A., Inc. v. U.S. Dep't of Energy*, 679 F. Supp. 2d 18 (D.D.C. 2010) .................. 39

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ........................................................... 34

*Lynch v. United States*, 292 U.S. 571 (1934) ......................................................................... 32

*Lyng v. Payne*, 476 U.S. 926 (1986) ...................................................................................... 17

*Mathews v. Eldridge*, 424 U.S. 319 (1976)............................................................. 33, 35

*Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1 (1978) ................................... 35

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009).................................... 42

*Minard Run Oil Co. v. U.S. Forest Service*, 670 F.3d 236 (3d Cir. 2011) ................................... 40

*Mingo Logan Coal Co. v. U.S. EPA*, 850 F. Supp. 2d 133 (D.D.C. 2012)...................... 17, 21, 29

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ............................................................. 22, 29

*Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998) ................................... 42

*N. Mariana Islands v. United States*, 686 F. Supp. 2d 7 (D.D.C. 2009)................................ 15, 44

*Nalco Co. v. EPA*, 786 F. Supp. 2d 177 (D.D.C. 2011)................................................... 14

*Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Reserve Sys.*, 773 F. Supp. 2d 151 (D.D.C. 2011) ............................................................. 22

*Nat'l Ass'n of Mortg. Brokers, Inc. v. Donovan*, 641 F. Supp. 2d 8 (D.D.C. 2009).................... 26

*Nat'l Council of Resistance of Iran v. Sec'y of State*, 251 F.3d 192 (D.C. Cir. 2001) ..... 36, 37, 38

*Newland v. Sebelius*, ___ F. Supp. 2d ___, 2012 WL 3069154 (D. Colo. July 27, 2012)............................................................. 44

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578 (3d Cir. 2002) ............................................................. 41

*NOW v. Operation Rescue*, 747 F. Supp. 760 (D.D.C. 1990)........................................ 44

*NRDC v. EPA*, 571 F.3d 1245 (D.C. Cir. 2009) ............................................................. 17

*Pamel Corp. v. P.R. Highway Auth.*, 621 F.2d 33 (1st Cir. 1980)................................ 33

*Patriot, Inc. v. HUD*, 963 F. Supp. 1 (D.D.C. 1997) ..................................................... 44

*Pelfresne v. Vill. of Williams Bay*, 865 F.2d 877 (7th Cir. 1989) ................................ 40

*People's Mojahedin Org. of Iran v. Dep't of State*, 182 F.3d 17 (D.C. Cir. 1999) ..................... 23

*People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 613 F.3d 220 (D.C. Cir. 2010) ............................................................. 37

*Propert v. District of Columbia*, 948 F.2d 1330 (D.C. 1991)................................ 30, 35

*Pub. Citizen, Inc. v. FAA*, 988 F.2d 186 (D.C. Cir. 1993) ....................................................... 22, 23

*Pub. Citizen v. Steed*, 733 F.2d 93 (D.C. Cir. 1984) ....................................................................... 24

*R.J. Reynolds Tobacco Co. v. U.S. Food and Drug Admin.*, 823 F. Supp. 2d 36
   (D.D.C. 2011) .......................................................................................................................... 44

*Reed v. Vill. of Shorewood*, 704 F.2d 943 (7th Cir. 1983) .............................................................. 33

*RoDa Drilling Co. v. Siegal*, 552 F.3d 1203 (10th Cir. 2009) ........................................................ 40

*RSWW, Inc. v. City of Keego Harbor*, 397 F.3d 427 (6th Cir. 2005) ............................................ 33

*Rural Cellular Ass'n v. FCC*, 685 F.3d 1083 (D.C. Cir. 2012) ...................................................... 29

*Ry. Labor Execs.' Ass'n v. NMB*, 29 F.3d 655 (D.C. Cir. 1994) (en banc) .................................. 19

*Sampson v. Murray*, 415 U.S. 61 (1974) ........................................................................................ 38

*Sauer v. City of N.Y.,* 206 U.S. 536 (1907) .................................................................................... 31

*Simms v. District of Columbia*, ___ F. Supp. 2d ___, No. 12-701 2012 WL 2619125
   (D.D.C. July 6, 2012) ...................................................................................................... 15, 42, 44

*Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735 (1996) ...................................................... 28

*Spadone v. McHugh*, ___ F. Supp. 2d ___, 2012 WL 2017973 (D.D.C. June 6, 2012) .............. 22

*Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144 (10th Cir. 2001) ..................... 33

*Thorpe v. Hous. Auth. of City of Durham*, 393 U.S. 268 (1969) .................................................. 32

*Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598 (D.C. Cir.
   1992) ....................................................................................................................................... 17

*Treigle v. Acme Homestead Ass'n*, 297 U.S. 189 (1936) ................................................................ 32

*Tri Cnty. Indus., Inc. v. District of Columbia*, 104 F.3d 455 (D.C. Cir. 1997) ...................... 32, 34

*U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997 (D.C. Cir. 2002) ......................................................... 16

*United States v. Craft*, 535 U.S. 274 (2002) .................................................................................. 32

*Va. Historic Tax Credit Fund 2001 LP v. C.I.R.*, 639 F.3d 129 (4th Cir. 2011) .......................... 32

*Vill. of Terrace Park v. Errett*, 12 F.2d 240 (6th Cir. 1926) ........................................................ 33

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C. Cir.
   1977) ....................................................................................................................................... 40

*Wash. Teachers' Union, Local No. 6 v. American Federation of Teachers*, 751 F. Supp. 2d 38 (D.D.C. 2010) ........................................................................................ 43

*Westborough Mall, Inc. v. City of Cape Girardeau, Mo.*, 794 F.2d 330 (8th Cir. 1986) ............. 33

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ....................................................... 14

*Wis. Gas Co. v. F.E.R.C.*, 758 F.2d 669 (D.C. Cir. 1985) ................................................. 38, 42, 43

*World Duty Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61 (D.D.C. 2000) ......................... 40

*Zinermon v. Burch*, 494 U.S. 113 (1990) ...................................................................................... 34

**Constitutional Provisions**

U.S. Const. amend. V ...................................................................................................................... 30

**Statutes**

5 U.S.C. § 702 ................................................................................................................................ 16

5 U.S.C. § 704 ................................................................................................................................ 16

5 U.S.C. § 706(2) ................................................................................................................. 16, 17, 21

8 U.S.C. § 1189(c)(3)(D) ............................................................................................................... 23

26 U.S.C. § 45 .................................................................................................................................. 8

50 U.S.C. app. § 2170(a)(3) ...................................................................................................... 4, 20

50 U.S.C. app. § 2170(b)(1)(A)(i) .................................................................................................. 4

50 U.S.C. app. § 2170(b)(1)(A)(ii) ................................................................................................. 4

50 U.S.C. app. § 2170(b)(1)(E) ....................................................................................................... 4

50 U.S.C. app. § 2170(b)(2)(A) .............................................................................................. 4, 5, 19

50 U.S.C. App. § 2170(b)(2)(B)(i)(I) ............................................................................................ 19

50 U.S.C. app. § 2170(b)(2)(C) ....................................................................................................... 5

50 U.S.C. app. § 2170(d)(1) ...................................................................................................... 5, 18

50 U.S.C. app. § 2170(d)(2) ............................................................................................................ 5

50 U.S.C. app. § 2170(f) .................................................................................................... 4, 22, 37

50 U.S.C. app. § 2170(k) ................................................................................................................. 3

50 U.S.C. app. § 2170(*l*)(1)(A) .......................................................................................... 5

 **Regulations**

31 C.F.R. § 800.402 .................................................................................................... 4, 10

31 C.F.R. § 800.503 .................................................................................................... 5, 20

31 C.F.R. § 800.506 .................................................................................................... 5, 20

**Other Authorities**

Executive Order 11858 (May 7, 1975), as amended by Executive Order 13456
    (Jan. 23, 2008).......................................................................................... *passim*

Mission Statement of the DOD Siting Clearinghouse, Office of the Deputy Under
    Secretary of Defense, Installations and Environment,
    *available at* http://http://www.acq.osd.mil/ie/siting.shtml ................................................ 7

## INTRODUCTION

This is a civil action challenging the issuance of an order by the Committee on Foreign Investment in the United States ("CFIUS") as violating the Administrative Procedure Act ("APA") and the United States Constitution and causing immediate and irreparable harm to plaintiff Ralls Corporation ("Ralls") that demands preliminary injunctive relief.  CFIUS is an interagency committee established under Section 721 of the Defense Production Act of 1950, as amended, 50 U.S.C. app. § 2170 ("Section 721").  Its purpose is to review transactions that could result in the control of a U.S. business by a foreign person in order to determine the effect of such transactions on the national security of the United States.

CFIUS's powers under Section 721 and related executive orders and regulations are limited.  It may only review certain "covered transactions" that could result in foreign control of a person engaged in interstate commerce in the United States.  It may not bar a covered transaction from taking place.  And, like all agencies, it may not arbitrarily or capriciously render determinations absent any evidence or explanation or by unexpectedly and inexplicably abandoning a prior policy or practice, and it may not engage in the unconstitutional deprivation of property absent due process.

CFIUS violated the foregoing principles and well-established law when it issued an order on August 2, 2012, subjecting Ralls to draconian obligations in connection with Ralls's acquisition of four small Oregon companies whose assets consisted solely of windfarm development rights, including land rights to construct the windfarms, power purchase agreements, and necessary government permits.  Without identifying any evidence or providing any explanation, CFIUS concluded that the acquisition was a "covered transaction" subject to its authority and that "there are national security risks to the United States that arise as a result of" the acquisition.  Moreover, rather than propose measures that would have mitigated the

purported national security risks, CFIUS—again without any evidence or explanation—instead required Ralls immediately to cease all construction and operations and remove all items from the relevant properties; prohibited Ralls from having any access to the properties; barred Ralls from selling wind turbines made by its affiliate, Sany Electric, for use on the properties; and forbade Ralls from selling the properties until all items had been removed, CFIUS was notified of the buyer, and CFIUS did not object to the buyer.  CFIUS made these obligations enforceable via injunctive relief, civil penalties, and criminal penalties.  At no time was Ralls ever provided any opportunity to view, review, respond to, or rebut the evidence upon which CFIUS purportedly relied in rendering its determinations and issuing its order—evidence that CFIUS still has never identified.

CFIUS has exceeded its statutory authority and engaged in arbitrary and capricious conduct in violation of the Administrative Procedure Act.  Furthermore, CFIUS has deprived Ralls of its property absent due process in violation of the Fifth Amendment to the United States Constitution.  As a result, Ralls has suffered, and is continuing to suffer, immediate and irreparable harm.  CFIUS's order necessarily prevents the wind turbines on the property from being placed in service by December 31, 2012, thereby causing Ralls to lose out on some $25 million in federal renewable energy tax credits—seriously threatening the project's commercial viability and undermining its sale to a third party.  Only if construction can resume by September 20, 2012, can this deadline be met—thereby necessitating immediate injunctive relief enjoining enforcement of CFIUS's order.  Furthermore, the order has rendered Ralls completely unable to access real property that it has the right to enter, except to engage in conduct that destroys the very reason it obtained access to the property in the first place.  The order also works ongoing and irreparable reputational harm to Ralls's projects and Sany's turbines, inflicting lasting

competitive harm at the same time Ralls and Sany seek to establish a market presence in the United States wind industry.

Because CFIUS's unlawful and unauthorized conduct is working, and will continue to work, immediate and irreparable harm to Ralls absent temporary injunctive relief by this Court, Ralls respectfully requests that this Court enter a temporary restraining order enjoining enforcement of CFIUS's order and restraining CFIUS from taking any action that would frustrate or eliminate the jurisdiction of this Court, schedule a hearing on Ralls's request for a preliminary injunction at the earliest available date, and, after such hearing, enter a preliminary injunction enjoining further enforcement of the order during the pendency of this litigation.

## BACKGROUND

### A.    THE COMMITTEE ON FOREIGN INVESTMENT IN THE UNITED STATES

CFIUS is an interagency committee that reviews transactions that could result in the control of a U.S. business by a foreign person in order to determine the effect of such transactions on the national security of the United States.  Its authority derives from Section 721, *see* 50 U.S.C. app. § 2170(k), and Executive Order 11858 (May 7, 1975), as amended by Executive Order 13456 (Jan. 23, 2008), as well as implementing regulations, *see* 31 C.F.R. Part 800.  The Secretary of the Treasury serves as Chairperson of CFIUS and is also a member.  The other members of CFIUS are the heads of the following eight departments and offices: Department of Justice, Department of Homeland Security, Department of Commerce, Department of Defense, Department of State, Department of Energy, Office of the U.S. Trade Representative, and Office of Science and Technology Policy.  The Director of National Intelligence and the Secretary of Labor are non-voting members of CFIUS.  Additionally, the following five offices observe and sometimes participate in CFIUS's activities:   Office of

Management and Budget, Council of Economic Advisors, National Security Council, National Economic Council, and Homeland Security Council.

Section 721 authorizes CFIUS to "review" and "investigat[e]" a "covered transaction" to determine its effects on national security.  50 U.S.C. app. § 2170(b) (1)(A)(i), (2)(A).  It defines "covered transaction" as "any merger, acquisition, or takeover … by or with any foreign person which could result in foreign control of any person engaged in interstate commerce in the United States."  *Id*. § 2170(a)(3).

The CFIUS process begins when parties to a proposed or pending covered transaction jointly file a voluntary notice with CFIUS or when CFIUS decides to review a covered transaction *sua sponte*.  If the parties file a voluntary notice, the voluntary notice must include the information required by 31 C.F.R. § 800.402, including "a summary setting forth the essentials of the transaction" and information about the parties involved.  The notice must also include detailed information about foreign persons and foreign governments involved in the transaction.  Upon receiving the voluntary notice, CFIUS "shall review the covered transaction to determine the effects of the transaction on the national security of the United States."  50 U.S.C. app. § 2170(b)(1)(A)(i).  In so doing, CFIUS "shall consider" eleven factors specified in subsection (f) of Section 721.  *Id.* § 2170(b)(1)(A)(ii), (f).

CFIUS's review "shall be completed before the end of the 30-day period beginning on the date of the acceptance of" the voluntary notice.  *Id.* § 2170(b)(1)(E).  CFIUS may request additional information from the parties during the 30-day review period, and the parties must provide the requested information within three business days.

In addition to reviewing covered transactions, CFIUS "shall," under certain circumstances, also "conduct an investigation of the effects of a covered transaction on the

national security of the United States." *Id.* § 2170(b)(2)(A). The circumstances triggering an investigation are defined in Section 721 and 31 C.F.R. § 800.503. Any such investigation must be completed within 45 days of its commencement. 50 U.S.C. app. § 2170(b)(2)(C). CFIUS may "negotiate, enter into or impose, and enforce any agreement or condition with any party to the covered transaction in order to mitigate any threat to the national security of the United States that arises as a result of the covered transaction." *Id.* § 2170(*l*)(1)(A).

Section 721 also provides that the President "may take such action for such time as the President considers appropriate to suspend or prohibit any covered transaction that threatens to impair the national security of the United States." *Id.* § 2170(d)(1). The President "shall announce the decision on whether or not to take action … not later than 15 days after the date on which an investigation … is completed." *Id.* § 2170(d)(2). The President may take such action only if, among other things, he finds that existing provisions of law, other than Section 721 and the International Emergency Economic Powers Act, do not, in his judgment, provide adequate and appropriate authority for the President to protect the national security. Executive Order 11858 (as amended by Executive Order 13456) also provides that CFIUS "shall send a report to the President requesting the President's decision with respect to a review or investigation of a transaction" in the following three circumstances:  (i) CFIUS "recommends that the President suspend or prohibit the transaction"; (ii) CFIUS "is unable to reach a decision on whether to recommend that the President suspend or prohibit the transaction"; and (iii) CFIUS "requests that the President make a determination with regard to the transaction."   31 C.F.R. § 800.506 provides that "upon completion or termination of any investigation," CFIUS "shall send a report to the President requesting the President's decision" under the same three circumstances as Executive Order 11858.

**B.    THE BUTTER CREEK PROJECTS AND THE TERNA-RALLS TRANSACTION**

The "Butter Creek Projects" consist of four Oregon windfarm projects:  Pine City Windfarm, LLC; Mule Hollow Windfarm, LLC; High Plateau Windfarm, LLC; and Lower Ridge Windfarm, LLC (collectively, the "Project Companies").  *See* Ex. A (Declaration of Robert Guertin) ("Guertin Decl.") ¶ 4; Ex. B (Declaration of Kevin Ke Zhu) ("Zhu Decl.") ¶ 5-6. These Project Companies were originally created by Oregon Windfarms, LLC, an Oregon limited liability company owned entirely by United States citizens.  Guertin Decl. ¶¶ 3-4.  The Project Companies' assets consisted solely of the land rights to construct the windfarms, power purchase agreements, transmission interconnection agreements and ancillary agreements with other companies, agreements for the management and use of shared interconnection facilities with the owners of nearby windfarms, and the government permits necessary to construct a commercial windfarm.  *Id.* ¶ 5; Ex. C (Declaration of Jialiang Wu) ("Wu Decl.") ¶ 5; Zhu Decl. ¶ 7.  In December 2010, Oregon Windfarms sold its interests in the Project Companies to Terna Energy USA Holdings Corporation ("Terna"), a Delaware corporation formed to acquire and act as a holding company for wind energy projects in the United States.  Guertin Decl. ¶ 7; Zhu Decl. ¶¶ 4-6.

In 2010 and 2011, the Federal Aviation Administration ("FAA") issued "Determinations of No Hazard" for each of the twenty planned wind turbines in the Butter Creek Projects. Guertin Decl. ¶ 6.  Such determinations are tantamount to FAA approval, and the FAA's review process includes review by the Department of Defense, the purpose of which is to "prevent, minimize, or mitigate adverse impacts on military operations, readiness, and testing."  Mission Statement of the DOD Siting Clearinghouse, Office of the Deputy Under Secretary of Defense,

Installations and Environment, *available at* http://http://www.acq.osd.mil/ie/siting.shtml; Guertin Decl. ¶ 6.

In March 2012, Terna sold its membership interests in the Project Companies to Intelligent Wind Energy, LLC ("IWE"), a Delaware limited liability company then owned by U.S. Innovative Renewable Energy ("USIRE").  Zhu Decl. ¶¶ 2-4.  After IWE purchased the Project Companies from Terna, USIRE sold IWE to Ralls; IWE is now a wholly-owned subsidiary of Ralls, which is owned by two Chinese nationals.  *Id.* ¶¶ 2, 8.  At the time of Ralls's acquisition of the Project Companies, the Project Companies' assets still consisted solely of the land rights to construct the windfarms, power purchase agreements, transmission interconnection agreements and ancillary agreements with other companies, agreements for the management and use of shared interconnection facilities with the owners of nearby windfarms, and the government permits necessary to construct a commercial windfarm.  Zhu Decl. ¶ 7.  At that time, there was no on-going business concern associated with the Project Companies; they were essentially "greenfield" development projects that simply represented the right to build an operating windfarm.  *Id.*

Ralls acquired the Project Companies in order to provide a U.S. market opportunity for Sany Electric wind turbines.  Wu Decl. ¶ 3.  Ralls and Sany are affiliated companies, wherein Ralls is the development arm of Sany wind turbines in the United States.  *Id.*  The Butter Creek Projects involve developing, and will ultimately result in, four separate 10 megawatt ("MW") windfarms in north central Oregon consisting of twenty 2.0 MW wind turbine generators (five turbines per windfarm).  *Id.* ¶ 4; Ex. D (Declaration of Gene Anderson) ("Anderson Decl.") ¶ 3. Upon completion, the windfarms will be tied into the PacifiCorp transmission grid in the western United States, though neither Ralls nor the Project Companies will control or have access to the

grid.  Wu Decl. ¶ 6; Anderson Decl. ¶ 3.  PacifiCorp itself owns thousands of MWs of wind energy generating facilities, and nearly 10,600 MW of total generating assets.  Wu Decl. ¶ 6. Once completed, the Butter Creek Projects' 40 MW of wind-generated power will comprise approximately 0.37% of PacifiCorp's total generating capacity, and approximately 2.3% of its wind energy generating capacity.  *Id.*

The Butter Creek Projects present Ralls and Sany with an opportunity for significant commercial investment.  Wu Decl. ¶ 7.  First, the projects provide an opportunity for Sany to demonstrate the reliability of its wind turbines and to bolster its ability to compete in the United States wind market.  *Id.*  Second, they allow Sany and Ralls to pursue the competitive rate structure reflected in the power purchase agreements with PacifiCorp.  *Id.*  These rates will provide an opportunity for a profit from the Butter Creek Projects, so long as operating expenses are kept in check and within prudent industry practice.  *Id.*

A large part of the value of the Butter Creek Projects to Ralls is the receipt of the federal renewable energy investment tax credit.  *Id.* ¶ 8; *see* 26 U.S.C. § 45.  This program allows Ralls to receive a cash payment equal to 30% of qualified expenditures on the windfarms, so long as the project is placed in service by December 31, 2012.  Wu Decl. ¶ 8.  Ralls estimates the value of this incentive to be $25 million.  *Id.* ¶ 9.  Ralls based its decision to acquire and develop the Butter Creek Projects, as well as the specific purchase price for acquiring the Project Companies, in part on its expectation that it would receive this federal incentive.  *Id.* ¶ 10.  The commercial viability of the Butter Creek Projects depends largely on receipt of this incentive.  *Id.*  Ralls's inability to receive the federal cash grant will significantly reduce not only the value of the Butter Creek Projects, but also its profitability.  *Id.*

Ralls is in the business of identifying and developing windfarm project opportunities, and it does not intend to be the long-term owner of the Butter Creek Projects. *Id.* ¶ 11. In acquiring the Project Companies and developing the Butter Creek Projects, Ralls's main purpose was to ensure utilization of Sany Electric wind turbines at the Butter Creek sites, advancing Sany Electric's United States market presence. *Id.* Since Ralls intends to sell the Butter Creek Projects, it will be able to receive a commercially acceptable price only if the projects can be placed in service by December 31, 2012, thereby qualifying for the federal energy incentive. *Id.* Additionally, Ralls intends to continue identifying and developing windfarm project opportunities in the United States for utilization of Sany Electric wind turbines. *Id.*

In deciding to purchase the Project Companies, Ralls relied in large part on the FAA's prior "Determinations of No Hazard," which added value by demonstrating an absence of federal governmental concerns regarding the placement of the wind turbines, including the absence of national security concerns. *Id.* ¶ 28. Shortly after Ralls acquired the Project Companies, the United States Navy expressed concerns with regard to the location of one of the four windfarm projects, the "Lower Ridge Windfarm." *Id.* ¶ 14. The Navy advocated moving the Lower Ridge Windfarm to "reduce airspace conflicts between the Lower Ridge wind turbines and low-level military aircraft training." *Id.*; Ex. E, at 1. Although the Navy indicated that it had no authority to require such a move, Ralls agreed, at significant expense and effort, to move the Lower Ridge Windfarm to a new location. Wu Decl. ¶ 14. Moving the Lower Ridge Windfarm to its new location required Ralls to obtain additional approvals from the Oregon Public Utility Commission. *Id.* ¶ 15. The Navy wrote to the Oregon Public Utility Commission on Ralls's behalf, emphasizing its concern that the placement of the wind turbines at either location "may have negative security implications" but recommending that the requested approvals issue. *Id.*

¶ 15; Ex. E, at 2.  In the same letter, the Navy added that it "appreciat[ed]" Ralls's "cooperation and consideration" in agreeing to move the Lower Ridge Windfarm, particularly given Ralls's "time constraints" in completing the windfarms.  Wu Decl. ¶ 15; Ex. E, at 3.  Given the Navy's assent, as well as the prior FAA determinations, Ralls believed it to be highly unlikely that CFIUS would raise national security concerns regarding the transaction.  Wu Decl. ¶ 16.

Ralls' general contractor for the Butter Creek Projects, Aubrey Silvey, began construction on the projects on April 23, 2012.  *Id.* ¶ 12; Anderson Decl. ¶ 4.  Silvey set an aggressive construction schedule, with a target date for commercial operation of the turbines by December 31, 2012, the date by which the projects must be placed in service in order to qualify for the federal incentive.  Wu Decl. ¶ 12; Anderson Decl. ¶ 4.  The "placed in service" standard requires that the projects are entirely constructed and connected to the electric grid.  Wu Decl. ¶ 13.

## C.    CFIUS'S PROHIBITION OF THE TERNA-RALLS TRANSACTION

On June 28, 2012, Ralls and Terna submitted a voluntary notice to CFIUS informing CFIUS of Ralls's recent acquisition of the Project Companies from Terna.  Wu Decl. ¶ 17; Ex. F. Ralls included all of the information required of it by 31 C.F.R. § 800.402(c), including facts set forth above.  Wu Decl. ¶ 17.  In the weeks that followed submission of the voluntary notice, CFIUS asked Ralls and Terna a number of follow-up questions, as to all of which Ralls and Terna timely provided responses.  *Id.*

On July 25, 2012, CFIUS issued an Order Establishing Interim Mitigation Measures regarding the Terna-Ralls transaction ("Order").  *See* Ex. G.  The Order stated that CFIUS had determined that the Terna-Ralls transaction was a "covered transaction" and that "there are national security risks to the United States that arise as a result of the Transaction."  *Id.* at 1.  The

Order stated that, as a result of the CFIUS determination, the "Companies," which the Order defined as Ralls and the Project Companies:

- "Shall immediately cease all Construction and Operations, and shall not undertake any further Construction and Operations, at the Properties" (defined as any of the sites on which the Project Companies proposed to conduct windfarms);

- "Shall remove all stockpiled or stored items from the Properties no later than July 30, 2012, and shall not deposit, stockpile, or store any new items at the Properties"; and

- "Shall immediately cease all access, and shall not have any access, to the Properties."

*Id.*; *see also* Wu Decl. ¶ 18. The Order added that "[n]otwithstanding the foregoing, U.S. citizens contracted by the Companies and approved by CFIUS may access the site until July 30, 2012, solely for the purposes of removing any items from the Properties in compliance with" the Order. Ex. G, at 1-2. As authority for its action, CFIUS cited "Section 721, and Executive Order 11858 of May 7, 1975, as amended by Executive Order 13456, 73 Fed. Reg. 4677 (Jan. 23, 2008)." *Id.* CFIUS cited no other authority for its action. The Order provided that it "is enforceable, through injunctive relief, criminal or civil penalty, or otherwise, pursuant to section 721, the Executive Order, the CFIUS regulations, 18 U.S.C. § 1001, or any other applicable law." *Id.* at 2.

Upon issuance of the Order, Ralls and its contractor suspended all construction activity at the Butter Creek Projects. Anderson Decl. ¶¶ 6-7. The next day, July 26, 2012, in a good-faith effort to address CFIUS's concerns, Ralls notified CFIUS that it was considering selling the Butter Creek Projects to a U.S. buyer. Wu Decl. ¶¶ 19, 30.

In response, on August 2, 2012, CFIUS issued an Amended Order Establishing Interim Mitigation Measures ("Amended Order"). *See* Ex. H. The Amended Order expanded the

definition of "Companies" to include the Project Companies, Ralls and its subsidiaries, and the Sany Group (including Sany Electric and Sany Heavy Industries).  *Id.* at 1.  The Amended Order also added more prohibitions to the previous Order, stating that in addition to the prior prohibitions, the Companies:

- "[S]hall not deposit, stockpile, or store any new items at the Properties, any lay down site identified by the Companies in any information or communication submitted to CFIUS, or at any location that is closer to the R-5701 Restricted Airspace than the lay down site that is farthest from the R-5701 Restricted Airspace";

- "Shall not sell or otherwise transfer or propose, or otherwise facilitate the sale or transfer to any third party for use or installation at the Properties of any items made or otherwise produced by the Sany Group"; and

- "Shall not complete a sale or transfer of the Project Companies or their assets to any third party until:

  o All items deposited, installed, or affixed (including concrete foundations) on the Properties subsequent to the acquisition by Ralls of the Project Companies have been removed from the Properties;

  o the Companies notify CFIUS of the intended recipient or buyer;

  o the Companies have not received an objection from CFIUS within 10 business days of notification."

*Id.* at 2; *see also* Wu Decl. ¶ 20; Anderson Decl. ¶ 8.  As with the previous Order, the Amended Order cited as authority for its directives "section 721, and Executive Order 11858 of May 7, 1975, as amended by Executive Order 13456, 73 Fed. Reg. 4677 (Jan. 23, 2008)."  Ex. H, at 1. As before, the Amended Order cited no other authority for its directives.  Also as with the

previous Order, the Amended Order provided that it "is enforceable, through injunctive relief, criminal or civil penalty, or otherwise, pursuant to section 721, the Executive Order, the CFIUS regulations, 18 U.S.C. § 1001, or any other applicable law." *Id.* at 3.

Since CFIUS's issuance of the Order and Amended Order, Ralls and Aubrey Silver have remained in full compliance with both orders at all times, and all construction activity at the Butter Creek sites has been entirely suspended since July 25, 2012. Anderson Decl. ¶ 9; Wu Decl. ¶ 21. Furthermore, Aubrey Silvey will not resume construction while the orders remain in place. Anderson Decl. ¶ 9; Wu Decl. ¶ 21. During this period of suspension, Aubrey Silvey has revised the construction schedule several times to determine whether, if construction were resumed, the projects could still be placed in service by December 31, 2012. Anderson Decl. ¶ 10. Aubrey Silvey has determined that because of the suspension in construction caused by the orders, the projects can only be placed in service by December 31, 2012 if construction resumes by September 20, 2012. *Id.* ¶ 11; Wu Decl. ¶ 22. Moreover, the use of Sany wind turbines is advantageous to completing the projects by December 31, 2012; if Ralls is unable to use Sany wind turbines, it will be more difficult or more expensive to place the projects in service by December 31, 2012. Anderson Decl. ¶ 12; Wu Decl. ¶ 23.

Had CFIUS not issued its Order and Amended Order, Aubrey Silvey would have proceeded with the construction project in accordance with the original schedule, using Sany wind turbines. Anderson Decl. ¶ 13; Wu Decl. ¶ 29. Aubrey Silvey and Ralls had every reasonable expectation that the original construction schedule would have provided for the Butter Creek Projects to be placed in service by December 31, 2012. Anderson Decl. ¶ 14; Wu Decl. ¶ 29. If construction on the Butter Creek Projects does not resume by September 20, 2012, that will necessarily prevent Ralls from placing the projects in service by December 31, 2012 and

from receiving the critical federal incentive, a result that would significantly reduce the commercial viability of the projects and reduce Ralls' Butter Creek assets to *de minimis*, salvage value. Wu Decl. ¶ 26. The orders have thus also prevented Ralls from selling the Butter Creek sites as a going concern, as was always Ralls's intention. *Id.* ¶ 27. In order to achieve a sale of these sites, construction must resume immediately, so that the projects can be placed in service by December 31, 2012 and qualify for the federal energy incentive to which Ralls is otherwise entitled. *Id.*

Furthermore, prohibiting the use of Sany wind turbines frustrates one of the primary purposes of Ralls' acquisition and development of the Butter Creek Projects: the demonstration of the reliability of Sany wind turbines in the U.S. wind industry, particularly its superior run time compared to competitor products, which are used on other nearby windfarms. *Id.* ¶ 24. In the meantime, moreover, the Order and Amended Order impugn the quality of the products and the integrity of Ralls and Sany, causing them continued harm in the U.S. market and making it difficult to find a buyer for the Butter Creek Projects. *Id.* ¶ 25. All of the foregoing consequences are directly and entirely attributable to CFIUS's actions in issuing the Order and Amended Order. *Id.* ¶¶ 24, 26-27.

## ARGUMENT

To obtain injunctive relief through either a temporary restraining order or preliminary injunction, the moving party must show: (1) a likelihood of success on the merits, (2) that it would likely suffer irreparable injury in the absence of an injunction, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 185 (D.D.C. 2011) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("The same standard applies to both temporary restraining orders and to preliminary injunctions."). This

Court routinely grants preliminary injunctive relief in the face of violations of the Administrative Procedure Act or deprivations of property absent due process. *See N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 11 (D.D.C. 2009) (violation of APA); *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 39 (D.D.C. 2008) (violation of APA); *Simms v. District of Columbia*, ___ F. Supp. 2d ___, No. 12-701 2012 WL 2619125, at *1 (D.D.C. July 6, 2012) (violation of due process). Ralls satisfies each of the requirements here.

## I.      RALLS IS LIKELY TO SUCCEED ON THE MERITS.

Ralls is likely to succeed on its merits that CFIUS's Amended Order is unlawful and unauthorized.  The Amended Order constitutes a judicially reviewable final agency action under the Administrative Procedures Act ("APA") that is unlawful because (1) CFIUS lacks the statutory authority to impose restrictions amounting to prohibiting the transaction outright or to restrict transactions not within its purview; and (2) CFIUS acted arbitrarily and capriciously in (a) providing no explanation for its underlying factual findings or legal conclusions, (b) failing to explain why it ignored readily available, adequate, and appropriate alternative measures, (c) prohibitively restricting Ralls's acquisition of the Butter Creek Projects after the federal government previously assented to the transaction, and (d) barring Ralls from future sales of Sany items to be used at the properties or sales of the properties absent CFIUS's consent, restrictions entirely unrelated to CFIUS's purported power to review covered transactions and mitigate supposed national security risks.  In addition, the Amended Order constitutes an unconstitutional deprivation of Ralls's property absent due process in violation of the United States Constitution.

### A.      CFIUS Has Violated the Administrative Procedure Act.

Ralls will likely prevail on its claim that CFIUS has violated the APA in issuing the Amended Order.  The APA provides that "[a] person suffering legal wrong because of agency

action, or adversely affected or aggrieved by agency action within the meaning of a relevant

statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA authorizes a court to:

> hold unlawful and set aside agency action, findings, and conclusions found to be—
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>     [or]
> (D) without observance of procedure required by law.

5 U.S.C. § 706(2).

The Amended Order qualifies as "final agency action" that is subject to appeal under the

APA. *See* 5 U.S.C. § 704. The Supreme Court has articulated a two-part test for determining

when agency action is "final." First, the action must "mark the consummation of the agency's

decisionmaking process—it must not be of a merely tentative or interlocutory nature." Second,

the action must be "one by which rights or obligations have been determined, or from which

legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal

quotation marks and citation omitted). Both requirements are satisfied here. The Amended

Order "mark[s] the consummation of [CFIUS's] decisionmaking process" because CFIUS has

conclusively resolved all of the critical questions relevant to the transaction. It has determined

that Ralls's acquisition of the project companies is a "covered transaction," that the transaction

raises national security risks, and that extraordinary restrictions are purportedly necessary to

prevent these national security risks. *See U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997 (D.C. Cir.

2002). Second, the Amended Order quite plainly determines Ralls's legal rights and obligations,

and legal consequences flow from the order. The Amended Order uses mandatory and

declarative language— Ralls "shall" cease construction, "shall" remove materials from the

project sites, "shall" cease all access to the project sites, "shall not" sell or transfer certain items,

and so on—that clearly establishes finality and leaves no room for "conjectur[e]" about CFIUS's

intent.  *NRDC v. EPA*, 571 F.3d 1245, 1252 n.2 (D.C. Cir. 2009); *American Airlines, Inc. v. TSA*, 665 F.3d 170, 174 (D.C. Cir. 2011).  Furthermore, the Amended Order expressly provides for its enforcement in federal court, and violating its terms could expose Ralls to significant penalties. *See* Ex. H, at 3.  Thus the Amended Order manifestly determines "rights or obligations" and has "legal consequences."

In issuing the Amended Order, CFIUS violated the APA in at least two ways:  it exceeded its statutory authority, and it acted in an arbitrary and capricious manner.

**1.     CFIUS Exceeded Its Authority Because It Can Only Impose Measures to Mitigate National Security Risks, Not Prohibit a Transaction or Regulate Foreign Trade.**

It is bedrock administrative law that an agency may not exceed the authority granted to it by Congress.  *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) ("Regardless of how serious the problem an administrative agency seeks to address, … it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." (internal quotation marks omitted)); *Lyng v. Payne*, 476 U.S. 926, 937 (1986) ("[A]n agency's power is no greater than that delegated to it by Congress."); *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992) ("It is central to the real meaning of the rule of law … that a federal agency does not have the power to act unless Congress, by statute, has empowered it to do so."); *Mingo Logan Coal Co. v. U.S. EPA*, 850 F. Supp. 2d 133, 134 (D.D.C. 2012) (Jackson, J.).  For that reason, the APA directs the federal courts to "hold unlawful and set aside agency action … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

CFIUS acted beyond its statutory authority because its Amended Order imposes restrictions tantamount to nullifying Ralls's acquisition of the Project Companies altogether. CFIUS has ordered Ralls to cease all construction and operations at the project sites, to remove

all equipment from the sites, and to cease all access to the sites (except to remove equipment), thus denying Ralls the benefit of its bargain.  The agency also has prohibited Ralls from selling its property without approval from CFIUS.  These requirements do not merely "mitigate" any national security risks associated with the transaction; they prohibit any use or sale of the property, thus effectively prohibiting or suspending the transaction.  But Section 721 does not grant CFIUS authority to prohibit Ralls from acquiring the Project Companies; only the President has that apparent power.  Nor does Section 721 grant the agency authority to prohibit future transfers of the property to domestic purchasers; indeed, even the President lacks *that* power.

It is plain from the text of the governing statute that CFIUS lacks authority to block transactions outright.  Section 721 expressly confers on the President, and the President alone, the power to "suspend or prohibit any covered transaction that threatens to impair the national security of the United States."  50 U.S.C. App. § 2170(d)(1).  This delegation of power carries a critical negative implication:  Because the power to block a transaction is vested in the President personally, the power is thereby denied to CFIUS.  *See Botany Worsted Mills v. United States*, 278 U.S. 282, 289 (1929) ("When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode."); *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1061 (D.C. Cir. 1995) (applying "the familiar maxim of statutory construction: *expressio unius est exclusion alterius*, meaning, 'mention of one thing implies exclusion of another thing.'" (quoting *American Methyl Corp. v. EPA*, 749 F.2d 826, 835-36 (D.C. Cir. 1984))).

Other statutory provisions indicate that Congress intended for CFIUS to have relatively modest powers compared to those of the President.  Section 721 authorizes CFIUS to "take any necessary actions" with respect to national security threats that "ha[ve] not been mitigated."  50

18

U.S.C. App. § 2170(b)(2)(A), (B)(i)(I).  The implication is that CFIUS must first seek to mitigate any national security concerns identified in its initial review before it takes any further action; there is a statutory preference for "mitigation" over other (unspecified) "actions."  Here again, the grant of power to take "any necessary actions" must be understood in reference to the President's statutory authority to "suspend or prohibit" transactions; the two clauses must be construed *in pari materia.  See, e.g.*, *Alexander v. Alexandria*, 9 U.S. (5 Cranch) 1, 7-8 (1809) ("It is to be observed that acts *in pari materia* are to be construed together as forming one act.  If, in a subsequent clause of the same act, provisions are introduced, which show the sense in which the legislature employed doubtful phrases previously used, that sense is to be adopted in construing those phrases.").  Because Congress has delegated the power to suspend or prohibit transactions to the President, such blocking must be understood as excluded from the class of "any necessary actions" otherwise available to CFIUS.  *Cf. Ry. Labor Execs.' Ass'n v. NMB*, 29 F.3d 655, 659 (D.C. Cir. 1994) (en banc) (rejecting as "incredible" an agency's attempt to have the court "*presume* a delegation of power from Congress absent an express *withholding* of such power").

The Executive Order implementing Section 721 reflects this understanding, too.  Under the executive order, as under the statute, only the President has the authority to block transactions, and CFIUS's role is limited to entering mitigation agreements.  Section 6(c)(i) of Executive Order 11858, as amended, authorizes members of CFIUS to "recommend that the President suspend or prohibit the transaction."  By contrast, CFIUS is directed to "enter[] into a mitigation agreement with the parties to a transaction" or "impos[e] conditions on such parties." *Id*. § 7(a).  Taken together, the clear implication of these two provisions is that the President— and *only* the President—has the power to nullify a transaction, while CFIUS is limited to risk

mitigation.  The same understanding is reflected in CFIUS regulations.  The regulations establish a mechanism by which CFIUS members may "*recommend* that the President suspend or prohibit the transaction," 31 C.F.R. § 800.506(b)(1) (emphasis added), thus contemplating that the President alone has the authority to block transactions and that CFIUS members do not.  Again, CFIUS's role under the regulations is limited to risk mitigation.  *Id*. § 800.503(a)(1).  And the agency may not use its limited mitigation powers to bootstrap itself into the more sweeping power to suspend or prohibit.

The Amended Order also exceeds CFIUS's powers by purporting to restrict domestic transactions that are plainly beyond CFIUS's statutory ken.  Section 1(d) of the Amended Order bars Ralls from "sell[ing] or otherwise transfer[ring] … *to any third party* for use or installation at" the windfarms "any *items* made or otherwise produced by the Sany Group."  Ex. H, at 2 (emphases added).  But Section 721 limits CFIUS's oversight to transactions "by or with any foreign person which could result in *foreign control* of *any person*."  50 U.S.C. app. § 2170(a)(3) (emphases added).  Because future transactions in which Ralls sells or transfers "items made or otherwise produced by the Sany Group" would not "result in foreign control of any person," CFIUS lacks the authority to impose restrictions on (much less outright bar) such transactions.  Similarly, Section 1(e) of the Amended Order bars Ralls from "complet[ing] a sale or transfer of the Project Companies or their assets *to any third party*" absent CFIUS approval.  Ex. B, at 2 (emphasis added).  But CFIUS lacks the authority to impose restrictions on Ralls regarding the future sale or transfer of the Project Companies or their assets "to any third party," even if it were an American party.  CFIUS's jurisdiction extends only to transactions "which could result in foreign control."

Sections 1(d) and 1(e) of the Amended Order thus seek to regulate transactions over which CFIUS has no colorable claim of authority.  Just as CFIUS may not leverage its authority to mitigate national security risks into an authority to prohibit transactions, it may not use its authority over foreign ownership to bootstrap itself into regulating future domestic transactions involving foreign trade.  Quite simply, "[t]his is a stunning power for an agency to arrogate to itself when there is absolutely no mention of it in the statute."  *Mingo Logan Coal*, 850 F. Supp. 2d at 139.  Because the obligations in sections 1(d) and 1(f) of the Amended Order manifestly exceed CFIUS's statutory authority, CFIUS has violated the APA.

### 2. CFIUS's Determination Was Arbitrary and Capricious.

The Amended Order further amounts to arbitrary and capricious agency action in violation of the APA.  5 U.S.C. § 706(2)(A).

### a. CFIUS Provided No Evidence or Explanation Why the Terna-Ralls Transaction Is a "Covered Transaction" or Raises "National Security Risks."

CFIUS has offered literally no evidence or explanation whatsoever for the key factual findings and legal conclusions that underlie its decision to impose prohibitive restrictions on the Ralls transaction.  The Amended Order simply recites, in a conclusory manner, that Ralls's acquisition of the project companies "constitutes a 'covered transaction' for purposes of section 721," with no explanation of why that is so.  Ex. H, at 1.  The order also recites that "there are national security risks to the United States that arise as a result of the Transaction," *id.*, but again offers no evidence or explanation at all for that determination.

CFIUS's failure to provide any evidence or explanation for these conclusions is a textbook violation of the APA's requirement of adequate and reasoned agency decisionmaking.  "The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result."  *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir.

1993).  "[A]gency action accompanied by an inadequate explanation constitutes arbitrary and capricious conduct."  *FEC v. Rose*, 806 F.2d 1081, 1088 (D.C. Cir. 1986).  Furthermore, as the Supreme Court emphasized in *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983), an agency transgresses the prohibition against arbitrary and capricious action when it "offer[s] an explanation for its decision that runs counter to the evidence before the agency."  *Id*. at 43.  The clear implication is that an agency must indeed justify its decisions with some sort of explanation and some sort of evidence.  To provide neither—as was the case here—*a fortiori* violates the APA.  *See, e.g.*, *Spadone v. McHugh*, ___ F. Supp. 2d ___, 2012 WL 2017973, at *4 (D.D.C. June 6, 2012) ("A decision is arbitrary or capricious under the APA if an agency failed to provide a reasoned explanation.").

The absence of any explanation or evidence accompanying the Amended Order is especially striking given that Section 721 sets forth a lengthy and detailed list of factors that CFIUS must consider when determining whether a transaction raises national security risks.  *See* 50 U.S.C. App. § 2170(f)(1)-(11).  This Court "must look to see 'whether the decision was based on a consideration of the relevant factors and whether there was clear error of judgment.'"  *Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Reserve Sys.*, 773 F. Supp. 2d 151, 169 (D.D.C. 2011) (quoting *DIRECTV, Inc. v. FCC*, 110 F.3d 816, 826 (D.C. Cir. 1997)).  But it cannot not do so when the Amended Order does not mention or even cite any of these factors.  The Amended Order provides no indication that CFIUS properly considered the factors Congress required it to consider and instead leaves open the possibility that CFIUS "relied on factors which Congress has not intended it to consider" or "entirely failed to consider an important aspect of the problem."  *State Farm*, 463 U.S. at 43.  Of course, by virtue of CFIUS's own

reticence, Ralls is powerless to make such a demonstration, and this Court is prevented from engaging in the very judicial review that the APA authorizes.

While it is true that "[c]ourts 'will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 286 (1974)), that is not the case here. CFIUS's path to its vague but consequential determination that "there are national security risks to the United States that arise" from Ralls's acquisition cannot "reasonably be discerned"; to the contrary, it is a mystery to everyone—Ralls, this Court, the public—except CFIUS. In issuing the bare-bones yet far-reaching Amended Order, CFIUS "has passed from the 'tolerably terse to the intolerably mute,'" in violation of the APA. *Rose*, 806 F.2d at 1088 n.14 (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)). Because CFIUS has "failed to provide a reasoned explanation" the court "must undo its action." *County of L.A. v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999).

The fact that this case involves national security does not absolve CFIUS of its obligation under the APA to offer at least some explanation and evidence for its decision to impose prohibitive restrictions on Ralls's acquisition of the Project Companies. In many other national security contexts, federal courts require the executive branch to provide at least some evidence— and sometimes a great deal of evidence—to justify its actions. For instance, to withstand judicial review under the Antiterrorism and Effective Death Penalty Act of 1996, the State Department must provide "substantial support" for its decision to list a group as an foreign terrorist organization. 8 U.S.C. § 1189(c)(3)(D).[1] Similarly, in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), the Supreme Court rejected the government's argument that "courts should review its

---

[1] The D.C. Circuit has recognized that AEDPA's judicial review provision is "APA-like." *People's Mojahedin Org. of Iran v. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999).

determination that a citizen is an enemy combatant under a very deferential 'some evidence' standard." *Id*. at 527.  To the contrary, "[a]ny process in which the Executive's factual assertions go wholly unchallenged or are simply presumed correct without any opportunity for the alleged combatant to demonstrate otherwise falls constitutionally short." *Id*. at 537.  Significantly, the government provided more explanation for its determination that Hamdi was an enemy combatant, *see id*. at 512-13 (discussing Mobbs Declaration), than it has provided for its decision to restrict Ralls's acquisition—which is to say, none at all.  There is no reason to believe that Congress meant to suspend or depart from these basic requirements of reasoned agency decisionmaking under Section 721.

> **b.   CFIUS Gave No Explanation for Imposing Draconian Restrictions on the Transaction Instead of Less Burdensome Alternatives That Mitigate National Security Risks.**

Similarly, CFIUS has offered no explanation for its decision to impose draconian restrictions that are tantamount to nullifying the Terna-Ralls transaction when equally effective but less burdensome alternatives are available.  As noted above, CFIUS has no statutory authority to impose restrictions equivalent to barring the Terna-Ralls transaction; but the APA also requires CFIUS at least to *explain* its decision to impose severe restrictions equivalent to barring the transaction rather than more modest alternatives that equally accomplish the goal of mitigating purported national security risks.  "To be regarded as rational, an agency must also consider significant alternatives to the course it ultimately chooses." *Allied Local & Reg'l Mfrs. Caucus v. U.S. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000); *see also Public Citizen v. Steed*, 733 F.2d 93, 100 (D.C. Cir. 1984) (finding that agency "failed to explain why alternatives [that] were available to the agency, could not correct many of the … problems that [it] had identified").

Correspondence between Ralls and CFIUS indicates, for example, that the federal government may be concerned that certain windfarms will be located in restricted military

airspace, thereby potentially interfering with United States Navy flight training operations. *See* Ex. E; Ex. I.  Indeed, the only portion of the Amended Order that provides any suggestion of the reasons for CFIUS's action seems to relate to such concerns; the Amended Order states that Ralls shall not store any new items at, among other places, "any location that is closer to the R-5701 Restricted Airspace than the lay down site that is farthest from the R-5701 Restricted Airspace."  Ex. H, at 2.  But if that is the case—and it is only a guess, since the Amended Order gives no real explanation for CFIUS's decision—it is possible to address that concern with risk mitigation measures that stop well short of practically prohibiting the transaction outright.  For instance, CFIUS could require Ralls to move the windfarms in question (as it has already done once, with which Ralls complied at its own expense).

Similarly, the Amended Order's *ultra vires* prohibition on the use of any Sany wind turbines at the Butter Creek Projects, even if the Project Companies are sold to a third party, suggests that the federal government may be concerned that the Sany-manufactured turbines installed at the projects could include hidden surveillance devices for intelligence operations against the Navy's nearby facilities.  Again, this is only speculation, given CFIUS's utter lack of any explanation; but if that is so, that fear can also be allayed with other risk mitigation measures.  CFIUS could require Ralls to submit the turbines to government counterintelligence experts for detailed physical inspection before installation at the project sites.  CFIUS also could require Ralls to submit to periodic, unannounced counter-intelligence sweeps to verify that the turbines are still clean after installation.

The foregoing minimally burdensome restrictions would seem to prevent the activities about which the government appears to be concerned.  Yet CFIUS has offered no indication that it considered these alternatives and found them inadequate, nor any explanation for why it

deemed them inadequate if it considered them.   Its failure to do so amounts to arbitrary and capricious action in violation of the APA.   *See Nat'l Ass'n of Mortg. Brokers, Inc. v. Donovan*, 641 F. Supp. 2d 8, 15 (D.D.C. 2009) (noting "well settled" rule that agency "has a duty to consider responsible alternatives" and "give a reasoned explanation for its rejection of such alternatives" (quoting *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987)) (internal quotation marks omitted)).   What is more, the fact that Ralls is left to guess at CFIUS's concerns and how they might be mitigated through more modest restrictions only underscores the complete absence of any reasoned explanation for the Amended Order's conclusions, in violation of the APA.

The notion that the APA requires CFIUS to adopt, or at a minimum to consider, less burdensome restrictions also draws support from the doctrine of constitutional avoidance.   As noted *infra*, the draconian restrictions imposed by the Amended Order constitute a deprivation of Ralls's property absent due process in violation of the Fifth Amendment.   In the same way that federal courts will construe statutes where possible "to avoid serious doubt of their constitutionality," *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 841 (1986) (internal quotation marks omitted), so too CFIUS has an obligation to exercise its powers in a way that does not raise serious constitutional concerns.   Translated into APA terms, it is arbitrary and capricious for CFIUS to fail to consider alternatives that would accommodate the government's purported security concerns without raising problems under the Due Process Clause, and for CFIUS to give no explanation for its decision to reject these alternatives in favor of constitutionally problematic restrictions.

###### c.     CFIUS Restricted the Transaction After the Federal Government Previously Assented to It.

CFIUS also acted arbitrarily and capriciously in violation of the APA when it decided prohibitively to restrict Ralls's acquisition of the Project Companies after the federal government previously assented to the transaction.  In May 2012, following Ralls's purchase, the Navy objected to the proposed location of the Lower Ridge windfarm, expressing concern that it would interfere with military flight operations.  Ralls then agreed to relocate the windfarm—at its own great expense—and the Navy relented.  Indeed, the Navy told the Oregon Public Utility Commission that it "very much appreciated [Ralls's] cooperation and consideration in revising project plans to reduce impacts to the Navy's flight training capabilities," especially given Ralls's "time constraints" in completing the windfarms.  Wu Decl. ¶ 15; Ex. E, at 3.  The Navy did not voice any other concerns about any other Butter Creek Projects.  Its sign-off, furthermore, followed the FAA's earlier "Determinations of No Hazard," which also included review by the Department of Defense to "prevent, minimize, or mitigate adverse impacts on military operations, readiness and testing."  *See* pp. 6-7, *supra*.  Yet in its Amended Order, CFIUS—which includes the Navy through the Secretary of Defense—subjected the transaction to extraordinary restrictions that practically nullify Ralls's acquisition of the Project Companies. The Amended Order offers absolutely no explanation for this sudden and extraordinary shift in course.

A fundamental requirement of reasoned decisionmaking under the APA is that an agency must offer an explanation for its decision to abandon a prior policy or practice.  In *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009), the Supreme Court rejected the proposition that an agency must provide "more substantial" reasons when changing a prior position as compared to adopting that position in the first instance.  *Id.* at 514.  But the Court emphasized that an agency

still must give *some* reason why it is changing course—and must acknowledge that it is in fact

doing so.  "[T]he requirement that an agency provide reasoned explanation for its action would

ordinarily demand that it display awareness that it *is* changing position."  *Id.* at 515; *Arkema Inc.*

*v. EPA*, 618 F.3d 1, 6 (D.C. Cir. 2010).  To the contrary, "[s]udden and unexplained change"

reflects arbitrary and capricious agency conduct.  *Smiley v. Citibank (South Dakota), N.A.*, 517

U.S. 735, 742 (1996).  That is precisely what occurred when CFIUS issued its order.  CFIUS

may or may not have a legitimate reason for blocking a transaction as to which the Navy

previously assented and expressed no other concerns, but one searches the Amended Order in

vain for such an explanation, or even for a sign that CFIUS is aware that it is now restricting a

transaction as to which a CFIUS member previously assented.  *See EME Homer City*

*Generation, L.P. v. EPA*, ___ F.3d ___, 2012 WL 3570721, at *34 (D.C. Cir. Aug. 21, 2012)

(agency may only "change course provided it acknowledges it is doing so, presents good reasons

for doing so, and its approach is permissible under the statute" (internal quotation marks

omitted)).

Moreover, the Court in *Fox* observed that there are some circumstances in which an

agency *is* required to "provide a more detailed justification than what would suffice for a new

policy created on a blank slate."  556 U.S. at 515.  Such circumstances include when an agency's

new position "rests upon factual findings that contradict those which underlay its prior policy; or

when its prior policy has engendered serious reliance interests that must be taken into account."

*Id.* at 515.  Both of those conditions are present here.  Presumably the Amended Order is based

on new factual findings that the Navy did not take into account, perhaps because they came to

light after the Navy completed its review (though the arbitrary and capricious absence of any

factual evidence or explanation complicates this presumption).  And Ralls relied on both the

FAA "Determinations of No Hazard" and the Navy's prior assent when it acquired the Project Companies and began construction on the windfarms, *see* Wu Decl. ¶¶ 16, 28, demonstrating "serious reliance interests."  *See Mingo Logan Coal*, 850 F. Supp. 2d at 143 (invalidating EPA action where plaintiff "rel[ied] upon a valid permit" issued by another agency that EPA action effectively invalidated).  CFIUS thus has a heightened responsibility under the APA to explain why, contrary to the federal government's prior non-opposition, it is now restricting the transaction.  Yet it failed to offer *any* explanation whatsoever, in violation of the APA.

> **d.**     **CFIUS Imposed Restrictions and Remedies Wholly Unrelated to Its Power to Review Covered Transactions and Mitigate National Security Risks.**

Finally, CFIUS acted arbitrarily and capriciously in prohibiting Ralls's future sales of Sany Group items that would be used at the properties (Section 1(d)) and in prohibiting Ralls's future sales of the Project Companies or their assets absent CFIUS approval (Section 1(e)).  *See* Ex. H, at 2.  As noted, these restrictions exceed CFIUS's statutory authority, *see* pp. 20-21, *supra*.  But they also bear no rational connection—and indeed are completely incongruent and disproportional—to any purported national security risks, further rendering their imposition arbitrary and capricious under the APA.

Agency action is arbitrary and capricious if the agency does "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Rural Cellular Ass'n v. FCC*, 685 F.3d 1083, 1094 (D.C. Cir. 2012) (quoting *State Farm*, 463 U.S. at 43) (internal quotation marks omitted).  As Ralls has explained, CFIUS has failed to articulate *any* "satisfactory explanation for its action."  But even if it had attempted to do so, it could not possibly identify a "rational connection between" any purported national security risks and its "choice" to prohibit future sales of Sany turbines for use at the Butter Creek properties or future sales of the Project Companies absent CFIUS approval.  If CFIUS's goal in

restricting the use of Sany turbines at the Butter Creek Projects was to eliminate national security concerns, that goal utterly fails since the Amended Order does not prohibit Ralls from using the turbines at any other windfarms that may be near military installations or other sensitive locations.  If Ralls were to sell or transfer the Sany turbines to such windfarms, CFIUS would have no jurisdiction to prevent that sale of goods.  Furthermore, CFIUS's requirement that it approve any third-party buyer of the Project Companies is wildly overbroad.  Ralls is required to notify CFIUS of *any* intended buyer, without any consideration as to whether the buyer poses even the slightest risk to national security.  And, of course, given the absence of any "facts found," CFIUS can hardly demonstrate a "rational connection" to its "choice[s] made."  For this further reason, the Amended Order violates the APA.  *See, e.g.*, *Berge v. United States*, ___ F. Supp. 2d ___, 2012 WL 3039736, at *28 (D.D.C. July 26, 2012).

**B.    CFIUS Has Unconstitutionally Deprived Ralls of Its Property Absent Due Process.**

The Amended Order also deprives Ralls of its property absent due process as guaranteed by the United States Constitution.  The Fifth Amendment provides that "[n]o person shall be … deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.[2]   A due process violation occurs when a plaintiff establishes (1) a sufficient property interest that government has eliminated (2) without providing sufficient procedural safeguards to prevent an erroneous deprivation.  *See Am. Mfrs. Mutual Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999).  Ralls is highly likely to prevail on both of these  prongs:  it has numerous undeniable and important property rights related to the Butter Creek Projects, including rights in land, in the pertinent contracts with third parties, and in the already-issued government permits for the projects.  And

---

[2] This parallels the Fourteenth Amendment's due process protection.  "The procedural due process components of the two Amendments are the same."  *Propert v. District of Columbia*, 948 F.2d 1330, 1330 n.5 (D.C. 1991).

CFIUS's order has almost wholly eviscerated those very substantial rights while providing almost no process whatsoever.

> **1.     Ralls Has Been Deprived of Numerous Property Interests by the Amended Order.**

A "property interest" protected by due process arises whenever a claimant has "a legitimate claim of entitlement" in the interest.  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).   Property rights, for due process purposes, "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  *Id.*  Such property interests "may take many forms." *Id.* at 576. Here, Ralls has numerous relevant property interests tied up in the windfarm projects that are subject to the Amended Order.  These include (1) its land rights to construct the windfarms; (2) its various contractual rights pursuant to the power purchase agreements, the transmission interconnection agreements and ancillary agreements with PacifiCorp, and the agreements for the management and use of shared interconnection facilities with the owners of nearby wind farms; (3) its rights under the already-issued government permits necessary to operate the wind farms; and (4) its legitimate claim, contingent on completion of the windfarms by December 31, 2012, to the revenue from the renewable energy tax credits.  *See* Wu Decl. ¶ 5; Zhu Decl. ¶ 7.

For purposes of establishing a cognizable constitutional claim, Ralls clearly has a property right concerning the land rights to construct the wind farms.  *See Sauer v. City of N.Y.,* 206 U.S. 536, 547-58 (1907) (light and air easements); *Green Bay & Miss. Canal Co. v. Patten Paper Co.*, 172 U.S. 58, 82 (1898) (water-power easement).  Ralls also has a protected property right in its various contracts. Under both the Fifth Amendment's Takings and Due Process Clauses, "[v]alid contracts are property, whether the obligor be a private individual, a

municipality, a state, or the United States." *Lynch v. United States*, 292 U.S. 571, 579 (1934); *see also Treigle v. Acme Homestead Ass'n*, 297 U.S. 189, 194-98 (1936) (property interest in rights created by private contract). Indeed, as rights in realty are created by contracts, the two kinds of deprivations can overlap. *Thorpe v. Hous. Auth. of City of Durham*, 393 U.S. 268, 278-79 & n.31 (1969) (leasehold interest). Government-issued permits such as those held by Ralls likewise create a property right to engage in the permitted conduct. *3883 Conn. LLC v. District of Columbia*, 336 F.3d 1068, 1072-73 (D.C. Cir. 2003); *Tri Cnty. Indus., Inc. v. District of Columbia*, 104 F.3d 455 (D.C. Cir. 1997). Finally, Ralls's potential tax credits constitute property interests. *See Va. Historic Tax Credit Fund 2001 LP v. C.I.R.*, 639 F.3d 129 (4th Cir. 2011) ("tax credits [a]re both 'valuable' and imbued with 'some of the most essential property rights.'" (quoting *United States v. Craft*, 535 U.S. 274, 283 (2002))). That is particularly the case given that the Amended Order's prohibition on further construction, if not enjoined by September 20, 2012, will completely eradicate the ability to qualify for investment tax credits, depriving Ralls of realizing that value in any sale, even to a CFIUS-approved buyer.

CFIUS's Amended Order plainly has deprived Ralls of the foregoing property interests. Before the order was entered, Ralls had land, contract, and government-permit rights to construct the project, and was actively doing so. After CFIUS's order, however, it has become illegal for Ralls even to access the land or to use it for any purpose whatsoever—except for limited personnel who must do so only to destroy the improvements Ralls has built there. Ralls is prohibited from selling or transferring the primary goods to be used in erecting the windfarms, its various contractual and permitting rights have become useless, and CFIUS has given itself unfettered discretion to prevent Ralls even from selling its rights. As a result, nearly all of the Ralls's value in the companies, the land, and its contract and permitting rights has been

eliminated by the Amended Order.  That is especially true for the tax credit—the value of which, as noted, will have been totally eliminated if the Amended Order remains in place after September 20, 2012, even if Ralls were to sell its interests.

"Actions taken by the State which destroy the value or utility of a protected property interest constitute a … deprivation of that interest for which due process cannot be denied." *Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1153 (10th Cir. 2001).  As Judge Posner has aptly put it, "If the state prevents you from entering your house it deprives you of your property right." *Reed v. Vill. of Shorewood*, 704 F.2d 943, 949 (7th Cir. 1983) (Posner, J.).  *See also, e.g.*, *RSWW, Inc. v. City of Keego Harbor*, 397 F.3d 427, 436 (6th Cir. 2005); *Westborough Mall, Inc. v. City of Cape Girardeau, Mo.*, 794 F.2d 330, 336-37 (8th Cir. 1986); *Pamel Corp. v. P.R. Highway Auth.*, 621 F.2d 33, 35 (1st Cir. 1980); *Vill. of Terrace Park v. Errett*, 12 F.2d 240, 243 (6th Cir. 1926).  And that is exactly what CFIUS has done to Ralls—it has prevented it from entering, using, or even selling its rights in land, in numerous third-party contracts, and in the permits Ralls had painstakingly acquired; and if the Amended Order remains in place, it will have totally destroyed the value of the critical tax incentive to Ralls.

### 2. The Near-Total Absence of Process Leading Up to the Order Is Not Even Close to What Is "Due" Here.

Once the deprivation of a property interest is established—as Ralls easily has done here—determining the amount of process "due" requires a balancing of "three distinct factors":

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  In light of the near-complete lack of any process afforded by CFIUS, these factors militate clearly and strongly in favor of Ralls.

At a minimum, "'*some* form of hearing' is required before the owner is finally deprived of a protected property interest." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982). "[T]he State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement." *Id.* at 434. Indeed, the Supreme Court has held that "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). A hearing can be postponed until after the deprivation only in "emergency situations," and only where the initial deprivation is preliminary and temporary in nature. *Hodel v. Va. Surface Mining & Reclamantion Ass'n*, 452 U.S. 264, 300 (1981).

As the D.C. Circuit has previously recognized, "[t]he property interest here—the entitlement to continue construction without unfair interference—is substantial; any interruption of construction is likely to be very costly." *Tri Cnty. Indus.*, 104 F.3d at 461. That is even more true here because, in addition to completely shutting down construction on the Butter Creek Projects, CFIUS's order has also rendered the underlying property rights almost completely useless and worthless to Ralls.

The "procedures used" in this case were, so far as Ralls's participation was concerned, virtually nonexistent. After Ralls voluntarily reported the transaction to CFIUS, it was never given any sort of notice that, in addition to adopting mitigating measures to the extent the relevant regulations and Executive Orders permit, CFIUS was considering depriving Ralls of its property interests altogether. Moreover, Ralls was hardly provided with a meaningful opportunity to be heard: while it was permitted (indeed, required) to respond to specific factual questions posed by CFIUS, it was never given an opportunity to view, review, respond to, or rebut the specific facts upon which CFIUS intended to make—and did make—its determinations.

Even the Order and Amended Order themselves reflect no process of reasoned decisionmaking; they simply announce the deprivation. "[H]owever weighty the governmental interest may be in a given case, the amount of process required can never be reduced to zero—that is, the government is never relieved of its duty to provide *some* notice and *some* opportunity to be heard prior to final deprivation of a property interest." *Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991). That is precisely what occurred here.

In any event, far from being harmless, the lack of meaningful process here greatly increased "the risk of an erroneous deprivation." *Mathews*, 424 U.S. at 335. Ralls was given no pre-deprivation opportunity whatsoever to review or rebut the factual predicates upon which CFIUS based its decision. If, for example, CFIUS had flawed evidence that the Sany turbines contained or were likely to contain surveillance devices, Ralls was offered no chance to demonstrate the utter baselessness of that proposition. Or if CFIUS believed that certain aspects of the turbines or construction would cause problems for military aircraft, Ralls was never allowed to show that this belief rested on false predicates, or to propose mitigation measures that would address such specific concerns. The Supreme Court has held that even "the probability of error in utility cutoff decisions is not so insubstantial as to warrant dispensing with all process prior to termination." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 20 (1978). Surely the same is true of the probability of error in the complex predicate factual findings related to matters within CFIUS's purview—especially when considering that, even if CFIUS did have the authority to totally deprive persons of their property interests (and it does not), the relevant findings still would be not just whether security concerns exist at all, but rather whether those concerns should be addressed by reasonable mitigation measures or instead by full-blown deprivation.

CFIUS may assert that its internal decision-making processes include safeguards to increase their accuracy.   Whether or not any such reassurance would be factually correct, it certainly would be legally insufficient:

> The United States functions with a unitary executive, created in Article II of the Constitution and constrained by the Fifth Amendment from depriving anyone protected by that Amendment of life, liberty or property without due process of law.   The involvement of more than one of the servants of that unitary executive in commencing a deprivation does not create an apparent substitute for the notice requirement inherent in the constitutional norm.

*Nat'l Council of Resistance of Iran v. Sec'y of State*, 251 F.3d 192, 207 (D.C. Cir. 2001)

("*NCRI*").

With respect to the final factor—the government interest at stake—CFIUS's assertion that its Amended Order is justified in the name of national security cannot save it.   CFIUS has done no more than rotely claim that national security interests counsel against allowing the transaction; but that blanket assertion manifestly cannot entirely dispense with all procedural requirements, as CFIUS has done here.   Even in the designation of a foreign entity as a foreign terrorist organization (FTO)—which requires a determination by the federal government that the entity "engages in terrorist activity … or retains the capability and intent to engage in terrorist activity or terrorism" *and* that its conduct "threatens the security of United States nationals or the national security of the United States"—the D.C. Circuit has required the federal government to provide more process than Ralls was afforded here.   Specifically, the D.C. Circuit has held that prior to making the critical determination that an entity is an FTO, the federal government must provide notice of "those unclassified items upon which [it] proposes to rely" in making its determination, *id.* at 209, identify "which sources [it] regards as sufficiently credible that [it] relies on them," and "explain to which part of" the governing statutory factors "the information [it] relies on relates," *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 613 F.3d 220, 230

(D.C. Cir. 2010) ("*PMOI*").   The government must also provide the putative FTO with the opportunity to present evidence "to rebut the administrative record or otherwise negate the proposition" that it is an FTO.   *NCRI*, 251 F.3d at 209.   Specifically, it must provide the entity "an opportunity to rebut the unclassified material on which [it] relies."   *PMOI*, 613 F.3d at 230. *See also In re People's Mojahedin Org. of Iran*, 680 F. 3d 832 (D.C. Cir. 2012) (ordering federal government to comply with due process requirements on pain of issuance of mandamus).

Ralls received none of this process prior to CFIUS's issuance of its far-reaching Amended Order.   It was never provided with *any* of the evidence "upon which [CFIUS] propose[d] to rely" in making its determination.   It was never told which evidence CFIUS "regard[ed] as sufficiently credible" such that it "relie[d] on" that evidence.   Notwithstanding that Section 721 sets forth a lengthy list of factors CFIUS must consider, *see* 50 U.S.C. app § 2170(f), CFIUS never "explain[ed] to which part of" those factors "the information [it] relie[d] on relates."   Nor was Ralls ever given an opportunity to present evidence rebutting the record "or otherwise negat[ing]" CFIUS's proposed findings and determinations.   Even had Ralls been provided with this evidence *after* the Amended Order issued, it would still be constitutionally insufficient.   *See PMOI*, 613 F.3d at 227 (finding due process violation even where entity was afforded limited pre-deprivation participation, because entity "was notified of the Secretary's decision and permitted access to the unclassified portion of the record only *after* the decision was final").   But even that did not happen; even after issuance of the Amended Order, Ralls remains completely in the dark as to the specific reasons for CFIUS's decision, the statutory factors on

which CFIUS relied, or the purported facts on which its determination was based, underscoring the violation of Ralls's due process rights.[3]

## II.   RALLS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF TEMPORARY INJUNCTIVE RELIEF.

Granting temporary injunctive relief is necessary to prevent Ralls from suffering harm that is imminent and irreparable.  *See, e.g.*, *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) (observing that "the basis of injunctive relief in the federal courts has always been irreparable harm"  (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)) (brackets and internal quotation marks omitted)).  Although the irreparable harm inquiry is a "fact-based process unique to each case before the court," *Express One Int'l, Inc. v. USPS*, 814 F. Supp. 87, 90 (D.D.C. 1992), a movant generally must establish injury "that is certain, great, and actual, not theoretical," *Housing Study Group v. Kemp*, 736 F. Supp. 321, 330 (D.D.C. 1990).  The "injury complained of [must be] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Wis. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985).  Should the Amended Order remain in place during the pendency of this suit, Ralls will suffer certain and irreparable harm for at least four reasons.

*First*, the Amended Order necessarily prevents completion of the Butter Creek Projects by December 31, 2012, thereby preventing Ralls, or any party to which Ralls sells the Project Companies, from receiving some $25 million in federal incentives that are critical to the projects. Only if construction is able to resume by September 20, 2012, can the windfarms be completed

---

[3] The D.C. Circuit has made clear that national security concerns also do not permit all process to be postponed until after the deprivation.  *Nat'l Council of Resistance of Iran*, 251 F.3d at 205-08. Moreover, while "emergency situations" will sometimes permit a temporary and tentative deprivation that is accompanied by less process than is otherwise required, *Hodel*, 452 U.S. at 300, CFIUS's orders in this case are neither temporary nor supported by any showing that an emergency existed.

and placed in service by December 31, 2012.   Anderson Decl. ¶ 11; Wu Decl. ¶ 22.   To demonstrate that irreparable injury is likely, Ralls "must show that it will suffer harm that is more than simply irretrievable; it must also be serious in terms of its effects on" Ralls. *LG Elecs. U.S.A., Inc. v. U.S. Dep't of Energy*, 679 F. Supp. 2d 18, 35 (D.D.C. 2010) (internal quotation marks omitted).   There can be no doubt that the loss of $25 million in federal incentives that is certain to occur if the Amended Order is not immediately enjoined is "serious in terms of its effects on" Ralls.

Ralls and its contractor had every reasonable expectation that the original construction schedule would have provided for the Butter Creek Projects to be placed in service by December 31, 2012.  Anderson Decl. ¶ 14; Wu Decl. ¶ 29.  The continued prohibition of construction on the Butter Creek Projects, however, necessarily prevents Ralls from placing the projects in service by December 31, 2012, and from receiving the critical federal incentive, a result that would significantly reduce the commercial viability of the projects and reduce Ralls' Butter Creek assets to *de minimis*, salvage value.  Wu Decl. ¶ 26.  Because the projects would be significantly reduced in commercial value, moreover, divestment to another party would be extraordinarily difficult, notwithstanding that divestment has always been Ralls's intention from the outset.  *Id.* ¶ 27.   In addition, if previously-acquired Sany products cannot be used on the Butter Creek Projects—as the Amended Order mandates—it will be much more difficult and significantly more expensive to place the projects in service by December 31, 2012.  Anderson Decl. ¶ 12; Wu Decl. ¶ 23.

"The destruction of a business is, of course, an essentially economic injury.  It is not, however, one of the 'mere' economic injuries which … are insufficient to warrant a stay." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 n.2 (D.C. Cir.

1977).  To the contrary, "economic loss may constitute irreparable harm where the loss threatens the very existence of the movant's business." *World Duty Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61, 67 (D.D.C. 2000); *see also Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 28 (D.D.C. 1997) ("Particularly because [the plaintiffs] are small companies, the time and person power spent, as well as the millions of dollars in costs, are indeed significant and irreparable losses.").  The imminent and certain loss of $25 million in federal incentives—which, from the outset, have been critical to the commercial viability of the Butter Creek Projects and Ralls's investment, and upon which Ralls relied in acquiring and developing the projects—will undoubtedly result in the complete "destruction" of the Project Companies and Ralls's investment.  So too, moreover, will the inability to use Sany wind turbines at the projects, which the Amended Order also forbids—even by another buyer.

*Second*, the Amended Order impermissibly encroaches on Ralls's property interests, causing irreparable damage.  "As a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity for which monetary compensation is an inadequate substitute." *Pelfresne v. Vill. of Williams Bay*, 865 F.2d 877, 883 (7th Cir. 1989).  Moreover, "when interests involving real property are at stake, preliminary injunctive relief can be particularly appropriate because of the unique nature of the property interest." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (internal quotation marks omitted); *accord Minard Run Oil Co. v. U.S. Forest Service*, 670 F.3d 236, 256 (3d Cir. 2011).

Here, by issuing the Amended Order, CFIUS has placed a time-consuming, costly, and unlawful obstacle in the path of the exercise of Ralls's property rights, including "enjoyment or possession of land." *Pelfresne*, 865 F.2d at 883.  CFIUS has barred Ralls from developing its

private property interests, has ordered it to remove any development it has undertaken on the property, and has forbidden any physical access to the property. The only exception to CFIUS's sweeping ban on access to Ralls's real property is to allow an extremely limited set of individuals—U.S. citizens contracted by Ralls and approved by CFIUS—to enter the property for the sole purpose of destroying the very reason Ralls acquired the property in the first place. Accordingly, with each passing day it is in place, the Amended Order infringes upon Ralls's real property interests, causing irreparable injury sufficient to support a preliminary injunction. *See E. Tenn. Natural Gas Co. v. Sage*, 361 F.3d 808, 828-29 (4th Cir. 2004) (finding irreparable injury where owner was excluded from real property).

*Third*, by preventing Ralls from proceeding with the Butter Creek Projects, the Amended Order works lasting and irreparable competitive harm on Ralls and Sany, its affiliate. A primary purpose of Ralls's purchase of the Project Companies and development of the Butter Creek Projects was to demonstrate the reliability of Sany's wind turbines and to bolster its ability to compete in the United States wind industry, particularly as compared to competitor products used on nearby windfarms. Wu Decl. ¶¶ 11, 24. That purpose is impeded if not eviscerated by the Amended Order, which also serves to impugn the quality of the products and the integrity of Ralls and Sany, causing them continued harm in the U.S. market. *Id.* ¶ 25. Courts routinely consider such harms irreparable. *See Allergan, Inc. v. Shalala*, No. 94-1223, 1994 U.S. Dist. LEXIS 21716, at *10 (D.D.C. Nov. 10, 1994) ("[I]f a manufacturer of a product drops out of the market, its competitors are likely to gain sales, probably in some measure in proportion to their market share."); *cf. Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) ("In a competitive industry where consumers are brand-loyal, we believe that loss of market share is a potential harm which cannot be redressed

by a legal or an equitable remedy following a trial." (internal quotation marks omitted)). That is especially the case where, as here, the injured party is a smaller competitor seeking to gain entry into an established market, *see Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1066 n.6 (D.C. Cir. 1998), and the party's injury from the unlawful conduct includes incalculable "damage to its goodwill," *see Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1090 (7th Cir. 2008).

*Fourth*, "[i]t has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976) (plurality opinion)). This Court has repeatedly held that the continuing deprivation of property absent due process "constitutes irreparable injury." *See, e.g.*, *Simms v. District of Columbia*, ___ F. Supp. 2d ___, No. 12-701 2012 WL 2619125, at *11 (D.D.C. July 6, 2012); *Gordon v. Holder*, 826 F. Supp. 2d 279, 296 (D.D.C. 2011). As set forth above, CFIUS has unconstitutionally deprived Ralls of its property absent constitutionally guaranteed due process, thereby causing Ralls to suffer irreparable injury every day.

There can be little doubt that the foregoing irreparable injuries to Ralls are "certain, great, actual, and imminent." *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (citing *Wisconsin Gas*, 758 F.2d at 674). They are not "something merely feared as liable to occur at some indefinite time," *Wisconsin Gas*, 758 F.2d at 674—they *are* occurring at present, and they will *continue* to occur absent immediate injunctive relief. Because Ralls has "demonstrate[d] that [its] injury is of such 'imminence' that there is a clear and present need for equitable relief to prevent irreparable harm," *Judicial Watch, Inc. v. Dep't of Homeland Sec.*, 514

F. Supp. 2d 7, 10 (D.D.C. 2007) (quoting *Wisconsin Gas*, 758 F.2d at 674), temporary injunctive relief is warranted.

## III.     THE BALANCE OF THE EQUITIES FAVORS RALLS.

The balance of the equities weighs in favor of Ralls. "Under this factor, the Court must consider the balance of the equities and determine whether an injunction would more substantially injure other parties, such as the [defendant]." *Wash. Teachers' Union, Local No. 6 v. American Federation of Teachers*, 751 F. Supp. 2d 38, 57 (D.D.C. 2010). Granting preliminary injunctive relief to Ralls will not "substantially injure" other parties, above all CFIUS; it will merely prevent CFIUS from enforcing the Amended Order for a brief period of time until the merits can be fully litigated. Vague entreaties to "national security risks" cannot aid CFIUS in this respect, for at no time has CFIUS ever revealed what those "risks" are or its reasoning behind identifying even inchoate "risks." Accordingly, CFIUS cannot show that it or another party would be "substantially injured" by temporary injunctive relief. *See Citizens for Responsibility and Ethics in Wash. v. Cheney*, 577 F. Supp. 2d 328, 340 (D.D.C. 2008) (granting preliminary relief where "a preliminary injunction … does not impose burdensome obligations on Defendants").

To the contrary, the substantial injury to Ralls absent such relief is identifiable, imminent, and certain. It is prohibited from accessing land it has the right to access. It is prohibited from proceeding with development into which it has sunk substantial amounts of money in reliance on prior representations by the federal government. It stands to lose $25 million in critical tax incentives. Its contracts and permits are rendered nearly worthless. Its brand name and goodwill, and those of Sany and its wind turbines, are impugned, and it is hindered from establishing market presence. Its constitutional rights are being violated. In short, the immediate impact on Ralls from the Amended Order is profound. Any minimal harm to CFIUS in

temporarily not enforcing the Amended Order "pales in comparison to the possible infringement upon [Ralls's] constitutional and statutory rights" and the extraordinary and irreparable harms Ralls will endure.  *Newland v. Sebelius*, ___ F. Supp. 2d ___, 2012 WL 3069154, at *4 (D. Colo. July 27, 2012); *see also NOW v. Operation Rescue*, 747 F. Supp. 760, 770 (D.D.C. 1990) (holding that balance of equities "clearly falls to plaintiffs" when "defendants' activities are illegal and interfere with plaintiffs' exercise of constitutionally protected rights").

## IV.     TEMPORARY INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST.

The public interest weighs heavily in favor of Ralls.  "[T]he public interest is best served by having federal agencies comply with the requirements of federal law."  *Patriot, Inc. v. HUD*, 963 F. Supp. 1, 6 (D.D.C. 1997).  There is a "strong public interest in requiring an agency to act lawfully, consistent with its obligations under the APA."  *Bracco Diagnostics*, 963 F. Supp. at 30; *see also N. Mariana Islands*, 686 F. Supp. 2d at 21 ("The public interest is served when administrative agencies comply with their obligations under the APA."); *Cresote Council v. Johnson*, 555 F. Supp. 2d 36, 40 (D.D.C. 2008) (noting "the general public interest in open and accountable agency decision-making").  In addition, it is "always in the public interest" to "prevent the violation of a party's constitutional rights."  *Simms*, ___ F. Supp. 2d ___, 2012 WL 2619125, at *12; *see also R.J. Reynolds Tobacco Co. v. U.S. Food and Drug Admin.*, 823 F. Supp. 2d 36, 52 (D.D.C. 2011) (preliminarily enjoining agency action because of "the public's interest in preserving its constitutional protections—and, indeed, the Government's concomitant interest in not violating the constitutional rights of its citizens").  And unconstitutional action "that would also have severe economic effects is not in the public interest."  *Gordon*, 826 F. Supp. 2d at 297.  Given this well-established and unambiguous authority, Ralls is entitled to temporary injunctive relief.

## CONCLUSION

For the foregoing reasons, Ralls respectfully requests that this Court enter a temporary restraining order enjoining enforcement of CFIUS's order, schedule a hearing on Ralls's request for a preliminary injunction at the earliest available date, and, after such hearing, enter a preliminary injunction enjoining further enforcement of the order during the pendency of this litigation.

Respectfully submitted,

  /s/  Paul D. Clement
Paul D. Clement (D.C. Bar No. 433215)
Viet D. Dinh (D.C. Bar No. 456608)
H. Christopher Bartolomucci (D.C. Bar No. 453423)
George W. Hicks, Jr. (D.C. Bar No. 499223)
Brian J. Field (D.C. Bar. No. 985577)
BANCROFT PLLC
1919 M Street, N.W., Suite 470
Washington, D.C. 20036
(202) 234-0090

Steven S. Honigman (D.C. Bar No. 201020)
500 East 77th Street
New York, New York 10162
(202) 549-4917

*Counsel for Plaintiff Ralls Corporation*

Dated:  September 13, 2012