*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

VOLUNTARY NOTICE TO THE COMMITTEE ON FOREIGN
INVESTMENT IN THE UNITED STATES UNDER SECTION 721
OF TITLE VII OF THE DEFENSE PRODUCTION ACT OF 1950,
AS AMENDED, AND 31 C.F.R. PART 800
WITH RESPECT TO A TRANSACTION BETWEEN

**Ralls Corporation**

**AND**

**Terna Energy USA Holding Corporation**

*Counsel for Terna Energy USA Holding Corp.*

Robert LaRussa
Shearman & Sterling LLP
801 Pennsylvania Avenue, NW
Suite 900
Washington, DC  20004

Phone:  202-508-8000
Fax:  202-508-8100
rlarussa@shearman.com

*Counsel for Ralls Corp.*

Stephen Heifetz
Michael Gershberg
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036

Phone:  202-429-6227
Fax:  202-429-3902
sheifetz@steptoe.com
mgershberg@steptoe.com

Todd J. Guerrero
Ruilin Li
Fredrikson & Byron, P.A.
200 South Sixth Street
Minneapolis, MN 55402

Phone:  612-492-7000
Fax:  612-492-7077
tguerrero@fredlaw.com

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

Terna Energy USA Holding Corporation ("Terna") and Ralls Corporation ("Ralls") (collectively, "the Parties") respectfully provide this Notice for consideration by the Committee. As indicated below, the Parties do not believe that Terna and Ralls have engaged in a "covered transaction," nor do the Parties believe that the transaction increases national security risk. The Parties note that the windfarm projects at issue in this Notice previously have been reviewed and approved by the Federal Aviation Administration; further, the Department of Navy has been engaged with and supported Ralls during recent permitting processes. The Parties nevertheless appreciate that CFIUS may have different interests that are unrelated to this prior constructive dialog with the executive branch. The Parties accordingly submit this voluntary Notice in response to the Committee's request and look forward to resolving any questions or concerns from the Committee.

Ralls also notes that contractual obligations and the December 2012 expiry of certain federal renewable energy incentives dictate that construction of the windfarms must continue. Ralls respects the CFIUS process and asks the Committee to recognize that development of the windfarms pursuant to contractual obligations and other commercial realities is not intended to discount the Committee's interests.

Before providing the required content for this Notice, we present below some prefatory points – briefly (1) identifying the Parties, (2) providing background on the development assets and projects, (3) describing prior executive branch approvals, (4) describing prior cooperation with the Navy, (5) explaining the planned resale of the projects, (6) explaining the Parties' position as to why this is not a covered transaction, and (7) explaining why the transaction does not increase national security risk.

<u>Terna and Ralls</u>

Terna Energy SA is a publicly traded renewable energy company listed on the Athens Stock Exchange and is the ultimate parent company of Terna. Terna Energy SA (through its subsidiaries) formed Terna, a Delaware corporation, in December 2010 to acquire and act as a holding company for wind energy projects in the United States. In December 2010, Terna acquired two sets of wind projects – one in Idaho and one in Oregon. As of today, Terna continues to hold (through its subsidiary) all of the membership interests in six project companies that are developing the Idaho projects. Terna also held the membership interests in four companies – Pine City Windfarm, LLC, an Oregon limited liability company, Mule Hollow Windfarm, LLC, an Oregon limited liability company, High Plateau Windfarm, LLC, an Oregon limited liability company, and Lower Ridge Windfarm, LLC, an Oregon limited liability company (collectively, the "Project Companies") – with rights to develop four small windfarm projects in north central Oregon. These companies were originally formed in 2009 by Oregon Windfarms, LLC, an Oregon limited liability company owned by U.S. citizens. In March 2012, Terna sold its membership interests to Intelligent Wind Energy, LLC ("IWE"), a Delaware limited liability company that is owned by Ralls.

Ralls is a Delaware company that is privately owned and controlled by two Chinese nationals – Messrs. Dawei Duan and Jialing Wu. Messrs. Duan and Wu are not Chinese

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

government or military officials.  Mr. Duan is the CFO of the Sany Group ("Sany"), a Chinese global manufacturing company and one of the largest privately-held companies in China.  Sany is not a state-owned or controlled company.  Mr. Duan is also a Vice President of Sany Heavy Industries, a company whose shares are publicly traded on the Shanghai stock exchange and are majority owned by Sany.  Mr. Wu is a Vice President of Sany and also the General Manager of Sany Electric Company, Ltd. ("Sany Electric"), a wholly-owned Chinese subsidiary of Sany.  Sany Electric manufactures wind turbine generators.  Ralls' primary business purpose to date has been to try and identify U.S. market opportunities and help develop wind energy projects for which Sany Electric's wind turbine generators can be used.

The Windfarm Projects

The Project Companies purchased by Ralls are holding companies for the Butter Creek development assets which, with the addition of labor, capital, and equipment will become small operating wind energy projects.  Once constructed, the Butter Creek windfarms will consist of an aggregate of twenty 2.0 megawatt ("MW") wind turbine generators (five turbines per windfarm) and related systems to allow for power production and interconnection to the PacifiCorp transmission grid in the western United States under long-term contracts with PacifiCorp.  At the time of the transaction, construction had not yet commenced and the projects were essentially greenfield projects, existing only on paper and consisting solely of various easements, permits, contracts and other intangible assets.  The Project Companies will not control or have access to PacifiCorp's transmission grid, and PacifiCorp will control when the turbines operate.  PacifiCorp itself owns thousands of MWs of wind energy generating facilities, and nearly 10,600 MW of total generating assets.  Once constructed, Ralls' 40 MW of wind-generated power will comprise approximately 0.37% of PacifiCorp's total generating capacity, and approximately 2.3% of its wind energy generating capacity.

Once completed, the Butter Creek windfarms will be regulated under the federal Public Utility Regulatory Policy Act of 1978 ("PURPA"), the primary purpose of which is to provide a market for the electricity produced by small, mainly renewable power producers and co-generators.  The intent in enacting PURPA was to encourage new, independent power producers to enter the market to compete with traditional utilities to lower energy costs to U.S. consumers and to promote the development of renewable energy.  The Butter Creek windfarm projects at issue meet these important statutory objectives.

Executive Branch Approval of the Windfarm Projects

In 2010 and 2011, prior to the Ralls acquisition, the Federal Aviation Administration ("FAA") issued "Determinations of No Hazard" (*i.e.*, FAA permission) for locations at which the wind farms are proposed to be sited.

The FAA's review process includes a review by the Department of Defense.  This review by the Department of Defense, which allowed the FAA to issue its Determinations of No Hazard for the Butter Creek windfarm projects, is designed to ". . . prevent, minimize, or mitigate adverse impacts on military operations, readiness and testing."  Mission Statement of the DOD Siting Clearinghouse, Office of the Deputy Under Secretary of Defense, Installations and Environment (*see* http://www.acq.osd.mil/dodsc/about/).  After Ralls acquired the Project

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

Companies, the Navy expressed safety concerns with regard to the location of one of the four projects. In particular, the Navy urged moving the proposed site of one windfarm development project – the "Lower Ridge Windfarm" – to "reduce airspace conflicts between the Lower Ridge Windfarm wind turbines and low-level military aircraft training." Navy letter dated May 17, 2012, attached as **Exhibit 10**. The Lower Ridge Windfarm is the only one of the four development projects proposed to be located within a restricted flight zone, but like the other projects will be located on private property. Although the Navy indicated that it had no authority to require such a move, Ralls agreed, at significant expense and effort, to move the Lower Ridge Windfarm to a new location 1.5 miles south, a site for which the FAA previously had issued additional permits, but which also was within the restricted flight zone.

The move, however, required the Oregon Public Utility Commission to waive certain rules, and the move further required *de minimis* location and height adjustments to the FAA permits at the new site to accommodate landowner farming concerns and slightly higher turbines. The Navy, in its May 17, 2012 letter, urged the Oregon Commission to waive the relevant rule in order to allow the Lower Ridge Windfarm to be moved 1.5 miles south, and the Oregon Commission did, in fact, waive the rule. The FAA has not yet, however, issued new permits for the location 1.5 miles south. Ironically, Ralls has federal approval to build the Lower Ridge Windfarm where the Navy does not want it, but has not received from the FAA final authorization to build in the location that the Navy would prefer.

In reliance on the FAA permits, Ralls acquired the Butter Creek development assets and signed contracts that have obligated it to begin windfarm construction. As a contractual matter, the construction of the Lower Ridge Windfarm could be either at the original site or at the site 1.5 miles south (which the Navy prefers, and therefore, so too does Ralls). But without new FAA authorizations for the Navy's preferred site, it appears to Ralls that its only option is to construct the Lower Ridge Windfarm on the original site.

<u>Cooperation with the Navy</u>

As indicated above, the FAA and state permitting processes have involved dialog with the Navy. In fact, since the Navy contacted Ralls in late April of this year, Ralls has had extensive communications with the Navy and has gone to great lengths to be responsive to the Navy's concerns. Ralls voluntarily made costly and disruptive changes to its construction plans and undertook significant additional local, state, and federal permitting activities, notwithstanding the time constraints under which Ralls is operating. Indeed, the Navy told the Oregon Commission that the Navy "recognize[s] the Company's time constraints in completing the project, and we very much appreciate their cooperation and consideration in revising project plans to reduce impacts to the Navy's flight training capabilities." **Exhibit 10**.

Ralls remains committed to satisfying the Navy and other government concerns. Ralls would even be willing to move the Lower Ridge Windfarm to an entirely new location if FAA permits for the new location could be secured expeditiously and related matters could be resolved quickly so that construction at the new location could still be completed this year. Ralls is willing to accept this alternative even though it would incur additional costs and delays in doing so.

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

Sale of Butter Creek Project Companies to Yeland

Ralls does not intend to be a long-term owner of the windfarms.  In fact, Ralls signed an agreement in June 2012 with Lanxi Wind Power Technology (Dalian) Corporation Ltd., a Chinese limited liability company ("Lanxi"), which is a wholly-owned subsidiary of Yeland Group Co., Ltd. ("Yeland").  Pursuant to this agreement, Ralls intends to sell the Project Companies to Lanxi.  However, it is Ralls' intention that Ralls and Lanxi/Yeland will submit a Notice to CFIUS addressing the Ralls-Lanxi transaction prior to closing.  Ralls understands that Lanxi/Yeland intend to fully cooperate with the Committee.

Lanxi's parent company Yeland is a Beijing, China based residential property development and distribution company listed on the Shenzhen Stock Exchange.  Yeland is also involved in the development of commercial property and hotels.

The reason for the re-sale to Lanxi is that Ralls does not want to own a windfarm business.  Rather, Ralls is in the business of identifying and developing windfarm project opportunities.  Ralls' purchase was only intended to ensure the utilization of Sany Electric wind turbine generators at the Butter Creek sites and thus advance Sany Electric's U.S. marketing strategy.

No "Covered Transaction"

While the Parties respect the CFIUS process and intend to cooperate fully with the Committee, the Parties do not believe that the transaction between Terna and Ralls is a "covered transaction."  Although Ralls formally acquired the ownership of legal entities (*i.e.*, the Project Companies), the only assets of the Project Companies were a set of intangible assets and rights to develop four small windfarms.  Ralls did not acquire an operating windfarm or any other going concern.  The legal entities acquired do not constitute a "U.S. business," which is a prerequisite for finding a "covered transaction."  In particular, a U.S. business is defined under 31 C.F.R.          § 800.226 as an entity "engaged in interstate commerce in the United States."  The Parties do not believe that Ralls acquired any such business.

The only assets of the Project Companies acquired by Ralls were the following bundle of intangibles:  power purchase agreements, transmission interconnection agreements and ancillary agreements with PacifiCorp; agreements for the management and use of shared interconnection facilities with the owners of nearby windfarms; the land rights to construct the windfarms; and government permits necessary for a commercial windfarm.  This set of legal rights does not constitute a business engaged in interstate commerce.  In particular, the Project Companies acquired by Ralls did not, either individually or collectively, constitute an operating business that, as of the date of acquisition or even today, engages in interstate commerce.  In acquiring the Project Companies, Ralls did not acquire and still does not have any plants, employees, revenue, tangible assets, or technology.  It is only with the addition of labor, capital and equipment (and in particular, wind turbines), that the windfarm projects will become an operating business.  In this sense, the transaction is equivalent to the acquisition of separate assets not constituting a functioning business, which is not a "covered transaction."  In accordance with the seller's (*i.e.*,  —  ... Terna's) preference, the acquisition was structured as a sale of equity interests in the Project Companies rather than a sale of the Butter Creek development assets.  However, this is only a

4

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

difference in form, not substance. Therefore, the transaction approximates Example 1 under 31 C.F.R. § 800.302(c):

> Corporation A, a foreign person, acquires, from separate U.S. nationals (a) products held in inventory, (b) land, and (c) machinery for export. Assuming no other relevant facts, Corporation A has not acquired a U.S. business, and this acquisition is not a covered transaction.

Consistent with CFIUS regulations, this is not a covered transaction because Ralls did not acquire a going concern or an entity that was engaged in interstate commerce at the time of purchase.

<u>No Increase in National Security Risk</u>

The transaction at issue involves the transfer of small, unconstructed wind farm projects – essentially development assets – from one foreign party, Terna, to Ralls. Ralls already owns a small, 10 MW operating windfarm project in the United States, and Ralls has agreed to address the Navy's concerns regarding Butter Creek by moving the Lower Ridge Windfarm site to a location that is more acceptable to the Navy, pending the issuance of new FAA permits.

To the extent that the Committee is concerned about possible espionage or other hostile activities because of the proximity of the planned windfarms to the Navy's Northwest Training Range Complex, Ralls categorically denies any such intent on its part or on the part of any related person or entity. Indeed, it is hard to see how the transaction here could increase espionage or other national security risk. There are many windfarms already present in the area, and there are innumerable other unsecured public and private facilities in the area. Ralls will not even own the windfarms when they are operational, because of the planned resale of the projects. Frankly, the suggestion that Ralls would acquire the windfarm projects for espionage or for other purposes inimical to national security strikes Ralls and its counsel as not credible. If Ralls had any such intent, which it does not, it could engage in leases of other windfarms or any other facilities so as to stay beyond the reach of the Committee. But Ralls is not trying to evade the reach of the Committee – it is happy to cooperate.

Relatedly, and in the hope that the Committee can resolve this matter expeditiously, the Parties note that additional key statutory factors weighing in favor of a full investigation by the Committee are not present here. In particular, the foreign entities are not state-owned, and this case does not involve critical infrastructure.

The acquisition by Ralls of the right to construct four small windfarms from Terna does not involve the participation or action on the part of any foreign government. Ralls' two owners are Chinese businessmen. The Chinese government holds no financial interest in Sany, Sany Electric, or Ralls, and indeed exercises no control over these companies.

Finally, the transaction would not result in the control of any "critical infrastructure" of the United States by a foreign person. The four wind farms acquired by Ralls, when constructed and operational, would constitute the miniscule amount of 0.37% of PacifiCorp's total generating capacity and account for an even lesser amount of the overall energy generating

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

capacity in the region.  The wind turbines themselves are intermittent, and operate only when the wind blows, and will be under the operational control of PacifiCorp.  Destruction of these windfarms would have no measureable effect on the delivery of energy in the area and therefore would have no impact whatsoever on national security.  Neither Ralls nor the Butter Creek companies will have control over PacifiCorp's transmission system.

Ralls' only interest here is in moving forward with renewable energy projects for commercial purposes.  The Parties look forward to resolving any Committee questions or concerns and to developing the windfarms.


1.      **§ 800.402(c)(1)(i):  Describe the transaction in question, including a summary setting forth the essentials of the transaction and a statement of the purpose of the transaction and its scope, both within and outside of the United States.**

The primary purpose of the transaction described below was to facilitate the development of the Butter Creek projects, a group of four wind energy projects located in Morrow County and Umatilla County, Oregon.  The projects are expected to consist of 20 wind turbine generators with a total capacity of 40 MW and will deliver output to PacifiCorp in accordance with the applicable power purchase agreements and interconnection agreements.  The projects are in the development stage, and at the time of the transaction had only secured certain wind development assets, including power purchase and interconnection agreements from PacifiCorp, land rights and permits.  The projects also presented the opportunity to utilize additional Sany Electric turbines in the U.S. wind market.   The scope of the transaction is limited to the acquisition of the Butter Creek development assets, as held by the Project Companies, located in north central Oregon.

At the outset, it is important to understand why, while Ralls and Sany are formally separate and independent entities, due to their affiliations described above, it is necessary that Ralls act as a development arm, in effect, for Sany Electric turbines.  Although Sany is a large private company, Sany Electric – the subsidiary that manufactures wind turbines – is small.  Before it can expect to gain a meaningful foothold in the U.S. market, it will need to show to large-scale purchasers – such as utilities and large wind developers – that the Sany Electric turbines produce energy efficiently and are reliable.  In short, the turbines need to have what is known in the industry as "run-time," *i.e.*, a sufficient period of operating experience that Sany Electric can point to show that its equipment will operate reliably for the long-term.  The U.S. industry bench-mark is said to be approximately 100 turbines operating in the U.S. at an average 95% availability in one year.  Thus, a primary business purpose is to allow greater run time for Sany Electric turbines so that they can better compete in the U.S. wind market in the years ahead.   The other primary purpose, of course, is commercial.  The rates reflected in the PacifiCorp power purchase agreements are generally thought to be attractive, allowing for profit, provided operating expenses are kept in check and within prudent industry practice.  The Butter Creek projects represent the opportunity for an attractive commercial investment.

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

**2.     § 800.402(c)(1)(ii): Describe the nature of the transaction, for example, whether the acquisition is by merger, consolidation, the purchase of voting interest, or otherwise.**

On March 16, 2012, IWE acquired all of the membership interests in the Project Companies.  The transaction was structured as a direct purchase by IWE from Terna of 100% of the issued and outstanding membership interests of each of the Project Companies.  The principal acquisition document was a Master Wind Projects Membership Interests Purchase Agreement dated February 28, 2012, by and among Terna, IWE, Ralls, Ralls Wind Farm, LLC ("Ralls OpCo"), and the Project Companies (the "MIPSA"), a copy of which along with all Exhibits and Schedules, is provided as **Exhibit 1** hereto.

At the time of the acquisition, IWE was directly owned by U.S. Innovative Renewable Energy, LLC, a Delaware limited liability company ("USIRE").  USIRE is owned 100% by Xiaolin (Jerry) Zhang, a U.S. citizen.  USIRE has a consulting agreement with Sany Electric under which it works to identify business opportunities for the placement of Sany Electric turbines in the U.S. wind market.  The organizational structure of the relevant companies immediately following the transaction is set forth in **Exhibit 2**.

As described in response to questions 10 and 11 below, part of the purchase price was paid upon the closing of the transaction and the remainder was deferred.  To secure the deferred payments and other obligations of IWE, each of Ralls and Ralls OpCo, a Delaware limited liability company that directly owned all of Ralls' tangible assets in the United States, provided Guarantee Agreements and Security Agreements, each of which are included in the documents provided as **Exhibit 1** hereto.  At closing, each of the Project Companies provided additional security to Terna to secure the deferred payments.  Ralls notes that there was an error in the description of the relationships between Ralls, Ralls OpCo., and IWE in the Guarantee Agreements.  However, that description is currently accurate, and has been accurate at all times since the April 2012 closing of the related transaction below.

After the transaction was consummated, on April 9, 2012, Ralls acquired all of the membership interests in IWE from USIRE pursuant to the Membership Interest Purchase Agreement attached as **Exhibit 3**.  The current organizational structure of the relevant companies is set forth in **Exhibit 2**.

**3.     § 800.402(c)(1)(iii): Provide the name, United States address (if any), Web site address (if any), nationality (for individuals) or place of incorporation or other legal organization (for entities), and address of the principal place of business of each foreign person that is a party to the transaction.**

Ralls Corporation
318 Cooper Circle
Peachtree City, GA 30269
USA
<u>Place of Organization</u>:  Delaware, USA

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

IWE and Ralls OpCo are wholly-owned subsidiaries of Ralls.

Intelligent Wind Energy, LLC
318 Cooper Circle
Peachtree City, GA 30269
USA
Place of Organization:  Delaware, USA

Ralls Wind Farm, LLC
318 Cooper Circle
Peachtree City, GA 30269
USA
Place of Organization:  Delaware, USA

U.S. Innovative Renewable Energy, LLC
11413 Ashbourne Hall Rd.
Charlotte, NC 28277
USA
Place of Organization:  Delaware, USA

    4.    § 800.402(c)(1)(iv):  Provide the name, address, website address (if any),
principal place of business, and place of incorporation or other legal organization of the
U.S. business that is the subject of the transaction.

    As described above, the Parties do not believe that the transaction involved the transfer of
a "U.S. business," as that term is defined in the CFIUS regulations.  Nevertheless, in response to
the Committee's request, the Parties respectfully submit this Notice.  For purposes of this Notice,
and without prejudice to the Parties' jurisdictional argument, the Parties refer to the following
Project Companies – which are merely holding companies for the Butter Creek development
assets – as the "U.S. business."

Lower Ridge Windfarm, LLC
Registered Address:  8630 SW Scholls-Ferry Road #152
Beaverton, OR 97008
Mailing address:  4120 Douglas Blvd. #306-476
Granite Bay, CA 95746-5936
Place of Organization:  Oregon, USA

High Plateau Windfarm, LLC
Registered Address:  8630 SW Scholls-Ferry Road #152
Beaverton, OR 97008
Mailing address:  4120 Douglas Blvd. #306-476
Granite Bay, CA 95746-5936
Place of Organization:  Oregon, USA

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

Mule Hollow Windfarm, LLC
<u>Registered Address</u>:  8630 SW Scholls-Ferry Road #152
Beaverton, OR 97008
<u>Mailing address</u>:  4120 Douglas Blvd. #306-476
Granite Bay, CA 95746-5936
<u>Place of Organization</u>:  Oregon, USA

Pine City Windfarm, LLC
<u>Registered Address</u>:  8630 SW Scholls-Ferry Road #152
Beaverton, OR 97008
<u>Mailing address</u>:  4120 Douglas Blvd. #306-476
Granite Bay, CA 95746-5936
<u>Place of Organization</u>:  Oregon, USA

As described above, the Project Companies were acquired from Terna Energy USA Holding Corporation.

Terna Energy USA Holding Corporation
400 Montgomery St., # 1105
San Francisco, CA 94104
<u>Place of Organization</u>:  Delaware, USA

**5.    § 800.402(c)(1)(v)(A):  Provide the name, address, and nationality (for individuals) or place of incorporation or other legal organization (for entities) of the immediate parent, the ultimate parent, and each intermediate parent, if any, of the foreign person that is a party to the transaction.**

Ralls is the ultimate parent in its corporate organization.  See the organizational chart of Ralls attached hereto as **Exhibit 2**.  The response to question 3 contains relevant information regarding Ralls, Ralls OpCo, IWE and USIRE.

**6.    § 800.402(c)(1)(v)(B):  Where the ultimate parent is a private company, provide the name, address, and nationality (for individuals) or place of incorporation or other legal organization (for entities) of the ultimate owner(s) of such parent.**

The following two individuals are the only shareholders of Ralls.  Dawei Duan owns 80% of the issued and outstanding stock of Ralls, and Jialing Wu owns 20% of the issued and outstanding stock of Ralls.  They are both directors of Ralls, and Mr. Wu is the CEO of Ralls.  Mr. Duan is also the CFO of Sany, and a Vice President of Sany Heavy Industries, a publicly-traded Chinese company that is majority owned by Sany.  Mr. Wu is a Vice President of Sany and also the General Manager of Sany Electric, a wholly-owned Chinese subsidiary of Sany.  Ralls is not a subsidiary of any Sany entity, and is an independent entity.

Jialiang Wu
<u>Nationality</u>:  Chinese
<u>Ralls registered address</u>:

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

160 Greentree Drive, Suite 101
Dover, Delaware 19904
<u>Sany Electric address</u>:
Beiqing Road Shahe,
Changping District
Beijing China 102206

Dawei Duan
<u>Nationality</u>: Chinese
<u>Ralls registered address</u>:
160 Greentree Drive, Suite 101
Dover, Delaware 19904
<u>Sany Group address</u>:
SANY Industrial Park, Economic and Technological Development Zone
Changsha, Hunan China

    **7.**    **§ 800.402(c)(1)(v)(C):  Where the ultimate parent is a public company, provide the name, address, and nationality (for individuals) or place of incorporation or other legal organization (for entities) of any shareholder with an interest of greater than five percent in such parent.**

    Not applicable.

    **8.**    **§ 800.402(c)(1)(vi):  Provide the name, address, website address (if any), and nationality (for individuals) or place of incorporation or other legal organization (for entities) of the person that will ultimately control the U.S. business being acquired.**

    As the only shareholders of Ralls, Messrs. Jialiang Wu and Dawei Duan will ultimately control the Project Companies until such time as ownership of the Project Companies are transferred to Lanxi/Yeland, which is expected on or about the commercial operation date of the wind turbines.  The response to question 6 contains relevant information regarding Messrs. Wu and Duan.  Ralls is not a subsidiary of any Sany entity, and is an independent entity.

    As mentioned above, however, Ralls' primary purpose is to provide business opportunities in the United States for wind turbines provided by Sany Electric.  Despite the formal independence of Ralls and Sany, in making business decisions affecting Ralls, Messrs. Duan and Wu consider their interests as officers of Sany companies.  They regularly consult with other officers of Sany, including Sany Electric's current president, Mr. Fugui Zhou.

    The business address for Sany Electric is Beiqing Road Shahe, Changping District, Beijing China 102206.  It does not have a separate website.  The business address of the Sany Group is SANY Industrial Park, Economic and Technological Development Zone, Changsha, Hunan China.  Its website is www.Sanygroup.com.

    **9.**    **§ 800.402(c)(1)(vii):  Provide the expected date for completion of the transaction, or the date it was completed.**

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

The MIPSA was executed by all parties thereto on February 28, 2012, and the transactions contemplated thereby were completed on March 16, 2012. Ralls acquired IWE from USIRE on April 9, 2012.

**10.    § 800.402(c)(1)(viii):  Provide a good faith approximation of the net value of the interest acquired in the U.S. business in U.S. dollars, as of the date of the notice.**

The total consideration to be paid for the Project Companies is $6,000,000 plus renewable energy credits, which was a negotiated price. Under the MIPSA, the purchase price for the Project Companies is divided into a series of payments. On March 16, 2012, IWE made an initial payment of $600,000. On May 31, 2012, IWE made a second payment of $1,200,000. On the earlier of (a) the date on which an aggregate of 36 MW of wind turbine power generation associated with the projects has been commissioned and (b) December 21, 2012, IWE will owe a final payment of $4,200,000. In addition, the Project Companies are obligated to transfer renewable energy credits generated by the projects to Terna until the latest of (x) the 20th anniversary of the commercial operation date under the relevant power purchase agreements, (y) the date when the relevant power purchase agreements are terminated in accordance with their terms and (z) December 31, 2033.

**11.    § 800.402(c)(1)(ix):  Provide the name of any and all financial institutions involved in the transaction, including as advisors, underwriters, or a source of financing for the transaction.**

No financial institutions were involved in the transaction for the purchase of the Project Companies and IWE. The transaction was self-financed. As described in response to question 10, a portion of the purchase price is still outstanding from IWE to Terna. As of the date of this notice, Ralls and IWE do not intend to borrow any funds to pay the remainder of the purchase price.

Financing to date for Ralls' activities have been through Sany Electric. Necessary capital infusions into Ralls have been made by Sany Electric as loans to Messrs. Duan and Wu. To the extent material to this review, Sany Electric is willing to provide additional information regarding its financing activities related to the Project Companies. In addition, Ralls is willing to provide CFIUS with additional information regarding the relationship between Ralls and the Sany Group of companies.

**12.    § 800.402(c)(2):  With respect to a transaction structured as an acquisition of assets of a U.S. business, provide a detailed description of the assets of the U.S. business being acquired, including the approximate value of those assets in U.S. dollars.**

While the acquisition was formally structured as an acquisition of equity interests, not of assets, it is important to understand what "assets" are actually purchased in a greenfield wind development project. When Ralls acquired the Project Companies, there was no on-going operating business. Instead, the Butter Creek projects represented a *potential* operating business.

11

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

Typically, in the wind energy development industry, a project developer will form legal entities, which act as holding companies for the various project development assets (*e.g.*, land leases, power purchase agreements, interconnection agreements, permits, etc.). Although these efforts are accomplished largely by a legal entity during the development phase, the collection of the various development assets into a legal entity does not necessarily constitute a business, and certainly not an operating business. Only upon completion of construction would any windfarm be aptly considered to be an entity engaged in interstate commerce.

At the time of acquisition by IWE, the Butter Creek projects – like all U.S. wind farm, greenfield projects – consisted of mere development assets, which assets were owned by Project Companies.

The development assets of the Project Companies were acquired by Ralls (through its acquisition of IWE), included the following: power purchase agreements with PacifiCorp (under which the Project Companies will sell all of the energy produced from the turbines at wholesale); interconnection agreements with PacifiCorp (under which the Butter Creek projects can interconnect to the transmission system owned and operated by PacifiCorp); various local, state, and federal permits (including Determinations of No Hazard issued by the FAA); leases and related real estate agreements with private landowners; wind data specific to the area; and related incidental development assets.

As described in response to question 10, the total value of the development assets, when acquired by IWE from Terna, was $6,000,000 plus renewable energy credits, which was negotiated between the Parties.

The ownership, by itself, of wind development assets does not by itself ensure that the windfarm will actually become an operating business. Instead, additional capital, labor and equipment need to be invested, including the following: approximately $7 million of "network upgrades" required to cover the costs to PacifiCorp for its transmission system upgrades to accommodate the injection of wind power from the Butter Creek projects into the grid; approximately $17 million to the U.S. construction firm that is responsible for the balance of plant construction and erection of the wind farm, including all necessary electrical design requirements; transportation of the turbines, towers, rotor blades and related equipment from a port in the United States to the Oregon sites; lease and related real estate payments; legal, accounting, and consulting fees; and of course the costs for the turbines, towers, rotor blades, and related equipment. Once built, the Butter Creek projects will comprise approximately $85 million of investment.

**13.     § 800.402(c)(3)(i):  With respect to the U.S. business that is the subject of the transaction and any entity of which that U.S. business is a parent (unless that entity is excluded from the scope of the transaction), provide their respective business activities, as, for example, set forth in annual reports, and the product or service categories of each, including an estimate of U.S. market share for such product or service categories and the methodology used to determine market share, and a list of direct competitors for those primary product or service categories.**

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

The Project Companies are essentially holding companies, holding assets which will comprise the respective wind farm assets. The Project Companies are described above in response to questions 3, 12, and 13.

**14.     § 800.402(c)(3)(ii): With respect to the U.S. business that is the subject of the transaction and any entity of which that U.S. business is a parent (unless that entity is excluded from the scope of the transaction), provide the street address (and mailing address, if different) within the United States and website address (if any) of each facility that is manufacturing classified or unclassified products or producing services described in paragraph (c)(3)(v) of this section, their respective Commercial and Government Entity Code (CAGE Code) assigned by the Department of Defense, their Dun and Bradstreet identification (DUNS) number, and their North American Industry Classification System (NAICS) Code, if any.**

None.

**15.     § 800.402(c)(3)(iii): With respect to the U.S. business that is the subject of the transaction and any entity of which that U.S. business is a parent (unless that entity is excluded from the scope of the transaction), list each contract (identified by agency and number) that is currently in effect or was in effect within the past five years with any agency of the United States Government involving any information, technology, or data that is classified under Executive Order 12958, as amended, its estimated final completion date, and the name, office, and telephone number of the contracting official.**

None.

**16.     § 800.402(c)(3)(iv): With respect to the U.S. business that is the subject of the transaction and any entity of which that U.S. business is a parent (unless that entity is excluded from the scope of the transaction), list any other contract (identified by agency and number) that is currently in effect or was in effect within the past three years with any United States Government agency or component with national defense, homeland security, or other national security responsibilities, including law enforcement responsibility as it relates to defense, homeland security, or national security, its estimated final completion date, and the name, office, and telephone number of the contracting official.**

None.

**17.     § 800.402(c)(3)(v)(A): With respect to the U.S. business that is the subject of the transaction and any entity of which that U.S. business is a parent (unless that entity is excluded from the scope of the transaction), list any products or services (including research and development) that it supplies, directly or indirectly, to any agency of the United States Government, including as a prime contractor or first tier subcontractor, a supplier to any such prime contractor or subcontractor, or, if known by the parties filing the notice, a subcontractor at any tier.**

None.

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

18.    § 800.402(c)(3)(v)(B):  With respect to the U.S. business that is the subject of the transaction and any entity of which that U.S. business is a parent (unless that entity is excluded from the scope of the transaction), list any products or services (including research and development), if known by the parties filing the notice, for which it is a single qualified source (i.e., other acceptable suppliers are readily available to be so qualified) or a sole source (i.e., no other supplier has needed technology, equipment, and manufacturing process capabilities) for any such agencies and whether there are other suppliers in the market that are available to be so qualified.

None.

19.    § 800.402(c)(3)(vi)(A):  With respect to the U.S. business that is the subject of the transaction and any entity of which that U.S. business is a parent (unless that entity is excluded from the scope of the transaction), list any products or services (including research and development) that it supplies to third parties and it knows are rebranded by the purchaser or incorporated into the products of another entity, and the names or brands under which such rebranded products or services are sold.

None.

20.    § 800.402(c)(3)(vi)(B):  With respect to the U.S. business that is the subject of the transaction and any entity of which that U.S. business is a parent (unless that entity is excluded from the scope of the transaction), list any products or services (including research and development) that in the case of services, it provides on behalf of, or under the name of, another entity, and the name of any such entities.

None.

21.    § 800.402(c)(3)(vii)(A):  With respect to the U.S. business that is the subject of the transaction and any entity of which that U.S. business is a parent (unless that entity is excluded from the scope of the transaction), list for the prior three years the number of priority rated contracts or orders under the Defense Priorities and Allocations System (DPAS) regulations (15 CFR part 700) that the U.S. business that is the subject of the transaction has received and the level of priority of such contracts or orders ("DX" or "DO").

None.

22.    § 800.402(c)(3)(vii)(B):  With respect to the U.S. business that is the subject of the transaction and any entity of which that U.S. business is a parent (unless that entity is excluded from the scope of the transaction), list for the prior three years the number of such priority rated contracts or orders that the U.S. business has placed with other entities and the level of priority of such contracts or orders, and the acquiring party's plan to ensure that any new entity formed at the completion of the notified transaction (or the U.S. business, if no new entity is formed) complies with the DPAS regulations.

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

None.


**23.**   **§ 800.402(c)(3)(viii):  With respect to the U.S. business that is the subject of the transaction and any entity of which that U.S. business is a parent (unless that entity is excluded from the scope of the transaction), provide a description and copy of the cyber security plan, if any, that will be used to protect against cyber attacks on the operation, design, and development of the U.S. business's services, networks, systems, data storage, and facilities.**

None.

**24.**   **§ 800.402(c)(4)(i):  Indicate whether the U.S. business that is being acquired produces or trades in items that are subject to the EAR and, if so, provide a description (which may group similar items into general product categories) of the items and a list of the relevant commodity classifications set forth on the CCL (i.e., Export Control Classification Numbers (ECCNs) or EAR99 designation).**

None.

**25.**   **§ 800.402(c)(4)(ii):  Indicate whether the U.S. business that is being acquired produces or trades in defense articles and defense services, and related technical data covered by the USML in the ITAR, and, if so, provide the category of the USML; articles and services for which commodity jurisdiction requests (22 CFR 120.4) are pending; and articles and services (including those under development) that may be designated or determined in the future to be defense articles or defense services pursuant to 22 CFR 120.3.**

None.

**26.**   **§ 800.402(c)(4)(iii):  Indicate whether the U.S. business that is being acquired produces or trades in products and technology that are subject to export authorization administered by the Department of Energy (10 CFR part 810), or export licensing requirements administered by the Nuclear Regulatory Commission (10 CFR part 110).**

None.

**27.**   **§ 800.402(c)(4)(iv):  Indicate whether the U.S. business that is being acquired produces or trades in Select Agents and Toxins (7 CFR part 331, 9 CFR part 121, and 42 CFR part 73).**

None.

**28.**   **§ 800.402(c)(5)(i):  Indicate whether the U.S. business that is the subject of the transaction possesses any licenses, permits, or other authorizations other than those**

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

under the regulatory authorities listed in paragraph (c)(4) of this section that have been granted by an agency of the United States Government (if applicable, list the relevant licenses).

A list of all licenses, permits, or other authorizations other than those under the regulatory authorities listed in paragraph (c)(4) are attached hereto as **Exhibit 4.**

**29.   § 800.402(c)(5)(ii):  Indicate whether the U.S. business that is the subject of the transaction has technology that has military applications (if so, identify such technology and describe such military applications).**

None.

**30.   § 800.402(c)(6)(i):  With respect to the foreign person engaged in the transaction and its parents, describe the business or businesses of the foreign person and its ultimate parent, as such businesses are described, for example, in annual reports, and the CAGE codes, NAICS codes, and DUNS numbers, if any, for such businesses.**

Ralls is a Delaware corporation, with its principal place of business in Atlanta, Georgia. It was established in 2010 for the purpose of participating in the U.S. renewable energy market. Ralls' primary business purpose to date has been to try and identify market opportunities and help develop wind energy projects for which Sany Electric's wind turbine generators can be used.  A brochure on Sany Electric's global business is provided at **Exhibit 5.**  Ralls has no DUNS, but its FEIN is 27-3363202.

**31.   § 800.402(c)(6)(ii):  With respect to the foreign person engaged in the transaction and its parents, describe the plans of the foreign person for the U.S. business with respect to:**

**(A) Reducing, eliminating, or selling research and development facilities;**

None.

**(B) Changing product quality;**

None.

**(C) Shutting down or moving outside of the United States facilities that are within the United States;**

None.

**(D) Consolidating or selling product lines or technology;**

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

As described above, Ralls intends to sell 100% of its interest in the Butter Creek projects to Lanxi/Yeland, a privately-held Chinese company, as of the beginning of commercial operation. Ralls and Lanxi/Yeland have signed an agreement to this effect, but Ralls intends that the parties will file a Notice with CFIUS prior to closing.

**(E) Modifying or terminating contracts referred to in paragraphs (c)(3)(iii) and (iv) of this section; or**

None.

**(F) Eliminating domestic supply by selling products solely to non-domestic markets.**

None.

**32.   § 800.402(c)(6)(iii):  With respect to the foreign person engaged in the transaction and its parents, indicate whether the foreign person is controlled by or acting on behalf of a foreign government, including as an agent or representative, or in some similar capacity, and if so, the identify the foreign government.**

No.

**33.   § 800.402(c)(6)(iv):  With respect to the foreign person engaged in the transaction and its parents, indicate whether a foreign government or a person controlled by or acting on behalf of a foreign government:**

**(A) Has or controls ownership interests, including convertible voting instruments, of the acquiring foreign person or any parent of the acquiring foreign person, and if so, the nature and amount of any such instruments, and with regard to convertible voting instruments, the terms and timing of their conversion;**

No.

**(B) Has the right or power to appoint any of the principal officers or the members of the board of directors of the foreign person that is a party to the transaction or any parent of that foreign person;**

No.

**(C) Holds any contingent interest (for example, such as might arise from a lending transaction) in the foreign acquiring party and, if so, the rights that are covered by this contingent interest, and the manner in which they would be enforced; or**

No.

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

(D) Has any other affirmative or negative rights or powers that could be relevant to the Committee's determination of whether the notified transaction is a foreign government-controlled transaction, and if there are any such rights or powers, their source (for example, a "golden share," shareholders agreement, contract, statute, or regulation) and the mechanics of their operation.

No.

34.   § 800.402(c)(6)(v):  With respect to the foreign person engaged in the transaction and its parents, describe any formal or informal arrangements among foreign persons that hold an ownership interest in the foreign person that is a party to the transaction or between such foreign person and other foreign persons to act in concert on particular matters affecting the U.S. business that is the subject of the transaction, and provide a copy of any documents that establish those rights or describe those arrangements.

None.

35.   § 800.402(c)(6)(vi):  With respect to the foreign person engaged in the transaction and its parents, provide for each member of the board of directors or similar body (including external directors) and officers (including president, senior vice president, executive vice president, and other persons who perform duties normally associated with such titles) of the acquiring foreign person engaged in the transaction and its immediate, intermediate, and ultimate parents, and for any individual having an ownership interest of five percent or more in the acquiring foreign person engaged in the transaction and in the foreign person's ultimate parent, the following information:

(A) A curriculum vitae or similar professional synopsis, provided as part of the main notice, and

(B) The following "personal identifier information," which, for privacy reasons, and to ensure limited distribution, shall be set forth in a separate document, not in the main notice:

(1) Full name (last, first, middle name);

(2) All other names and aliases used;

(3) Business address;

(4) Country and city of residence;

(5) Date of birth;

(6) Place of birth;

18

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

(7) U.S. Social Security number (where applicable);

(8) National identity number, including nationality, date and place of issuance, and expiration date (where applicable);

(9) U.S. or foreign passport number (if more than one, all must be fully disclosed), nationality, date and place of issuance, and expiration date and, if a U.S. visa holder, the visa type and number, date and place of issuance, and expiration date; and

(10) Dates and nature of foreign government and foreign military service (where applicable), other than military service at a rank below the top two non-commissioned ranks of the relevant foreign country.

Professional profiles for each officer and director of Ralls are attached as **Exhibit 6** to this application. The requested "personal identifier information" has also been provided in a separate sealed envelope.

36.     **§ 800.402(c)(6)(vii): With respect to the foreign person engaged in the transaction and its parents, provide the following "business identifier information" for the immediate, intermediate, and ultimate parents of the foreign person engaged in the transaction, including their main offices and branches:**

(A) Business name, including all names under which the business is known to be or has been doing business;

(B) Business address;

(C) Business phone number, fax number, and e-mail address; and

(D) Employer identification number or other domestic tax or corporate identification number.

Ralls Corporation
318 Cooper Circle
Peachtree City, GA 30269
USA
FEIN: 27-3363202

37.     **§ 800.402(d): List any filings with, or reports to, agencies of the United States Government that have been or will be made with respect to the transaction prior to its closing, indicating the agencies concerned, the nature of the filing or report, the date on which it was filed or the estimated date by which it will be filed, and a relevant contact point and/or telephone number within the agency, if known.**

None.

19

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

38.    **§ 800.402(e):  In the case of the establishment of a joint venture in which one or more of the parties is contributing a U.S. business, assume that the foreign person that is party to the joint venture has made an acquisition of the existing U.S. business that the other party to the joint venture is contributing or transferring to the joint venture and provide the name and address of the joint venture and the entities that established, or are establishing, the joint venture.**

Not applicable.

39.    **§ 800.402(g):  With respect to the foreign person that is a party to the transaction, its immediate parent, the U.S. business that is the subject of the transaction, and each entity of which the foreign person is a parent, append the most recent annual report of each such entity, in English.  Separate reports are not required for any entity whose financial results are included within the consolidated financial results stated in the annual report of any parent of any such entity, unless the transaction involves the acquisition of a U.S. business whose parent is not being acquired, in which case the notice shall include the most recent audited financial statement of the U.S. business that is the subject of the transaction.  If a U.S. business does not prepare an annual report and its financial results are not included within the consolidated financial results stated in the annual report of a parent, the filing shall include, if available, the entity's most recent audited financial statement (or, if an audited financial statement is not available, the unaudited financial statement).**

None of Ralls, IWE, or the Project Companies prepare annual reports.  A copy of Ralls' 2011 financial statement is provided at **Exhibit 7**.  A copy of IWE's financial statement through May 2012 is provided at **Exhibit 8**.  Copies of the Project Companies 2011 financial statements are attached at **Exhibit 9**.

40.    **§ 800.402(i):  Append a copy of the most recent asset or stock purchase agreement or other document establishing the agreed terms of the transaction.**

A copy of the MIPSA, together with all schedules, exhibits and ancillary agreements, is attached as **Exhibit 1**.  A copy of the agreement to effect Ralls' acquisition of IWE is attached as **Exhibit 3**.

41.    **§ 800.402(j)(1):  Append an organizational chart illustrating all of the entities or individuals above the foreign person that is a party to the transaction up to the person or persons having ultimate control of that person, including the percentage of shares held by each.**

Pre-, interim, and post-acquisition organizational charts are appended as **Exhibit 2** to this application.

42.    **§ 800.402(j)(2):  Provide the opinion of the person making the filing regarding whether:**

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

**(i) It is a foreign person;**

**(ii) It is controlled by a foreign government; and**

**(iii) The transaction has resulted or could result in control of a U.S. business by a foreign person, and the reasons for its view, focusing in particular on any powers (for example, by virtue of a shareholders agreement, contract, statute, or regulation) that the foreign person will have with regard to the U.S. business, and how those powers can or will be exercised.**

In the opinion of Ralls:

(i) Ralls is a foreign person as defined in 31 C.F.R. § 800.213;

(ii) it is not controlled by a foreign government; and

(iii) the transaction at issue will not result in control of a U.S. business because the Project Companies, as acquired, do not constitute businesses engaged in interstate commerce. As described more fully in the prefatory comments to this Notice, the Parties believe that the development rights acquired by Ralls in this transaction do not meet the regulatory definition of a "U.S. business."

**43.     § 800.402(k):  Provide information as to whether:**

**(1) Any party to the transaction is, or has been, a party to a mitigation agreement entered into or condition imposed under section 721, and if so, specify the date and purpose of such agreement or condition and the United States Government signatories; and**

**(2) Any party to the transaction has been a party to a transaction previously notified to the Committee.**

No party to this transaction has been a party to a mitigation agreement; nor has any party to this transaction previously been a party to a transaction notified to the Committee.

**44.     § 800.402(m):  Persons filing a voluntary notice shall include with the notice a list identifying each document provided as part of the notice, including all documents provided as attachments or exhibits to the narrative response.**

A list of the documents included as part of this notice follows:

Exhibit 1:  Membership Interests Purchase Agreement (MIPSA)

Exhibit 2:  Pre-, interim-, and post-acquisition organizational charts

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

Exhibit 3:  Membership Interest Purchase Agreement (IWE MIPSA)

Exhibit 4:  List of licenses, permits, or other authorizations

Exhibit 5:  Sany Electric brochure

Exhibit 6:  Professional profiles for each owner/director of Ralls Corp.

Exhibit 7:  Ralls Corporation's 2011 Financial Statement

Exhibit 8:  Intelligent Wind Energy, LLC's Financial Statement as of May 31, 2012

Exhibit 9:  Project Companies' 2011 Financial Statements

Exhibit 10: *In Re: The Request of Lower Ridge Windfarm, LLC and High Plateau Windfarm,*
*LLC for a Waiver of the five-Mile Radius Requirement*
OPUC Docket No. UM-1596

CERTIFICATION

Pursuant to subsection (n) of Section 721 of the Defense Production Act of 1950, I hereby certify that I am a duly authorized designee, as defined at 31 C.F.R. § 800.202, of Ralls Corporation, which is submitting the foregoing Notice, and that, to the best of my knowledge and belief:

1. The foregoing Notice fully complies with the requirements of Section 721 of the Defense Production Act of 1950, as amended, 31 C.F.R. Part 800, and any agreement or condition entered into with the Committee on Foreign Investment in the United States or any member of the Committee; and

2. The foregoing Notice, as it relates to the transaction, Ralls Corporation, and Ralls Corporation's parents, subsidiaries, and any other related entities described in the Notice, is accurate and complete in all material respects.

Signature:      _____
                Jialiang Wu

Title:          Chief Executive Officer

Submitter:      Ralls Corporation

Date:           06/28/2012

CONFIDENTIAL BUSINESS INFORMATION

CERTIFICATION

Pursuant to subsection (n) of Section 721 of the Defense Production Act of 1950, I hereby certify that I am the duly authorized designee, as defined at 31 C.F.R. § 800.202, of Terna Energy USA Holding Corporation, which is submitting the foregoing Notice, and that, to the best of my knowledge and belief:

1.  The foregoing Notice fully complies with the requirements of Section 721 of the Defense Production Act of 1950, as amended, 31 C.F.R. Part 800, and any agreement or condition entered into with the Committee on Foreign Investment in the United States or any member of the Committee; and

2.  The foregoing Notice, as it relates to the transaction, Terna Energy USA Holding Corporation, and Terna Energy USA Holding Corporation's parents, subsidiaries, and any other related entities described in the Notice, is accurate and complete in all material respects.

Georgios Angeletos
Secretary and Vice President
Terna Energy USA Holding Corporation


Submitter:        Terna Energy USA Holding Corporation

Date:             June 27, 2012