**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                )
RALLS CORPORATION,                              )
                                                )
                                                )
        *Plaintiff*,                            )
                                                )        Case No. 1:12-cv-01513-ABJ
        v.                                       )
                                                )
BARACK H. OBAMA,                                )
in his official capacity as                     )
President of the United States,                 )
COMMITTEE ON FOREIGN INVESTMENT                 )
IN THE UNITED STATES, and                       )
TIMOTHY F. GEITHNER, in his official            )
capacity as Secretary of the Treasury and       )
Chairman of the Committee on Foreign            )
Investement in the United States,               )
                                                )
                                                )
        *Defendants*.                           )
_____       )

**BRIEF OF OREGON WINDFARMS, LLC,**
**KENT MADISON, WILLIAM J. DOHERTY, AND IVAR CHRISTENSEN**
**AS AMICI CURIAE IN SUPPORT OF PLAINTIFF**

# TABLE OF CONTENTS

STATEMENT OF IDENTITY, INTEREST IN THE CASE, AND SOURCE OF AUTHORITY TO FILE ................................................................................... viii

STATEMENT OF CORPORATE DISCLOSURE ....................................................x

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS ............................x

INTRODUCTION ................................................................................................1

ARGUMENT ....................................................................................................1

I.      The Fifth Amendment's Due Process Clause prohibits the government from depriving Ralls of its property without due process of law .........................................1

II.     Congress cannot statutorily divest all courts of jurisdiction to determine whether a deprivation of property violates the Fifth Amendment's Due Process Clause ...................................................................................................3

        A.      The Fifth Amendment's Due Process Clause trumps Congress's jurisdiction-stripping authority and requires judicial review of Ralls's constitutional claims ....................................................................................3

        B.      Congress's Exceptions Clause authority is subject to the Fifth Amendment's Due Process Clause regardless of whether its ostensible purpose for exercising that authority is national security ...................................................5

III.    This Court may construe 50 U.S.C. Appx. § 2170(i) to limit the scope of the statute's jurisdiction-stripping provision to avoid a grave constitutional question ......7

IV.     CFIUS and the President deprived Ralls of property without any due process, in violation of the Fifth Amendment ...........................................................9

        A.      Defendants' orders deprived Ralls of its property ...........................................9

        B.      Defendants failed to afford Ralls an opportunity to be heard or even to inform it of the general nature of evidence purportedly justifying this deprivation ..............................................................................................10

V.      Judicial review of Executive Branch actions under 50 U.S.C. Appx. § 2170 is a
        critical safeguard for American businesses that benefit from foreign investment
        in the United States ................................................................................................. 14

        A.      Only the federal judiciary can ensure that the Executive Branch does not
                invoke 50 U.S.C. Appx. § 2170 to arbitrarily deprive businesses of their
                property interests without due process .......................................................... 14

        B.      The absence of judicial review of Executive Branch actions under
                50 U.S.C. Appx. § 2170 would have serious consequences for American
                citizens and businesses ................................................................................ 15

        C.      Judicial review is a necessary prophylactic against the Executive Branch
                asserting extra-constitutional authority in a manner inimical to basic
                separation-of-powers principles .................................................................. 17

CONCLUSION .......................................................................................................................... 18

# TABLE OF AUTHORITIES

**CASE**                                                                                      **PAGE**

*Algonquin SNG, Inc. v. Federal Energy Administration,*
    518 F.2d 1051 (D.C. Cir. 1975) ....................................................................................6

*Al Haramain Islamic Found., Inc. v. United States Dep't of the Treasury,*
    686 F.3d 965 (9th Cir. 2012)................................................................................. 13, 14

*American Airways Charters, Inc. v. Regan,*
    746 F.2d 865 (D.C. Cir. 1984) ....................................................................................2

*Armstrong v. Manzo,*
    380 U.S. 545 (1965) ....................................................................................................9

*Bartlett v. Bowen,*
    816 F.2d 695 (D.C. Cir. 1987) ................................................................................4, 5

*Battaglia v. General Motors Corp.,*
    169 F.2d 254 (2d Cir. 1948)......................................................................................4, 5

*Boumediene v. Bush,*
    553 U.S. 723 (2008) .................................................................................................6, 7

*Bowen v. Michigan Academy of Family Physicians,*
    476 U.S. 687 (1986) ....................................................................................................7

*County of Sacramento v. Lewis,*
    523 U.S. 833 (1998) ....................................................................................................2

*Den ex dem. Murray v. Hoboken Land & Improv. Co.,*
    59 U.S. 272 (1856) ..................................................................................................5, 6

*Demore v. Kim,*
    538 U.S. 510 (2003) ....................................................................................................7

*Elgin v. Dep't of the Treasury,*
    132 S. Ct. 2126 (2012)................................................................................................7

*Feinberg v. Federal Deposit Ins. Corp.*,
    522 F.2d 1335 (D.C. Cir. 1975) ................................................................................4

*GE v. Jackson*,
    610 F.3d 110 (D.C. Cir. 2010) ...............................................................................13

*Gray Panthers v. Schweiker*,
    652 F.2d 146 (D.C. Cir. 1980) .................................................................................9

*Grosjean v. American Press Co.*,
    297 U.S. 233 (1936) .................................................................................................2

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004) .................................................................................................6

*Hirsch v. McCulloch*,
    303 F.2d 208 (D.C. Cir. 1962) ...............................................................................15

*Honda Motor Co. v. Oberg*,
    512 U.S. 415 (1994) ...............................................................................................15

*In re Gault*,
    387 U.S. 1 (1967) .................................................................................................1, 2

*INS v. St. Cyr*,
    533 U.S. 289 (2001) .................................................................................................7

*Johnson v. Robison*,
    415 U.S. 361 (1974) ..........................................................................................5, 7, 8

*Marbury v. Madison*,
    5 U.S. 137 (1803) ...............................................................................................4, 7

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ...............................................................................................13

*Nat'l Council of Resistance of Iran I v. Dep't of State*,
    251 F.3d 192 (D.C. Cir. 2001) ..........................................................................12, 13

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    132 S. Ct. 2566 (2012) ..................................................................................7

*People's Mojahedin Org. of Iran v. Dep't of State,*
    613 F.3d 220 (D.C. Cir. 2010) ...................................................................13

*Propert v. District of Columbia,*
    948 F.2d 1327 (D.C. Cir. 1991) ..................................................................9

*Sanchez-Llamas v. Oregon,*
    548 U.S. 331 (2006) .....................................................................................2

*United States v. Robel,*
    389 U.S. 258 (1967) .....................................................................................6

*Volkswagenwerk Aktiengesellschaft v. Schlunk,*
    486 U.S. 694 (1988) .....................................................................................2

*Webster v. Doe,*
    486 U.S. 592 (1988) .....................................................................................7

*Weinberger v. Salfi,*
    422 U.S. 749 (1975) .....................................................................................7

**STATUTES**

50 U.S.C. Appx. § 2170 ....................................................................................14

50 U.S.C. Appx. § 2170(d)(1) ......................................................................3, 16

50 U.S.C. Appx. § 2170(d)(4) ...........................................................................3

50 U.S.C. Appx. § 2170(e) ............................................................................3, 8

50 U.S.C. Appx. § 2170(i) ..................................................................................8

## CONSTITUTIONAL PROVISIONS

U.S. CONST. amend. V ............................................................................................1

U.S. CONST. Art. III, § 2..........................................................................................4

## FEDERAL REGISTER

77 Fed. Reg. 60,281 .............................................................................3, 10, 11, 12, 16

## REGULATIONS

31 C.F.R. § 800.204(a)...........................................................................................16

## STATEMENT OF IDENTITY, INTEREST IN THE CASE,
## AND SOURCE OF AUTHORITY TO FILE

Oregon Windfarms, LLC (ðOregon Windfarmsö), is an American company that develops windfarms that are used to generate green energy. It is owned by Energy Vision, LLC, also an American company owned by three American citizens, and an individual American citizen. Oregon Windfarms created the Project Companies that hold the four windfarms known collectively as the ðButter Creek Projects.ö This project was sold to Terna Energy USA, which later indirectly sold it to Ralls Corporation (ðRallsö). The illegal orders issued by the Committee on Foreign Investment in the United States (ðCFIUSö) and President Barack H. Obama (ðPresidentö) prohibited construction of the Butter Creek Projects and required the divestment of the Project Companies by Ralls, among other restrictions.

An affiliate of Oregon Windfarms holds a continuing financial interest in the operations of the Butter Creek Projects, receiving a revenue stream related to the amount of electricity it generates. Because the challenged orders either have ended any opportunity to complete construction of the projects or delayed completion by at least many months, the company has already sustained several hundred thousand dollars of pecuniary harm. By the time CFIUS and the President issued the challenged orders, substantial construction had already begun on the Butter Creek Projects. Ralls was forced to remove wind turbine foundations and other items and fixtures from the properties. Delaying the completion of the project also entailed the financial and non-financial burdens associated with a stalled venture. This harmed not only Ralls but also American stakeholders with a financial interest in the projectøs operations, such as Oregon Windfarms.

In addition, Oregon Windfarms has an interest in continuing to create and sell green energy projects like the Butter Creek Projects. This interest is substantially impaired by the

possibility that the Executive Branch could— at any time, without any reason ascertainable by business owners, and without any regard for the months of delay and financial loss it may cause— prohibit an American company from selling a project to a buyer. This forces Oregon Windfarms and companies like it to risk financial loss from prohibition or delay when it sells a windfarm to a purchaser whose acquisition is subject to CFIUS's jurisdiction. Oregon Windfarms sells its windfarm projects to other companies, including foreign companies, that intend to construct and possibly resell the projects. However, any business that buys a windfarm project from Oregon Windfarms risks the same financial loss. Additionally, discouraging foreign investment in American wind energy reduces the amount of money and number of potential buyers in the sector, impairing potential profits for Oregon Windfarms' windfarm development business.

Kent Madison, William J. Doherty, and Ivar Christensen (collectively "Butter Creek landowners") own land upon which portions of the Butter Creek Projects were constructed. If it is not completed because of the challenged orders, they may lose part or all of an expected total thirty-five-year stream of lease income of approximately $13 million.

Other American businesses and workers are also indirectly harmed by the challenged orders. Construction contractors hired to construct the wind turbines and other facilities on the wind farms were pulled off of the job by the orders that required Ralls to halt construction and dismantle the project. The orders also destroyed other jobs that the project created in the field of green energy infrastructure, such as consultant and project management positions.

Purchasers and users of electric power also have suffered harm. Local utilities, one of which had already signed power purchase agreements with Ralls before the orders halted the project, have lost the green energy generated by the wind farm project. By eliminating that

source of power, the orders have driven up the cost and driven down the availability of green energy. As a result, the power companiesø customers, American consumers, have also been deprived of a source of affordable green energy.

Plaintiff consented to the filing of this brief of *amici curiae*. Defendants did not object to the request to file this brief.

## STATEMENT OF CORPORATE DISCLOSURE

Oregon Windfarms, LLC, is an American firm incorporated in the State of Oregon. There are no parent companies, subsidiaries, or affiliates of Oregon Windfarms, LLC, which have any outstanding securities in the hands of the public.

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

No counsel for a party authored this brief in whole or in part, and no such counsel or any party made a monetary contribution intended to fund the preparation or submission of this brief. No person or entity, other than amici, their members, or its counsel, made a monetary contribution intended to fund this brieføs preparation or submission.

**INTRODUCTION**

This case presents the question of whether the Executive Branch may take unauthorized actions that arbitrarily deprive individuals and businesses of their property at any time without any due process and without any judicial review. Here, CFIUS and the President used 50 U.S.C. Appx. § 2170 to deprive Ralls of its property interests in four small Oregon windfarms without even informing it of the general nature of the evidence that purportedly justifies these deprivations, let alone providing it with an opportunity to present evidence and be heard.

The Government takes the incredible position that Defendants' actions are unreviewable by any court, even though the unauthorized orders deprived Ralls of its property. But even if Defendants' reading of 50 U.S.C. § 2170(e) is correct, the Fifth Amendment's Due Process Clause demands more than this; and Congress cannot by legislative fiat relieve the Executive Branch of its obligation to comply with the procedural strictures the Fifth Amendment establishes. By flouting their obligation to provide due process, Defendants not only fly in the face of our Constitution but also endanger the ability of American businesses to transact in an international marketplace that requires the rule of law to thrive.

**ARGUMENT**

I.      **The Fifth Amendment's Due Process Clause prohibits the government from depriving Ralls of its property without due process of law.**

The U.S. Constitution guarantees Ralls, an American-registered corporation, due process of law. The Fifth Amendment's Due Process Clause unequivocally commands that "[n]o person shall … be deprived of life, liberty, or property, without due process of law". U.S. CONST. amend. V. The Supreme Court has recognized the importance of procedural due process in our constitutional system: "Due process of law is the primary and indispensable foundation of

individual freedom. It is the basic and essential term in the social compact which defines the rights of individuals and delimits the powers which the state may exercise." *In re Gault*, 387 U.S. 1, 20 (1967). And the Court has "emphasized time and again that '[t]he touchstone of due process is protection of the individual against arbitrary action of government,' whether the fault lies in a denial of fundamental procedural fairness or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998) (internal citations omitted).

Both U.S. citizens and foreign nationals are constitutionally entitled to procedural due process before the government can deprive them of their property. *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 350 (2006) ("A foreign national . . . , like anyone else in our country, enjoys under our system the protections of the Due Process Clause."); *see also Volkswagenwerk Aktiengeselschaft v. Schlunk*, 486 U.S. 694, 705 (1988) (noting that "there has been no question in this country of excepting foreign nationals from the protection of our Due Process Clause"). Likewise, corporations and business entities, such as Ralls, are protected by the Fifth Amendment's Due Process Clause. *See Grosjean v. American Press Co.*, 297 U.S. 233, 244 (1936); *American Airways Charters, Inc. v. Regan*, 746 F.2d 865, 873 n. 14 (D.C. Cir. 1984). The Due Process Clause thus applies with equal force to U.S. citizens and "foreign persons," as described by 50 U.S.C. Appx. § 2170(a)(3), conducting business in the United States.

Ralls and its owners possessed significant—and concrete—property interests in the four small Oregon windfarms covered by CFIUS's and the President's orders.[1] These property

---

[1] *See* Order Establishing Interim Mitigation Measures Regarding the Acquisition of Certain Assets of Terna Energy USA Holding Corporation by Ralls Corporation (July 25, 2012 ) ("Interim Order"); Amended Order Establishing Interim Mitigation Measures Regarding the Acquisition of Certain Assets of Terna Energy USA Holding Corporation by Ralls Corporation (August 2, 2012) ("Amended Interim Order"); The President's Order Regarding the Acquisition

interests included easements, power purchase agreements, generator interconnection agreements, agreements for the management and use of shared facilities with other nearby windfarms, government permits and approvals to construct windfarm turbines, and other assets related to the development of the Butter Creek Projects. (Am. Compl. ¶¶ 61, 81.) Before CFIUS or the President could deprive Ralls of its existing property interests in those four windfarms (Am. Compl. ¶¶ 61, 81), due process of law was required. But Defendants failed to meet this constitutional obligation and now assert that no court may call them to account. They are wrong.

## II.   Congress cannot statutorily divest all courts of jurisdiction to determine whether a deprivation of property violates the Fifth Amendment's Due Process Clause.

### A. The Fifth Amendment's Due Process Clause trumps Congress's jurisdiction-stripping authority and requires judicial review of Ralls's constitutional claims.

This Court has subject-matter jurisdiction to adjudicate Ralls's due process claims, irrespective of whether 50 U.S.C. Appx. § 2170(e) can be read to insulate such claims from judicial review. Defendants assert that 50 U.S.C. Appx. § 2170(e) strips this Court— and every other court— of jurisdiction to adjudicate Ralls's constitutional claims.[2] (Defs.' Mem. in Support of Mot. to Dismiss 1-2.) Defendants further claim that Congress specifically intended for 50 U.S.C. Appx. § 2170(e) to preclude all judicial review of all Presidential actions under subsection (d)(1) in cases such as this, including adjudication of whether the President's actions are consistent with the U.S. Constitution and, for that matter, whether the President's actions are even statutorily authorized. (Defs.' Mem. in Supp. of Mot. to Dismiss 1-2.) But Congress does not have the power to do this. To the extent that 50 U.S.C. Appx. § 2170(e) operates to strip all

---

of Four U.S. Windfarm Project Companies by Ralls Corporation," 77 Fed. Reg. 60,281 (Oct. 3, 2012) ("Presidential Order").

[2] 50 U.S.C. Appx. § 2170(e) provides in full: "The actions of the President under paragraph (1) [50 U.S.C. Appx. § 2170(d)(1)] and the findings of the President under paragraph (4) [50 U.S.C. Appx. § 2170(d)(4)] shall not be subject to judicial review."

courts of jurisdiction to review constitutional claims grounded in the Fifth Amendment's Due Process Clause, it fails to pass constitutional muster and must be struck down.

Congress cannot, consistent with the U.S. Constitution, strip all courts of jurisdiction to adjudicate the merits of federal constitutional claims implicating individual rights protected by the Fifth Amendment's Due Process Clause. To be sure, the Constitution makes clear that Congress has the authority under the Exceptions Clause to limit the jurisdiction of federal courts: "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution [and] the Laws of the United States, . . . with such Exceptions, and under such Regulations as the Congress shall make."[3] U.S. CONST. Art. III, § 2. But Congress's power under the Exceptions Clause to divest federal courts of jurisdiction to adjudicate concrete cases and controversies is not unlimited. And as the D.C. Circuit has recognized, although "Congress possesses broad powers to determine the jurisdictional limits of lower federal courts, it is . . . well established that Congress may not exercise that power to deprive any person of . . . liberty[] or property without due process of law." *Feinberg v. Federal Deposit Ins. Corp.*, 522 F.2d 1335, 1342 (D.C. Cir. 1975).

Appellate courts have long recognized that the Fifth Amendment's Due Process Clause constrains Congress's jurisdiction-stripping authority. *See Bartlett v. Bowen*, 816 F.2d 695, 706 (D.C. Cir. 1987); *Battaglia v. General Motors Corp.*, 169 F.2d 254, 257 (2d Cir. 1948) (concluding that jurisdiction-stripping provision precluding all judicial review of property deprivations without due process would be constitutionally invalid). For example, in *Battaglia*,

---

[3] *But see Marbury v. Madison*, 5 U.S. 137, 173-174 (1803) ("The constitution vests the whole judicial power of the United States in one supreme court, and such inferior courts as congress shall, from time to time, ordain and establish. This power is expressly extended to all cases arising under the laws of the United States; and consequently, in some form, may be exercised over the present case; because the right claimed is given by a law of the United States.").

-4-

the Second Circuit concluded that "while Congress has the undoubted power to give, withhold, and restrict the jurisdiction of courts other than the Supreme Court, it must not so exercise that power as to deprive any person of life, liberty, or property without due process of law or take private property without just compensation." 169 F.2d at 257. The D.C. Circuit has not only endorsed *Battaglia*'s conclusion that "congressional power over the jurisdiction of the courts is limited by the due process clause" but explained that the question whether a statute that "effectively foreclosed all judicial review of [a plaintiff's] constitutional claim" passes constitutional muster is not even an "arguably hard question." *Bartlett*, 816 F.2d at 706 ("think[ing] it obvious" that such a statute "ignores" the Supreme Court's "warnings in [*Johnson v.*] *Robison* and fails the test in *Battaglia* í   [and] would be flatly inconsistent with the doctrine of separation of powers implicit in our constitutional scheme").[4] This Court's jurisdiction thus necessarily extends to Ralls's constitutional claims.

### B. Congress's Exceptions Clause authority is subject to the Fifth Amendment's Due Process Clause regardless of whether its ostensible purpose for exercising that authority is national security.

The Government's invocation of national security concerns— legitimate or illegitimate— to justify its conduct cannot discharge federal courts of their fundamental duty to safeguard individual constitutional rights. The Supreme Court has long recognized that Congress cannot legislatively dispense with the minimum constitutional requirements of due process:

> The constitution contains no description of those processes which it was intended to allow or forbid. It does not even declare what principles are to be applied to ascertain whether it be due process. It is manifest that it was not left to the legislative power to enact any process which might be devised. The article is a restraint on the legislative as well as on the executive and judicial powers of the

---

[4] In *Johnson v. Robison*, the Supreme Court warned that a statute purporting to bar federal courts from deciding constitutional claims "would, of course, raise serious [constitutional] questions." 415 U.S. 361, 366 (1974).

government, and cannot be so construed as to leave congress free to make any
process "due process of law," by its mere will.

*Den ex dem. Murray v. Hoboken Land & Improv. Co.*, 59 U.S. 272, 276 (1856).

Although Defendants appear to suggest otherwise (Defs.' Mem. in Support of Mot. to
Dismiss 2), "the term ‗national security' is [not] a talisman, the thaumaturgic invocation of
which should, *ipso facto*, suspend the normal checks and balances on each branch of
Government." *Algonquin SNG, Inc. v. Federal Energy Administration*, 518 F.2d 1051, 1062
(D.C. Cir. 1975).[5] As the Supreme Court recently reaffirmed, even where national security
interests are implicated, fundamental separation-of-powers principles demand that the federal
judiciary remains the ultimate guardian of individual liberties:

> [T]he position that the courts must forgo any examination of the individual case
> and focus exclusively on the legality of the broader … [statutory] scheme cannot
> be mandated by any reasonable view of separation of powers, as this approach
> serves only to condense power into a single branch of government.… Whatever
> power the United States Constitution envisions for the Executive in its exchanges
> with other nations or with enemy organizations in times of conflict, it most
> assuredly envisions a role for all three branches when individual liberties are at
> stake.… Any process in which the Executive's factual assertions go wholly
> unchallenged or are simply presumed correct without any opportunity … to
> demonstrate otherwise falls constitutionally short.

*Hamdi v. Rumsfeld*, 542 U.S. 507, 535-37 (2004).[6]

This is not a case in which the Court is asked to opine on the wisdom of the President's
policy choices or value judgments but rather a case in which the Court is asked to determine— in

---

[5] *Cf. United States v. Robel*, 389 U.S. 258, 263-64 (1967) ("[T]he phrase ‗war power' cannot be
invoked as a talismanic incantation to support any exercise of congressional power which can be
brought within its ambit. ‗Even the war power does not remove constitutional limitations
safeguarding essential liberties.'").

[6] *See also Boumediene v. Bush*, 553 U.S. 723, 798 (2008) ("The laws and Constitution are
designed to survive, and remain in force, in extraordinary times. Liberty and security can be
reconciled; and in our system they are reconciled within the framework of the law.").

the context of a specific transaction— whether, *inter alia*, the Executive Branch unlawfully deprived Ralls of property without affording it constitutionally adequate due process.

**III.    This Court may construe 50 U.S.C. Appx. § 2170(i) to limit the scope of the statute's jurisdiction-stripping provision to avoid a grave constitutional question.**

Defendants' construction of 50 U.S.C. Appx. § 2170(e) to preclude all judicial review of the President's actions "raise[s] serious constitutional problems," and this Court should "construe the statute to avoid such problems" because "an alternative interpretation of the statute" is both reasonable and feasible. *INS v. St. Cyr*, 533 U.S. 289, 300 (2001) (citations omitted). Courts are obligated to construe statutes to avoid constitutional problems if it is fairly possible to do so. *Boumediene v. Bush*, 553 U.S. 723, 787 (2008); *accord Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2600 (2012) (recognizing "duty to construe a statute to save it, if fairly possible").

The Supreme Court has repeatedly recognized that a "serious constitutional question' would arise" if a jurisdiction-stripping provision was construed "to deny a judicial forum for constitutional claims arising under" a statute that purported to insulate Executive Branch actions from *all* judicial review. *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 687, 681 n. 12 (1986); *accord Elgin v. Dep't of the Treasury*, 132 S. Ct. 2126, 2132 (2012); *Weinberger v. Salfi*, 422 U.S. 749, 762 (1975). Constitutional claims are presumptively reviewable,[7] and it is well established that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Demore v. Kim*, 538 U.S. 510, 517 (2003) (quoting *Webster v. Doe*, 486 U.S. 592, 603 (1988)); *accord Elgin*, 132 S. Ct. at 2132; *Johnson v.*

---

[7] *See generally Marbury*, 5 U.S. at 177 ("[T]he constitution controls any legislative act repugnant to it' . It is emphatically the province and duty of the judicial department to say what the law is.").

*Robison*, 415 U.S. 361, 367 (1974). Here, the statute does not explicitly bar judicial review of constitutional claims. *See* 50 U.S.C. Appx. § 2170(e).

Taken together, the various subsections of Section 721 underscore that Congress did not plainly and unambiguously strip all federal courts of jurisdiction to review presidential actions under 50 U.S.C. Appx. § 2170(d). Subsection (i) limits the scope of subsection (e) to ensure that it does not impinge upon the essential functions of federal courts, including but not limited to adjudicating the merits of claims implicating core fundamental individual constitutional rights: "No provision of ... [Section 721 of the Defense Production Act of 1950, as amended,] shall be construed as altering or affecting any other authority, process, ... or review provided by or established under any other provision of Federal law ...." 50 U.S.C. Appx. § 2170(i). Further, the plain language of subsection (c), which contemplates that "information and documentary material filed with the President ... may be made public ... [if] relevant to any administrative *or judicial action or proceeding*," 50 U.S.C. Appx. § 2170(i) (emphasis added), buttresses the conclusion that presidential actions under subsection (d) are not categorically outside of the purview of judicial review.

Because there is no clear and unambiguous indication that Congress intended to preclude all judicial review of presidential findings under subsection (d) and 50 U.S.C. Appx. § 2170(i) can be reasonably read to ameliorate the constitutional infirmities with the statute's jurisdiction-stripping provision, this Court may, consistent with well-established Supreme Court precedent, preserve Ralls's constitutionally required right of judicial review and the federal judiciary's essential role without invalidating subsection (e) of Section 721.

IV.   **CFIUS and the President deprived Ralls of property without any due process, in violation of the Fifth Amendment.**

Judicial review will ensure compliance with the Fifth Amendment's Due Process Clause, which guarantees that the government may not deprive persons and business entities of their property without, at minimum, affording them a "opportunity to be heard í at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (citation and internal quotation marks omitted); *see Gray Panthers v. Schweiker*, 652 F.2d 146, 165 (D.C. Cir. 1980) ("core requirements of due process" include "adequate notice and a genuine opportunity to explain one's case"); *Propert v. District of Columbia*, 948 F.2d 1327, 1331 (D.C. Cir. 1991). Critically, at this point in the proceedings the Court need not and should not engage in a full-blown review of Ralls's claims on the merits; it is enough for the Court to conclude that it has jurisdiction to undertake such a full review, which it plainly does.  But even at this preliminary stage, it is clear that, as described below, CFIUS and the President deprived Ralls of its property without providing any notice of the evidence purportedly justifying that deprivation or any opportunity to adduce evidence and explain their case, let alone a genuine opportunity to be heard in a meaningful manner.

A.  **Defendants' orders deprived Ralls of its property.**

The crux of this case is Ralls's purchase of substantial property interests in the four Oregon windfarms affected by the challenged orders. The assets purchased included easements with local land owners— including the *amici* here— which enabled Ralls to access the properties and construct turbines; power-purchase and generator-interconnection agreements with the local utility, PacificCorp; agreements with other windfarms; and government permits and approvals required for Ralls to construct windfarm turbines. (Am. Compl. ¶ 61.) By July 25, 2012, when CFIUS issued the Interim Order, Ralls had completed installation of all five windfarm turbine

foundations at one windfarm and partially installed seven other windfarm turbine foundations at two other windfarms. (Am. Compl. ¶ 81.) By this point, American citizens and businesses also had an economic interest in the success of these four Oregon windfarms: an affiliate of Oregon Windfarms in its revenue stream from electricity generation, the lessors of the land on which the windfarms were being constructed, contractors hired to install windfarm turbine foundations and construct the windfarm turbines, wind turbine technicians, utilities, and green-energy companies.[8]

The Interim and Amended Interim Orders issued by CFIUS and the Presidential Order deprived Ralls of its property interests in these four windfarms. CFIUS's July Interim Order required Ralls and the Project Companies to "immediately cease all Construction and Operations" and "remove all stockpiled or stored items" from the four windfarms. (Am. Compl. ¶ 77.) The Interim Order also prohibited Ralls and the Project Companies from accessing the windfarms. (Am. Compl. ¶ 77.) The Amended Interim Order further prohibited Ralls from selling or transferring "any items made or otherwise produced by the Sany Group," a manufacturing company affiliated with Ralls's owners, and from selling or transferring the windfarms to any third party— including would-be American buyers— until it had removed all fixtures and concrete foundations and received permission to transfer the properties to a CFIUS-approved buyer. (Am. Compl. ¶ 80.)

The Presidential Order went further still, empowering CFIUS-selected "employees of the United States government" to access "all premises and facilities" on the windfarms at any time,

_____

[8] For example, Butter Creek landowners Kent Madison, William J. Doherty, and Ivar Christensen are likely to lose about $13,000,000 in lease payments as a direct result of the challenged orders. Likewise, the local utility, PacificCorp, will lose access to the 40 megawatts (MW) of wind-generated energy that the four windfarms are expected to generate. (Am. Compl. ¶ 70.)

for any reason to inspect and/or copy essentially anything they want. Presidential Order, § 2(h), 77 Fed. Reg. at 60,281-83. Notably, the "premises and facilities" necessarily include the real property owned by the *amici* Butter Creek landowners; thus, the Presidential Order constitutes a blanket authorization for government agents to enter the property of American citizens, implicating obvious Fourth Amendment concerns. And the Presidential Order also authorized CFIUS-selected federal employees to "interview officers, employees, or agents" of Ralls or the four windfarms" including American citizens" "concerning any matter relating to th[e] order . . . ." Presidential Order, § 2(h)(iii), 77 Fed. Reg. at 60,283.

Ralls is thus prohibited from investing in four small windfarms" which were created by Oregon Windfarms, a limited liability company wholly owned by American citizens (*see* Am. Compl. ¶¶ 35-36), and constructed upon land owned by American landowners such as Mr. Madison, Mr. Doherty, and Mr. Christensen. These burdensome restrictions not only directly implicate Ralls' property interests but also harm U.S. citizens and businesses. The challenged orders have had adverse collateral consequences affecting a would-be U.S. buyer of the Project Companies (*see* Am. Compl. ¶ 82); a local utility company, PacificCorp (Am. Compl. ¶ 70); American landowners who had contracted to lease their property to the four Oregon windfarms; American contractors who rely on the employment opportunities created by the windfarms as a source of income to support their families; local businesses that benefit when American contractors have sufficient disposable income to purchase their goods and services; and American consumers, who have a pecuniary interest in the increased availability of affordable American green energy. The orders implicate the fundamental due process rights of Ralls and threaten the economic interests of American citizens. This Court should reject Defendants' argument that they may trample these due process rights without review or sanction.

-11-

**B. Defendants failed to afford Ralls an opportunity to be heard or even to inform it of the general nature of evidence purportedly justifying this deprivation.**

In the course of issuing the challenged orders, neither CFIUS nor the President took any steps to ensure that the procedural due process rights of Ralls were honored. Instead, Defendants simply deprived Ralls of its property without meaningful explanation based on undisclosed evidence that they claim justifies their actions. Ralls had no opportunity to meaningfully challenge the proposition that Ralls's acquisition of four windfarms "might … threaten[] to impair the national security of the United States …." *See* Presidential Order, § (1)(a), 77 Fed. Reg. at 60,281. Ralls had no opportunity to review the alleged evidence supporting such a conclusion and was not made aware—even in general terms—of the nature of this evidence. (Am. Compl. ¶¶ 88, 100-103.) Ralls has not been informed of any specific conclusions Defendants have drawn from this evidence, apart from Defendants' general conclusion that Ralls's investment in four small windfarms may at an unspecified time pose some sort of vague, unspecified danger to "national security" for an unspecified reason. (Am. Compl. ¶ 88, 101-102.) And Ralls has not even been told whether the "evidence" Defendants relied on to reach those conclusions is classified or unclassified. (Am. Compl. ¶ 88.)

In short, the procedural protections CFIUS and the President have afforded Ralls in this matter make those provided by the infamous Star Chamber—where the accused was at least made aware of the evidence against him—appear rather generous. None of the hallmarks of procedural due process is present here: meaningful notice and a meaningful opportunity to be heard, review by a neutral and detached decisionmaker, or fundamental fairness.

The mere fact that Ralls's owners are foreign nationals does not alter the analysis. As the D.C. Circuit has held, the Due Process Clause requires that even a "putative foreign terrorist organization" must be given notice, access to unclassified evidence, and a "the opportunity to

present, at least in written form, such evidence as those entities may be able to produce to rebut the administrative record or otherwise negate the proposition that they are foreign terrorist organizations" before it is finally designated as such under AEDPA. *Nat'l Council of Resistance of Iran I v. Dep't of State*, 251 F.3d 192, 208-09 (D.C. Cir. 2001); *accord People's Mojahedin Org. of Iran v. Dep't of State*, 613 F.3d 220, 228 (D.C. Cir. 2010) (reaffirming that "due process requires that . . . [an alleged 'foreign terrorist organization'] be notified of the unclassified material on which the Secretary proposes to rely and an opportunity to respond to that material before its redesignation"). Defendants have not claimed that Ralls is a foreign terrorist organization, yet they have not even provided Ralls the procedural due process protections that such organizations are constitutionally entitled to. Defendants' actions thus violated Ralls's Fifth Amendment right to procedural due process under recent D.C. Circuit precedent.

Application of "the now-familiar *Mathews v. Eldridge* balancing test" for determining what procedural due process safeguards are constitutionally required, *GE v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010), to the facts of this case confirms this conclusion. The *Mathews v. Eldridge* test "consider[s] (1) the significance of the private party's protected interest, (2) the government's interest, and (3) the risk of erroneous deprivation and 'the probable value, if any, of additional or substitute procedural safeguards.'" *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). All three *Mathews v. Eldridge* factors support the conclusion that Defendants violated Ralls's due process rights.

First, the challenged orders not only prevent Ralls from transferring its property interests in the four windfarms "whatsoever, for any purpose"— even selling its property interests to a willing American buyer— without CFIUS's permission but also require Ralls to destroy its property (e.g., fully and partially installed wind turbine foundations). *See Al Haramain Islamic*

*Found.*, *Inc. v. United States Dep't of the Treasury*, 686 F.3d 965, 986 (9th Cir. 2012). Second, since Ralls can at best "guess ... as to the reasons for the [orders] ... , the risk of erroneous deprivation [i]s high." *Id.* Third, "although national security might justify keeping ... [Ralls] in the dark," CFIUS and the President made "no effort to  demonstrate that ... [their] failure to provide ... reasons for ... [their actions] promoted national security," *id.*, let alone their failure to provide Ralls with *any* opportunity to be heard and present evidence. In *Al Haramain*, the U.S. Court of Appeals for the Ninth Circuit held that the due process rights of an entity "designated as a Specially Designated Global Terrorist" for allegedly "provid[ing] support to al Qaida" were violated on less egregious facts than those here. *See id.* at 974, 985-86. Ralls, a commercial enterprise seeking to transact with American green energy firms, deserves equal if not more due process protections. In order to remedy this unconstitutional deprivation, this Court must exercise jurisdiction over Ralls's Fifth Amendment claims.

**V.    Judicial review of Executive Branch actions under 50 U.S.C. Appx. § 2170 is a critical safeguard for American businesses that benefit from foreign investment in the United States.**

**A. Only the federal judiciary can ensure that the Executive Branch does not invoke 50 U.S.C. Appx. § 2170 to arbitrarily deprive businesses of their property interests without due process.**

Because the federal judiciary is the only avenue available to Ralls to challenge CFIUS's and the President's actions under 50 U.S.C. Appx. § 2170, judicial review of its constitutional claims is constitutionally necessary. Section 721 of the Defense Production Act of 1950, as amended, 50 U.S.C. Appx. § 2170, does not provide any meaningful procedural safeguards for foreign- and American- business entities and individuals that attract CFIUS's attention. 50 U.S.C. Appx. § 2170 does not provide for *any* administrative mechanism to review Executive Branch actions under the statute (let alone guarantee affected business entities a meaningful

-14-

opportunity to be heard and attempt to rebut the government's evidence). Where, as here, administrative procedural safeguards do not adequately substitute for judicial review to protect business entities' and individuals' Fifth Amendment due process rights, judicial review is a *sine qua non* for due process and the rule of law. *See, e.g., Honda Motor Co. v. Oberg*, 512 U.S. 415 (1994) (denial of judicial review of punitive damage awards found unconstituttional because the statute provided no adequate substitute procedure); *see Hirsch v. McCulloch,* 303 F.2d 208, 213 (D.C. Cir. 1962) (due process requires that "findings and conclusions of the [administrative factfinder must be] ... subject to judicial review"). This Court should exercise jurisdiction over Ralls's claims to ensure that it is at least afforded the opportunity to be heard that it is constitutionally entitled to under the Fifth Amendment's Due Process Clause.

**B. The absence of judicial review of Executive Branch actions under 50 U.S.C. Appx. § 2170 would have serious consequences for American citizens and businesses.**

The orders have inflicted real-world, concrete harms on the economic interests of American citizens and businesses, whose property rights and economic interests have been adversely affected by Defendants' actions. When CFIUS and the President prohibited Ralls's construction and operation of four small Oregon windfarms, it eliminated the construction, consulting, and green-energy jobs that the Project Companies had created and would create. For example, the local utilities who had signed power-purchase agreements for affordable wind energy lost access to the power they had contracted for when the sale to Ralls was blocked and the entire wind-generation project was delayed by months or more. The private landowners who leased their property to Ralls to build the windfarms also suffered substantial direct monetary harm as a result of CFIUS's actions.

More broadly, if this Court concludes that CFIUS's and the President's actions are unreviewable, this case may have substantial ramifications for the American economy. For the Court will, by implication, effectively cede to the President and CFIUS unfettered authority to arbitrarily deprive American citizens and businesses of their property interests without any meaningful procedural safeguards, whenever they engage in transactions with foreign nationals that the Executive Branch unilaterally determines constitute "covered transactions" within the ambit of 50 U.S.C. Appx. § 2170 (another determination that would accordingly be unreviewable). This will have grave, long-term adverse collateral consequences for American-owned companies— with American employees— that depend on foreign investment to thrive or, in some cases, even sustain their operations.

As this case illustrates, without judicially enforceable limits on CFIUS's and the President's authority under 50 U.S.C. Appx. § 2170, the Executive Branch may take *ultra vires* actions in excess of its statutory authority with complete impunity. Under subsection (d)(1), the President may only act to "suspend or prohibit … [a] covered transaction that threatens to impair the national security of the United States." 50 U.S.C. Appx. § 2170(d)(1). And as broadly as subsection (a)(3) defines "covered transaction," the statute, as a definitional matter, limits the scope of this key phrase to only encompass transactions "by or with any foreign person which could result in the foreign control of any person." 50 U.S.C. Appx. § 2170(d)(1); *see* 31 C.F.R. § 800.204(a) (defining "control"). Notwithstanding this clear limitation on presidential authority under the statute, the Presidential Order prohibits Ralls from selling the four windfarms and all items and structures on those windfarms to willing buyers— including American buyers. *See* Presidential Order, § 2(d)-(f), 77 Fed. Reg. at 60,282. CFIUS's Amended Interim Order contained an identical provision. (Am. Compl. ¶ 85.) Logically, a transaction that transfers

-16-

property to an American buyer cannot result in the foreign control of any person— quite the opposite. A bar on Ralls selling the Project Companies to an American firm is thus outside any reasonable definition of the Defendants' authority, and yet the orders prohibit an American buyer from purchasing— and making productive use of— the windfarms without CFIUS's approval. (Am. Compl. ¶¶ 82-85.) In the absence of judicial review of CFIUS's and the President's actions, what, if any, enforceable limits on the Executive Branch's actions in cases such as this exist?

The Executive Branch's assertion of the power to arbitrarily deprive foreign and American businesses of their property will chill much-needed foreign investment and cause ripple effects through the economy. Even an American company that does not deal directly with a foreign company, but only with another company that does so, might find that its ability to buy and sell property interests, and to form and carry out contracts, has been indirectly impaired by CFIUS or the President.

**C. Judicial review is a necessary prophylactic against the Executive Branch asserting extra-constitutional authority in a manner inimical to basic separation-of-powers principles.**

The stakes of this case are high. If this Court concludes that actions taken pursuant to 50 U.S.C. Appx. § 2170 are not subject to judicial review— even to determine whether due process has been honored or whether the Executive Branch's actions were *ultra vires*— this will create a dangerous imbalance in our system of checks and balances: taken to its logical conclusion, such a holding would allow the Executive Branch to take literally *any* action regarding any matter that conceivably involved a transaction that conceivably involved a foreign person.[9]

---

[9] Indeed, even the "foreign person" requirement need not be honored, since the government would, by its argument, be shielded from judicial review of actions that did *not* involve a foreign person.

Only meaningful judicial review of the Executive Branch's actions under the statute can effectively check the broad authority over U.S. citizens' and businesses' transactions "by or with" foreign nationals that 50 U.S.C. Appx. § 2170 confers on the Executive Branch and ensure that the statute is applied in a manner that is consistent with the Constitution and federal law. If this Court concludes that it does not have jurisdiction to adjudicate Ralls's constitutionally based claims, it will not only set a dangerous precedent that threatens to undermine fundamental separation-of-powers principles that are essential to our constitutional scheme but give the Executive Branch tacit authority to ignore inconvenient constitutional and statutory constraints on its ability to deprive persons of property or liberty without due process of law. Such an unprecedented abdication of the judicial role would not only concentrate power in the Executive Branch in the precise manner that the Framers sought to avoid but undermine the property rights protections and confidence in the rule of law that are necessary for American enterprises and their foreign business partners to create a prosperous tomorrow.

## CONCLUSION

In accordance with the U.S. Constitution's guarantees and binding precedent, this Court should deny Defendants' motion to dismiss.


Dated:  November 12, 2012

Respectfully submitted,

/s/ Amber D. Abbasi
Amber D. Abbasi (DC Bar No. 974286)
CAUSE OF ACTION
1919 Pennsylvania Avenue NW, Suite 650
Washington, D.C. 20006
Phone: 202.499.4232
Fax: 202.507.5881
Email: Amber.Abbasi@CauseOfAction.org

*Attorney for Amici Curiae*
*Oregon Windfarms, LLC,*
*Kent Madison, William J. Doherty, and Ivar Christensen*