# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| RALLS CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 12-1513 (ABJ) |
| ) | |
| COMMITTEE ON FOREIGN ) | |
| INVESTMENT IN THE ) | |
| UNITED STATES, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## <u>MEMORANDUM OPINION</u>

This case concerns the availability of judicial review over certain actions taken by the President of the United States in the interest of protecting the national security.  Plaintiff Ralls Corporation ("Ralls") is a Delaware corporation owned by two Chinese nationals who are principals of a Chinese manufacturing concern. It entered into a transaction involving the acquisition of several windfarm projects located in the vicinity of a U.S. Naval installation in Oregon, where Ralls planned to install the Chinese company's turbines.  Ralls challenges a September 2012 order issued by President Barack Obama under section 721 of the Defense Production Act of 1950, as amended, 50 U.S.C. app. § 2170 (2012) ("section 721"), prohibiting the transaction.

In his order, the President found that Ralls and its owners, through their exercise of control over the four American-owned companies, might take action that threatens to impair the national security of the United States.  Based on that finding, the President found the transaction

to be prohibited, ordered Ralls to divest, and imposed other conditions on the disposition of the projects and the turbines.

Ralls then brought this action seeking declaratory and injunctive relief, and defendants moved to dismiss. Defendants question the Court's jurisdiction to hear any aspect of the dispute, and they point to the broad finality provision contained in section 721. It is their motion to dismiss on jurisdictional grounds that is before the Court at this juncture.

The statute is not the least bit ambiguous about the role of the courts: "The actions of the President . . . and the findings of the President . . . shall not be subject to judicial review." 50 U.S.C. app. §2170(e). Nonetheless, Ralls asks the Court to find that the President exceeded his statutory authority in imposing the conditions in the order, and that he acted in violation of the Constitution by treating these foreign owners of wind farms differently than foreign owners of other wind farms. This artful legal packaging cannot alter the fact that what plaintiff is urging the Court to do is assess the President's findings on the merits, and that it cannot do. Since the finality provision bars review of the *ultra vires* and equal protection challenges to the President's order, the Court will dismiss those claims for lack of jurisdiction. But plaintiff has also brought a due process claim that raises purely legal questions about the process that was followed in implementing the statute, and that claim will stand. The Court notes that it is not ruling that the due process claim *has* merit – simply that it is bound to go on to *decide* the claim on its merits. The Court will reach that question after further briefing by the parties.

Ralls also seeks review of an August 2012 order issued by the Committee on Foreign Investment in the United States, which imposed certain interim mitigating measures pending the President's review of the transaction. That order expired by its own terms and was expressly revoked by the President's order, and therefore, the Court will dismiss those claims as moot.

2

# BACKGROUND

## I.     Statutory Background

Section 721 of the Defense Production Act of 1950, also known as the "Exon-Florio Amendment," established the Committee on Foreign Investment in the United States ("CFIUS"). Section 721 gives CFIUS and the President the authority to take action in connection with a "covered transaction," which is defined as "any merger, acquisition, or takeover . . . by or with any foreign person which could result in foreign control of any person engaged in interstate commerce in the United States."  50 U.S.C. app. § 2170(a)(3).

CFIUS is a committee comprised of the Secretaries of Treasury, Homeland Security, Commerce, Defense, State, Energy, and Labor; the Attorney General of the United States; the Director of National Intelligence; and the heads of any other executive department, agency, or office the President determines to be appropriate; or their designees.   50 U.S.C. app. § 2170(k)(2).[1]  CFIUS review of a covered transaction can be initiated in two ways.  First, any party or parties to the transaction may initiate a review by submitting a written notice to the Chairperson of the Committee.  *Id.* § 2170(b)(1)(C)(i).  Alternatively, the President or CFIUS itself may initiate a review.  *Id.* § 2170(b)(1)(D).  Once review has been initiated, the statute grants the Committee thirty days to review the transaction to determine its effects on the national security of the United States.  *Id.* §§ 2170(b)(1)(A), (E).  If the review results in a determination that the transaction threatens to impair the national security of the United States and that the threat has not yet been mitigated, the Committee must conduct an investigation of the effects of the transaction on national security and "take any necessary actions in connection with the transaction" to protect national security.  *Id.* § 2170(b)(2)(A)–(B).  The statute expressly grants

---

1     The Secretary of Labor and Director of National Intelligence are nonvoting, *ex officio* members.  50 U.S.C. app. § 2170(k)(2).

CFIUS the authority to "negotiate, enter into or impose, and enforce any agreement or condition with any party to the covered transaction in order to mitigate any threat to the national security of the United States that arises as a result of the covered transaction." *Id.* § 2170(*l*)(1)(A). The investigation must be completed within 45 days. *Id.* § 2170(b)(2)(C).[2]

After CFIUS completes its investigation, it is required to submit a report to Congress on the results of the investigation or submit the matter to the President for decision. 50 U.S.C. app. § 2170(b)(3)(B). Section 721 grants the President the authority to "take such action for such time as the President considers appropriate to suspend or prohibit any covered transaction that threatens to impair the national security of the United States," so long as he finds that: (1) there is credible evidence that leads him to believe the foreign interest exercising control might take action that threatens to impair the national security; and (2) other provisions of the law do not provide adequate and appropriate authority to enable him to protect the national security. *Id.* § 2170(d)(1), (4). The President is required to announce his decision no later than fifteen days after the CFIUS investigation is completed. *Id.* § 2170(d)(2). The statute also provides a list of factors that the president "may, taking into account the requirements of national security, consider." *Id.* § 2170(f). These factors include consideration of the characteristics of the particular countries associated with the transaction.

Importantly, the statute contains a finality provision which states: "The actions of the President under paragraph (1) of subsection (d) of this section and the findings of the President

---

2       Once a covered transaction has been reviewed or investigated by CFIUS, CFIUS may only initiate another review if one of the parties to the transaction submitted false or misleading material information to the committee or, under certain conditions, if a party intentionally and materially breaches a mitigation agreement or condition that CFIUS had imposed. *Id.* § 2170(b)(1)(D).

under paragraph (4) of subsection (d) of this section shall not be subject to judicial review." *Id.* § 2170(e).

## II.      Factual Background

Ralls is owned by two Chinese Nationals, Dawei Duan and Jialiang Wu, who are also the CFO and a Vice President of the Sany Group ("Sany"), a Chinese manufacturing company.  Am. Compl. [Dkt. # 20] ¶ 14.  According to the amended complaint, Ralls's mission is to identify opportunities for the construction of windfarms in the United States that will use Sany turbines in order to demonstrate their quality and reliability to the United States wind industry.  *Id.* ¶ 5.

### A.   The Butter Creek Projects

In March 2012, Ralls purchased four American-owned, limited liability companies:   Pine City Windfarm, LLC; Mule Hollow Windfarm, LLC; High Plateau Windfarm, LLC; and Lower Ridge Windfarm, LLC.  *Id.* ¶¶ 35–36, 59–60.  Each of the four companies was associated with the development of a particular five-turbine windfarm project in north-central Oregon, and each held a bundle of assets related to the development of its project.  *Id.* ¶¶ 36–37, 61.  Collectively, the projects are known as the "Butter Creek projects."

The four companies were originally created by Oregon Windfarms, an Oregon limited liability company owned by United States citizens.  *Id.* ¶ 35.  In December 2010, Oregon Windfarms sold its interests to Terna Energy USA Holding Corporation ("Terna"), a Delaware corporation owned by a publicly traded Greek company.  *Id.* ¶ 59.  In March 2012, Terna sold its membership interests to Intelligent Wind Energy, LLC, a Delaware limited liability company that was owned by U.S. Innovative Renewable Energy, LLC ("USIRE"), a Delaware limited liability company owned by a United States Citizen.  *Id.* ¶ 60.  USIRE then sold Intelligent Wind Energy, LLC to Ralls.  *Id.*

The sites of the four Butter Creek projects overlap with a United States Navy restricted airspace and bombing zone that is used by military aircraft based out of Naval Air Station Whidbey Island.  Am. Compl. ¶¶ 40–41.  The proposed Butter Creek project sites are all located in or near the eastern region of the restricted airspace.  *Id.* ¶ 53.  Three of the windfarm project sites are located within seven miles of the restricted airspace.  *Id.* ¶ 42.  The fourth, Lower Ridge, is located within the restricted airspace.  *Id.* ¶¶ 42–43.  Shortly after Ralls acquired the Butter Creek project companies, the United States Navy expressed concerns regarding the location of the Lower Ridge windfarm, *id.* ¶ 62, and Ralls agreed to move it to a new location, still within the eastern region of the restricted airspace.  *Id.* ¶ 64; Ex. 1 to Am. Compl.

The amended complaint alleges that Oregon Windfarms has already developed several windfarm projects in the vicinity of the proposed Butter Creek projects and the restricted airspace.  Am. Compl. ¶¶ 44–49.  Turbines belonging to two of those windfarms are located within the restricted airspace.  *Id.* ¶ 47.  These turbines are made by REpower, a German company owned and operated by an Indian conglomerate, or by Vestas, a Danish company.  *Id.* ¶¶ 46–49.  Foreign investors allegedly own one of the Oregon Windfarms projects, and that acquisition preceded the installation of the turbines.  *Id.* ¶ 50.  In addition, the amended complaint alleges that hundreds of completed turbines are located in or near the western region of the restricted airspace, *id.* ¶¶ 54–55, and dozens, if not hundreds, of existing turbines in or near the western region of the restricted airspace are foreign-made and foreign-owned.  *Id.* ¶ 57.

On June 28, 2012, Ralls and Terna submitted a voluntary notice to CFIUS, pursuant to 50 U.S.C. app. § 2170(b)(1)(C), and the implementing regulations, 31 C.F.R. § 800.402(c), informing it of Ralls's recent acquisition of the Butter Creek project companies.  Am. Compl. ¶ 72.  In the weeks that followed, CFIUS asked Ralls and Terna a number of follow-up

questions, which Ralls and Terna answered.  *Id.* ¶ 73.  The amended complaint alleges that during this period, Ralls was provided one opportunity to meet with CFIUS.  *Id.* ¶ 74.  During that meeting, CFIUS did not provide or discuss with Ralls any evidence it had obtained or was reviewing in connection with national security risks.  *Id.*

B.  CFIUS Order

On July 25, 2012, CFIUS issued an Order Establishing Interim Mitigation Measures regarding the Terna-Ralls transaction, Ex. 4 to Am. Compl [Dkt. # 20-4]; *see also* Am. Compl. ¶ 75.  CFIUS also launched an investigation of the Terna-Ralls transaction on July 30, 2012, pursuant to subsection (b)(2) of section 721.  Am. Compl. ¶ 89.

The next month, on August 2, 2012, CFIUS issued an Amended Order Establishing Interim Mitigation Measures, Ex. 5 to Am. Compl [Dkt. # 20-5] ("CFIUS Order").  Am. Compl. ¶ 83.  The CFIUS Order declared that CFIUS had determined that the Terna-Ralls transaction constitutes a "covered transaction" for purposes of section 721, and that national security risks to the United States arise as a result.  CFIUS Order at 1.  It stated that "CFIUS seeks to mitigate those risks pending any further action by the President, or by CFIUS on his behalf."  *Id.*  Invoking the authority vested in CFIUS by section 721, as well as by executive order, CFIUS imposed interim mitigation measures, to become effective as of August 2, 2012 and to last "until CFIUS concludes action or the President takes action under section 721," or until revocation by CFIUS or the President.  *Id.* at 1–4.  The order required the four Butter Creek project companies, Ralls, its subsidiaries, Sany, Duan, and Wu to do the following, absent further approval from CFIUS:

- Immediately cease all construction and operations at the Butter Creek project sites;

- Remove all stockpiled or stored items from the sites no later than July 30, 2012, and not deposit, stockpile, or store any new items at the project sites, any "lay down site," or any location closer to the restricted airspace than the furthest "lay down site";

- Immediately cease all access to the project sites, except that U.S. citizens contracted by the companies and approved by CFIUS may access the site solely for purposes of removing items in compliance with the order;

- Refrain from "sell[ing] or otherwise transfer[ring] or propos[ing], or otherwise facilitate[ing] the sale or transfer" of any items produced by Sany to any third party for use or installation at the project sites;

- Refrain from completing a sale or transfer of the Butter Creek project companies or their assets to any third party until all items on the properties have been removed, the companies notify CFIUS of the intended recipient or buyer, and the companies do not receive an objection from CFIUS within 10 business days of notification.

*Id.* at 2.  On September 13, 2012, at the end of the statutory 45-day period, CFIUS transmitted a report to the President.  Am. Compl. ¶ 90.

C. Presidential Order

On September 28, 2012, President Barack Obama issued an order entitled "Order Regarding the Acquisition of Four U.S. Wind Farm Project Companies by Ralls Corporation," Ex. 6 to Am. Compl. [Dkt. # 20-5] ("Presidential Order"), which expressly revoked the CFIUS Order.  Am. Compl. ¶ 91.  The Presidential Order invokes the authority vested in the President by the Constitution and the laws of the United States of America, including section 721. Pursuant to that authority, the Presidential Order sets out two findings.  First, the order states that there is credible evidence that leads the President to believe that Ralls and its subsidiaries, the Sany Group, Duan, and Wu, through exercising control of the four Butter Creek project companies "might take action that threatens to impair the national security of the United States." Presidential Order at 1.  Second, the President found, in his judgment, that provisions of law other than section 721 and the International Emergency Economic Powers Act do not provide

adequate and appropriate authority to protect the national security in this matter.  *Id.*  The order does not elaborate further on these findings.

On the basis of these findings, "considering the factors described in subsection 721(f), as appropriate, and pursuant to [the President's] authority under applicable law, including section 721," the Presidential Order decrees:

- The Terna-Ralls transaction is prohibited, and ownership of the Butter Creek project companies by Ralls, its subsidiaries, Sany (collectively, "the companies"), Duan, or Wu is prohibited, whether directly or indirectly through owners, subsidiaries, or affiliates;

- In order to effectuate this order, within ninety days, Ralls shall divest all interests in the Butter Creek project companies, their assets, and any operations developed, held, or controlled by them;

- Within fourteen calendar days of the order, the companies are required to remove all structures or other physical objects or installations from the project sites and any alternate sites.

*Id.* at 1–2.  Like the CFIUS Order, the Presidential Order also (1) prohibits the companies and persons acting on behalf of them from accessing the project sites; (2) prohibits the companies, Duan, and Wu from selling or otherwise transferring, proposing to sell or transfer, or facilitating the sale or transfer of any items produced by Sany to any third party for use at the project sites; and (3) prohibits Ralls from completing a sale or transfer of the project companies or their assets to any third party until the same conditions are satisfied.  *Id.* at 2–3.

In addition, the Presidential Order requires that from the date of the order until Ralls provides a certification of divestment to CFIUS, the companies must certify to CFIUS on a monthly basis that they are in compliance with the order.  *Id.* at 3.  It also authorizes CFIUS, until divestment is completed and verified to its satisfaction, to implement measures it deems necessary and appropriate to verify that operations of the Butter Creek project companies are

"carried out in such a manner as to ensure protection of the national security interests of the United States." *Id.* As an example of what that might entail, the order describes:

> On reasonable notice to the Project Companies and the Companies, employees of the United States Government, as designated by CFIUS, shall be permitted access, for purposes of verifying compliance with this order, to all premises and facilities of the Project Companies and the Companies located in the United States: (i) to inspect and copy any books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of the Companies or the Project Companies that concern any matter relating to this order; (ii) to inspect any equipment and technical data (including software) in the possession or under the control of the Companies or the Project Companies; and (iii) to interview officers, employees, or agents of the Companies or the Project Companies concerning any matter relating to this order.

*Id.*

The order requires CFIUS to conclude its verification procedures within ninety days after the divestment is completed and it authorizes the Attorney General to take any steps necessary to enforce the order. *Id.*

## III.    Procedural Background

Ralls filed the original complaint in this case at 11:16 pm on September 12, 2012 – forty-one days after CFIUS issued the Amended Interim Order. Compl. [Dkt. # 1]. The complaint challenged the CFIUS Order under the Administrative Procedure Act and the Due Process Clause of the Fifth Amendment to the United States Constitution, and it sought invalidation of the order as well as an injunction against its enforcement. The next day, Ralls filed a motion for temporary restraining order and preliminary injunction. [Dkt. # 7]. The Court held a telephone conference with the parties on September 14, and issued a Minute Order directing defendants to file a partial opposition to the motion addressing the issue of irreparable harm by September 17, and scheduling a second telephone conference. Minute Order (Sept. 14, 2012). The Minute

Order also set a deadline for defendant to file a full opposition to the motion on the merits, pending revision of the schedule during the second telephone conference. *Id.*

The second telephone conference took place on September 18, 2012. By that point, the CFIUS order was set to expire in ten days, since the President was required to act by September 28. The Court extended the deadline for defendant to file its opposition to the motion for temporary restraining order and preliminary injunction by one day, and it set September 20 as the date for the hearing on the motion. Minute Entry (Sept. 18, 2012). The next day, Ralls filed a notice voluntarily withdrawing its motion. [Dkt. # 14].

After the President issued his order, Ralls amended its complaint, adding the President as a defendant and asking the Court to declare the Presidential Order invalid as well. Counts I and II, brought against defendants CFIUS and Geithner, allege that the CFIUS Order exceeded CFIUS's statutory authority, and that it was arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706. Am. Compl. ¶¶ 104–31. Counts III through V are brought against all defendants. Count III alleges that the Presidential Order constitutes an *ultra vires* action that exceeded the authority conferred upon the President by statute and regulation. *Id.* ¶¶ 132–43. Count IV alleges that the CFIUS Order and the Presidential Order violate the Due Process Clause of the Fifth Amendment to the United States Constitution as unconstitutional deprivations of property without due process of law. *Id.* ¶¶ 144–156. Count V alleges that the CFIUS Order and the Presidential Order unconstitutionally deprive Ralls of equal protection of the law by imposing different treatment on Ralls compared to similarly situated persons. *Id.* ¶¶ 157–167.

Along with the amended complaint, Ralls filed an opposed motion to expedite. [Dkt. # 21]. After another telephone conference with the parties, the Court granted the motion to

expedite in part and denied it in part, and set a briefing schedule for defendants' motion to dismiss, limited to jurisdictional issues. Minute Order (Oct. 3, 2012). The action is now before the Court on defendants' motion to dismiss for lack of subject matter jurisdiction.

## STANDARD OF REVIEW

In evaluating a motion to dismiss under Rule 12(b)(1), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) (citations omitted). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibly Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002). Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. Envtl. Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with examination of our jurisdiction."). Because "subject-matter jurisdiction is an 'Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

When considering a motion to dismiss for lack of jurisdiction, the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986),*vacated on other grounds*, 482 U.S. 64 (1987). Rather, a court "may consider such materials outside the pleadings as it deems appropriate to resolve the question of whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1993); *see also Jerome Stevens Pharms.*, *Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## ANALYSIS

I.      **Claims Challenging the Presidential Order**

A.   The Court lacks jurisdiction to review Ralls's *ultra vires* claim.

Count III alleges that certain provisions of the Presidential Order exceed the authority granted to the President under section 721. Ralls specifically challenges the provisions of the Presidential Order that:

- require Ralls to remove all items from the relevant properties and prohibit any access to the properties except to remove items;

- prohibit Ralls from selling or transferring any items made by Sany to any third party for use at the properties;

- prohibit Ralls from selling the Project Companies or their assets to any third party until it removes all items from the properties and ensures that CFIUS does not object to the proposed buyer; and

- authorize CFIUS to implement measures it deems necessary and appropriate to verify that operations of the Project Companies are carried out in such a manner as to ensure protection of the national security interests of the United States, such as by requiring the Companies and Project Companies to allow government employees to access their premises to inspect and copy books, accounts, documents; inspect any equipment and technical data, including software; and interview officers, or agents of the Companies or Project Companies, anywhere within the United States.

Am. Compl. ¶¶ 135–38.

The question before the Court at this stage is whether the Court has jurisdiction to hear this claim. It is well-accepted that the Administrative Procedure Act ("APA") does not confer jurisdiction on Article III courts to review actions of the President. *See Dalton v. Specter*, 511 U.S. 462, 469 (1994), citing *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). And since section 721 itself does not provide for judicial review, the type of review that would be involved is what is referred to as non-statutory review. *See Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).

   1) *The ultra vires claim is not inherently unreviewable.*

The courts have recognized a non-statutory cause of action to review claims of *ultra vires* executive action. *See Reich*, 74 F.3d at 1328 ("When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority."); *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988). But there are exceptions, and the government contends that non-statutory review is not available here. It notes that courts in some cases have declined to exercise judicial review when the plaintiff seeks an order of the court that will bear directly on the President. *See Franklin*, 505 U.S. at 802–03, quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1967) ("[I]n general, 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'"); *see also Reich*, 74 F.3d at 1331 n.4 (acknowledging that courts have cast doubt on non-statutory review of presidential action where such review would "bring judicial power to bear directly on the President."). Thus, courts have narrowly construed the circumstances under which a challenge to Presidential action will be found unreviewable.

In *Reich*, 74 F.3d at 1322, the D.C. Circuit refused to find a challenge to an action of the President to be unreviewable because the suit did not seek to directly enjoin the President, but

instead it sought to enjoin subordinate executive officers from enforcing the President's order. In *Reich*, the plaintiffs sought declaratory and injunctive relief against the Secretary of Labor's enforcement of an Executive Order issued by the President that barred the federal government from contracting with any employer that hired a permanent replacement for a worker during a lawful strike. *Id.* at 1324–25. The President relied on a provision of the Procurement Act for the authority to issue the executive order. The plaintiffs alleged that the order actually violated the Procurement Act, as well as the National Labor Relations Act and the Constitution. *Id.* at 1325. The court held that the mere fact that the challenged action was "essentially that of the President" did not shield it from judicial review. *Id.* at 1328. "We think it is now well established that review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Id.* at 1328. Thus, the court rejected the "breathtakingly broad claim of non-reviewability of presidential actions" advanced by the government. *Id.* at 1329; *see also Harlow v. Fitzgerald*, 457 U.S. 800, 811 n.17 (1982) ("Suits against other officials – including Presidential aides – generally do not invoke separation-of-powers considerations to the same extent as suits against the President himself.").

Similarly, in *Swan v. Clinton*, 100 F.3d 973, 977–79 (D.C. Cir. 1996), the D.C. Circuit reached the merits of a claim for injunctive and declaratory relief against President Clinton and other executive officials because the relief against the subordinate officials would sufficiently redress the plaintiff's injury. The Court was unconcerned that the President was one of the

named defendants.  Rather, it focused on the two other named defendants – subordinate officials who could perform all the actions necessary to redress the plaintiff's injury.  *Id.* at 979.[3]

Although Ralls challenges an order of the President, it seeks injunctive relief against the subordinate executive officials who would otherwise enforce the order.  And Ralls's injuries would be completely redressed by an order of this court enjoining the subordinate officials from enforcing the Presidential Order.  Accordingly, the facts that the actions challenged in this case are actions of the President and that the President is named as a defendant do not necessarily render Ralls's claims to be unreviewable.

The government contends that this case is different because even if the relief sought from the Court is directed at subordinate executive officials, the President would "effectively be required to re-open his determination and to issue a modified order . . . ."  Defs.' Mem. in Support of Mot. to Dismiss [Dkt. # 34-1] ("Defs.' Mem.") at 17–18.  Therefore, the government argues, the Court's relief will inevitably bear directly on the President himself.  Such relief would be particularly inappropriate here, the government asserts, because the Executive Order was issued in response to a national security threat – an area where he enjoys constitutional authority, broad discretion, and particular competence.  *Id.*

Yet, the Supreme Court engaged in review of an executive order under similar circumstances in *Dakota Central Telephone Co. v. South Dakota ex rel. Payne*, 250 U.S. 163, 184 (1919).  In that case, the state of South Dakota sued several telephone companies, seeking to enjoin them from implementing a schedule of rates that had been prepared by the Postmaster General.  *Id.* at 179.  The companies disclaimed all interest in the controversy because they

---

3    In *Swan*, the D.C. Circuit also recognized that "similar considerations regarding a court's power to issue relief against the President himself apply to [a] request for a declaratory judgment" as to a request for injunctive relief.  *Swan v. Clinton*, 100 F.3d 973, 977 n.1 (D.C. Cir. 1996).

claimed that by contract, their equipment had passed into the possession and control of the United States and were being operated by it as a governmental agency.  *Id.* at 180.  The companies relied upon a proclamation of the President pursuant to a joint resolution adopted by Congress.  The joint resolution permitted the President "during the continuance of the present war" to supervise or to take possession and assume control of telephone systems, among other communication systems, "whenever he shall deem it necessary for the national security or defense."  *Id.* at 181.  Six days after the joint resolution was adopted, the President deemed it "necessary for the national security and defense to supervise and take possession and assume control of all telegraph and telephone systems and to operate the same in such manner as may be needful or desirable."  *Id.* at 182.  Accordingly, "under and by virtue of the powers vested in [the President] by the foregoing resolution, and by virtue of all other powers thereto [him] enabling," the President took possession and assumed control and supervision of all telephone systems within the jurisdiction of the United States and gave the Postmaster General plenary power to control and operate them.  *Id.* at 182–83.  It was under this grant of power that the Postmaster General imposed the challenged schedule of rates.  *Id.*

As in the instant case, the challenged acts were acts of the President and they were taken in the context of a national security threat.  Yet, the Court reached the merits of the plaintiffs' claim that "there was an absence of power in the President to exert the authority to the extent to which he did exert it."  *Id.* at 184.  It then found that the President's actions were indeed authorized by the joint resolution of Congress.  *Id.* at 184–85.  The Court did not question its ability to determine the breadth of Congress's grant of authority, even though the President was operating in the realm of national security.

It is worth noting that in *Dakota Central,* the Supreme Court distinguished an *ultra vires* challenge based upon the scope of the President's authority from the plaintiffs' separate claim that "there was nothing in the conditions at the time the power was exercised which justified the calling into play of [his] authority." *Id.* at 184.  This second type of claim, the Court found, "involves considerations which are beyond the reach of judicial power" because it "at best concerns not a want of power, but a mere excess or abuse of discretion in exerting a power given[.]" *Id.* at 184; *see also Reich*, 74 F.3d at 1332 n.5 (describing that in *Dakota Central*, the Court refused to consider a claim that the President abused the discretion granted him under the joint resolution because it involved considerations about what was necessary for the national security during wartime, which are beyond the reach of judicial power, but noting that "the Court did consider, although ultimately rejected, an argument that there was an 'absence of power in the President' to take the action that he did").

With this guidance in mind, the Court observes that Ralls's *ultra vires* claim could on its face be interpreted to be asserting the first type of challenge, not the second.  It claims that the President lacked the authority to impose the particular sorts of restrictions included in the order.  The count does not expressly allege that the President's actions were not justified by the circumstances.  Given the Supreme Court's willingness to review the first type of challenge on the merits in *Dakota Central*, this Court cannot accept the government's argument that the likelihood that the President would be inclined to issue an amended order should the Court find his actions to be *ultra vires* is a circumstance that absolutely prohibits the Court from

determining whether the President had the authority to act.[4]  So this case will not be dismissed on the grounds that any claim raising questions about the extent of Presidential power in the national security context is inherently unreviewable; *Dakota Central* appears to suggest that there is non-statutory authority permitting a court to interpret the legislation in question and articulate the boundaries of a statutory grant of power to the executive.

 2) *The finality provision under section 721 bars the Court's review of Ralls's* ultra vires *claim.*

But that is not the end of the inquiry. In *Reich*, the D.C. Circuit recognized that even where non-statutory judicial review is normally available, Congress might expressly preclude such review:  "'When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority.'  To be sure, if Congress precluded non-statutory judicial review . . . that would be another matter."   *Reich*, 74 F.3d at 1328, quoting *Dart*, 848 F.2d at 224.  And here, the defense contends that the finality provision in section 721 expressly bars all judicial review, including review of the *ultra vires* claim.

 The finality provision states, "The actions of the President under paragraph (1) of subsection (d) of this section and the findings of the President under paragraph (4) of subsection (d) of this section shall not be subject to judicial review."  50 U.S.C. app. § 2170(e).  The government urges the Court to find the *ultra vires* claim barred from judicial review because

---

4      This distinction also explains why *Dalton v. Specter*, 511 U.S. 462 (1994), which the government cites, does not govern here.  In that case, the Supreme Court held that the President's exercise of his discretion in a matter that Congress has left to his sole discretion is unreviewable by the courts, particularly in matters of national security.  *Id.* at 474–75; *see* Defs.' Mem. at 23; Defs.' Reply Mem. [Dkt. # 40] ("Defs.' Reply") at 12–13.  But as discussed above, Ralls's *ultra vires* claim on its face challenges the authority of the President to take action; it does not challenge the way in which the President exercised his discretion.  *See Reich*, 74 F.3d at 1331 ("*Dalton*'s holding merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available.").

"Congress recognized that it was legislating in an area where – even apart from an express statutory withdrawal of jurisdiction – Presidential exercises of discretion are not ordinarily subject to judicial review."  Defs.' Mem. at 14.  Ralls counters that the finality provision does not bar its *ultra vires* claim because the provision, by its express language, applies only to Presidential actions "under" the statute.  Pl. Ralls Corp.'s Mem. in Opp. to Mot. to Dismiss [Dkt. # 35] ("Pl.'s Opp.") at 33–35.  Therefore, according to Ralls, the Court has jurisdiction to determine whether the actions of the President fell outside the statutory grant of authority.  The Court's task is, therefore, to determine whether the finality provision extends so broadly as to eliminate judicial consideration of that question in this case.

The D.C. Circuit has provided some guidance for approaching this type of question. First, courts generally apply a presumption of judicial review when interpreting the language of a finality provision.  *Dart v. United States*, 848 F.2d 217, 222 (D.C. Cir. 1988); *Amgen v. Smith*, 357 F.3d 103, 111 (D.C. Cir. 2004).  Under that presumption, a claim is only unreviewable if the government demonstrates "clear and convincing evidence" that Congress intended to restrict access to judicial review.  *Dart*, 848 F.2d at 221–23, citing *Bowen v. Mich. Acad. Of Family Physicians*, 476 U.S. 667, 671 (1986).

Courts next look to the language, structure, and legislative history of the statute to construe a finality provision's scope.  *Amgen*, 357 F.3d at 112, citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 206 (1994).  The D.C. Circuit has acknowledged that this analysis is "intertwined" with the merits determination.  *Amgen*, 357 F.3d at 113.  "If a no-review provision shields particular types of [executive] action, a court may not inquire whether a challenged [executive] decision is arbitrary, capricious, or procedurally defective, but it must determine whether the challenged . . . action is of the sort shielded from review."  *Id.*

The D.C. Circuit encountered a similar challenge to the President's statutory authority to take particular actions in the face of a finality provision in *Dart v. United States*, 848 F.2d at 217. In *Dart*, the plaintiff had been charged with violating an export law but was absolved of liability by an administrative law judge after an evidentiary hearing. *Id.* at 218. Later, however, the Secretary of Commerce issued an order summarily reversing the administrative law judge's decision and imposing sanctions. *Id.* at 218–19. The plaintiff brought suit, challenging the Secretary's order as exceeding his statutory authority under the Export Administration Act ("EAA").[5] *Id.* at 219. The EAA contained two sections that, when taken together, acted as a finality provision barring judicial review of "functions exercised under the Act and of orders of the Secretary that affirm, modify or vacate the [administrative law judge's] initial decision." *Id.* at 221 (internal quotation marks omitted). Accordingly, the D.C. Circuit was confronted with the question of whether it had jurisdiction to review the claim. *Id.*

The court first determined that a presumption of judicial review applied. *Id.* at 222. It then went on to find, based on the language, structure, and legislative history of the statute, that review of claims that the agency "facially violated" the statute were not barred by the finality provision.

> In sum, we do not find in the wording, the purpose, or the legislative history of section 13(a) the "clear and convincing evidence" that Congress intended to cut off all judicial review of EAA enforcement decisions. Rather, each of these factors is consistent with our reading of the finality clause as permitting review of agency actions that, on their face, violate the EAA.

---

5     The plaintiff also alleged that the order violated the Constitution, was not supported by substantial evidence, and improperly disregarded the ALJ's factual findings, but the Court declined to address those claims. *Dart*, 848 F.2d at 219.

*Id.* at 226.   In adopting this construction of the finality clause, the Court relied on the limiting language in the clause itself, *i.e.* it covered only "functions" and "orders" of the Secretary.  *Id.* at 224–27.  It also relied on portions of the statute's legislative history that suggested Congress did not intend to permit the Secretary of Labor to abuse the authority granted under the statute by hiding behind the finality clause.  *Id.* at 224–26;[6] *see also Amgen*, 357 F.3d at 112 (looking to the language, structure, and legislative history of a statute to determine whether a finality clause barred judicial review over the plaintiffs' claim).

Like the finality clause in *Dart*, the finality clause in section 721 contains an inherent limitation:  it only withdraws judicial review over the President's actions taken "under paragraph (1) of subsection (d) of this section."  50 U.S.C. app. § 2170(e).  Paragraph (1) of subsection (d), in turn, authorizes the President, once he has made the requisite findings, to "take such action for such time as the President considers appropriate to suspend or prohibit any covered transaction that threatens to impair the national security of the United States."  *Id.* § 2170(d)(1).  On its face, this provision leaves open a category of Presidential actions – those which the President does <u>not</u> consider appropriate to suspend or prohibit a covered transaction, or for which the President has <u>not</u> found that the affected transaction will impair the national security of the United States – to potential judicial review.

---

6       In arguing that the Court should interpret the finality provision in this case even more broadly than the D.C. Circuit did in *Dart*, the government seeks to distinguish the facts of this case from the facts of *Dart* by arguing that the analysis employed in that case is limited to situations where judicial review is authorized by statute – in that case, the Administrative Procedure Act ("APA").  Tr. [Dkt. # 42] 16:23–17:7.  It is true that the particular finality provision in *Dart* exempted particular actions only from the judicial review provisions of the APA.  However, the provision at issue here does not just exempt review under the APA, but withdraws all judicial review.  The Court is unaware of any case law that would indicate that this difference in what type of judicial review Congress has withdrawn has any bearing on how the Court should go about analyzing what is exempted from review.

But Ralls does not claim that the President failed to make the proper findings.  Rather, it claims that in imposing restrictions on the sale of the projects or the disposition of the turbines, the President took actions that exceeded his statutory powers.  The amended complaint alleges that no provision of section 721 "grants the President any powers beyond 'suspend[ing] or prohibit[ing]' a 'covered transaction.'"  Am. Compl. ¶ 133.  And Ralls repeatedly asserts that the President's actions exceeded his authority because they went beyond merely "suspending or prohibiting" the transaction.  *Id*. ¶¶ 135–38 (alleging that certain actions "exceed[] the President's conferred authority to 'suspend or prohibit' a 'covered transaction'"); Pl.'s Opp. at 30 ("This Court has jurisdiction to review Ralls's claim that in imposing sweeping restrictions on Ralls beyond merely 'suspend[ing] or prohibit[ing]' its acquisition of the Project Companies, the September Order exceeded the President's authority."); *id.* at 33 ("[H]aving made his findings, the President then engaged in *ultra vires* action facially violating section 721(d) when he not only prohibited Ralls's acquisition – the sole power that section 721(d) confers upon the President – but also required removal of items from the Butter Creek properties, [etc.] . . . ."); *id* at 34 ("Section 721(d) . . . grants the President *only* the authority to 'suspend or prohibit any covered transaction.'").

So plaintiff's entire *ultra vires* claim is premised upon the notion that the only thing the statute permits the President to do is to suspend or prohibit a transaction.  But the statute doesn't say that.

Section 721(d)(1) does not limit the President's authority to merely suspending or prohibiting a transaction; rather, it grants the President extremely broad authority to "*take such action for such time as the President considers appropriate* to suspend or prohibit" transactions.

(emphasis added).[7]  In other words, the statute expressly authorizes the President to do what he deems necessary to accomplish or implement the prohibition – not merely to issue it.  The use of the open-ended temporal phrase "for such time" reinforces this interpretation; if the President was permitted to do nothing more than make an up or down decision, he would not need an unlimited period of time.

It is important to note that in this case, Ralls did not seek CFIUS approval before it acquired the projects or began construction and installation of the turbines.  *See* Lago Decl., Ex. 1 to Defs.' Opp. to TRO Limited to Irreparable Harm [Dkt. # 11-1] ¶ 4.  Rather, CFIUS and the President were presented with a purchase that had already taken place and a project that was already under way.  *Id.*  The Presidential Order declares the transaction that resulted in the acquisition to be prohibited and then states, "in order to effectuate this order," Ralls is required to divest.  Presidential Order § 2(b).  The order then goes on to call for the removal of the Chinese turbines, to bar their use in the future, and to restrict the foreign nationals' access to the premises, among other things.  *Id.* §§ 2(c)–(f).  Since deciding to impose these sorts of requirements falls well within the scope of "taking such action . . . as the President considers appropriate . . . to prohibit" a transaction – particularly given the fact that the transaction had already taken place – their imposition was a Presidential action under subsection (d)(1) of the statute, and those actions have been declared to be unreviewable by Congress.  Thus, in accordance with the instructions

---

7      Ralls's narrow interpretation of this provision violates one of the fundamental canons of statutory interpretation – that no statutory provision should be interpreted so as to render any part meaningless – because it disregards the clauses, "take such action for such time as the President considers appropriate."  *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (internal quotation marks omitted).

set out by the D.C. Circuit in *Amgen,* this Court finds that the challenged action "is of the sort shielded from review."  357 F.3d at 113.[8]

In *Dart,* the D.C. Circuit cautioned that "Congress' finality clause must be given effect, and an agency action allegedly 'in excess of authority' must not simply involve a dispute over statutory interpretation or challenged findings of fact."  *Dart*, 848 F.2d at 231.  That warning is particularly apt here.  There may be some circumstance in the future where a court could determine that a claim the President exceeded the scope of his section 721 statutory powers on their face is not barred by the finality provision, but that is not the situation here, where the claim is premised entirely upon a misstatement of what that statutory authority is.  If the President was only authorized to suspend or prohibit a transaction as Ralls insists, then the Court could easily determine whether the President exceeded his authority without engaging in any review of the President's discretionary determinations.  But here, any assessment of the legality of the specific restrictions imposed by the President would entail consideration of whether and why the President considered those actions to be "appropriate" to give effect to the prohibition order, and that is just the type of examination that the finality provision bars.  Thus, judicial review of this claim would deprive Congress' finality clause of its true effect.[9]

---

8       As the Court of Appeals has observed, this jurisdictional analysis is necessarily "intertwined" with a determination on the merits.  *Amgen*, 357 F.3d at 113.  So in the event the finality provision here does not bar consideration of plaintiff's claim that the President exceeded his statutory authority, the claim would fail on the merits for the reasons set forth above.  The statute plainly permits the President to do more than simply suspend or prohibit a transaction.

9       The D.C. Circuit's decision in *Aid Ass'n for Lutherans v. United States Postal Service*, 321 F.3d 1166 (D.C. Cir. 2003) does not contradict this conclusion.  In that case, the finality provision barred only statutory review under the APA; it did not bar non-statutory review.  321 F.3d at 1172–73.  Therefore, the court found that there was no barrier to exercising the type of non-statutory review that is generally available under cases like *Reich* and *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902).  *Id.* at 1173.  Here, however, the finality provision is not limited to any particular type of review.

In this case, the jurisdictional question can be decided based upon a review of the plain language of the statutory grant of authority and the finality provision. But the D.C. Circuit has indicated that courts should also look to the statute's structure and legislative history as well. *Dart*, 848 F.2d at 226. And here, those inquiries reveal that Congress structured the process so that Presidential action would be a last resort, to be exercised only the face of an otherwise uncontrollable national security risk. The statute established a multi-agency committee charged with the responsibility of determining in the first instance whether a transaction poses a national security concern and provided it with the tools to address any such concerns before the President gets involved at all. For example, Congress granted CFIUS the authority to "negotiate, enter into or impose, and enforce any agreement or condition" in order to mitigate any threat to the national security that arises as a result of the covered transaction. 50 U.S.C. app. § 2170(*l*)(1). Only if CFIUS determines that the measure did not mitigate the threat does the President have an opportunity to act. *Id.* §§ 2170(b)(2)(B)(i)(I), (d)(2). Moreover, the President is only authorized to take action if he finds that there is no other way to protect the national security: he must make a finding that "provisions of law, other than [section 721] and the International Emergency Economic Powers Act, do not, in the judgment of the President, provide adequate and appropriate authority for the President to protect the national security in the matter before the President." *Id.* § 2170(d)(4)(B). The legislative history reflects the fact that Congress anticipated that the President would only rarely be involved. *See* H.R. Rep. No. 110-24(I) (2007), *reprinted in* 2007 U.S.C.C.A.N. 102, 104, at 11 (using language such as: "Transactions that enter investigation may also be terminated before reaching the President," and "Presidential decisions are also avoided in cases where . . .."). So when Congress went on to foreclose judicial

review of Presidential actions it did so in the context of a statutory scheme that limited the occasions for Presidential action in the first place.

In addition, to protect against abuse of authority in the absence of judicial review, Congress established itself as the monitor of the actions of both CFIUS and the President.  In 2007, Congress expressed concern about CFIUS's "accountability to Congress and the public" given that the reviews and investigations "remain highly confidential."  S. Rep. No. 110-80, at 3 (2007).   The resulting amendments to the statute "enhance[d] Congress's ability to perform its necessary oversight of the CFIUS process."  *Id.* at 7.   This takes the form of "a system of briefings and annual reporting to Congress," and briefings to any member of Congress on request.  *Id.* at 8–11; 50 U.S.C. app. § 2170(g), (m).  Moreover, "[a]ny transaction that goes to the President must be reported to Congress."  H.R. Rep. No. 110-24(I), at 11; *see* 50 U.S.C. app. § 2170(b)(3).

Finally, the legislative history reflects that Congress recognized that the authority it was conferring upon the President was to be executed in an area where the President already has broad authority to act.

> [E]xclusive of any powers derived from the Exon-Florio amendment or related regulations or executive orders, the President ultimately reserves the right in any transaction and at any time to reverse a transaction for national security purposes.   This authority derives both from the International Emergency Economic Powers Act and his inherent powers in the conduct of foreign affairs.

H.R. Rep. No. 110-24(I), at 12.  So a review of the structure of the statute and its legislative history supports the Court's determination that the finality provision bars consideration of the particular *ultra vires* claim advanced in this case.

The application of the finality provision here is consistent with other precedent binding on this Court.  Both the D.C. Circuit and the Supreme Court have made it clear that separation of

powers concerns should cause courts to hesitate before reviewing determinations that have been statutorily committed to the President's discretion and those considerations further support the holding here. *See Dakota Central*, 250 U.S. at 184; *Dalton*, 511 U.S. at 476–77; *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 840.

In *El-Shifa*, the D.C. Circuit refused to adjudicate claims brought under the law of nations and the common law by the owners of a factory in Sudan that had been destroyed by U.S. missile strike. 607 F.3d at 837–38. The plaintiffs sought judicial declarations that the United States violated international law by failing to compensate them for the unjustified destruction of their property, and that statements made by the President and other senior officials tying the plaintiffs to Osama bin Laden, terrorist groups, or the production of chemical weapons were false and defamatory. *Id.* at 839–40. They also sought injunctive relief consisting of an order requiring the United States to issue a retraction of the statements. *Id.* at 840. The court found that the questions of (1) whether the destruction of the factory was justified, and (2) whether the government's justifications for the attack were false, were political questions constitutionally committed to the Executive Branch. *Id.* at 846. "We have consistently held . . . that courts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security." *Id.* at 842.

The same separation of powers concerns are present here, since this was a discretionary determination made in the realm of foreign policy and national security. *See Ameziane v. Obama*, 699 F.3d 488, 494 (D.C. Cir. 2012) ("[I]t is within the role of the executive to acquire and exercise the expertise of protecting national security. It is not within the role of the courts to second-guess executive judgments made in furtherance of that branch's proper role.") (internal quotation marks omitted); *Dalton*, 511 U.S. at 474–75 (the President's exercise of his discretion

28

in matters that Congress has left to his sole discretion are unreviewable by the courts, particularly in matters of national security).

Accordingly, the Court will dismiss Count III, Ralls's *ultra vires* claim against the President, for lack of jurisdiction.

B.   <u>The Court lacks jurisdiction to review Ralls's due process challenge to the Presidential Order, but not the equal protection challenge.</u>

Counts IV and V raise constitutional challenges to the Presidential Order.   Again, the government argues that the Court is barred from reviewing these claims by the finality provision. The Court agrees with respect to plaintiff's equal protection claim, but not with respect to the due process claim.

1.   *Ralls's equal protection claim is barred by the finality provision.*

The equal protection challenge to the Presidential Order alleges that Ralls, its affiliates, and its executives have unfairly and unjustly been treated differently from others who are supposedly similarly situated.   Am. Compl. ¶ 160.   The government counters that review of this claim is barred by the finality provision in section 721.   Defs.' Mem. at 1.   As noted above, the Court must begin with a presumption of judicial review, which requires a showing of "clear and convincing evidence of a contrary legislative intent."   *Dart*, 848 F.2d at 221, quoting *Bowen*, 476 U.S. at 671.   The Court finds that this showing has been satisfied.   While Count V invokes the Constitution, at bottom it asks the Court to review the merits of the President's decision, and Congress has clearly embodied its views about that exercise in the finality provision.

Ralls does not allege discrimination against a suspect group.   So, an analysis of the equal protection claim would require the Court to determine whether the alleged differential treatment is rationally related to a legitimate government purpose.   *Heller v. Doe*, 509 U.S. 312, 320 (1993); *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).   This inquiry necessarily

involves reviewing the particular factual record that was before the President when he issued the order and determining whether the actions he took were rational in light of that record.  In other words, to adjudicate the equal protection claim, the Court would be required to review both the President's findings and his actions and to probe the reasons behind them.  This is precisely the type of inquiry that Congress withdrew from the courts in the finality provision in section 721.  50 U.S.C. app. § 2170(e) (barring judicial review of "the *actions* of the President under paragraph (1) of subsection (d) of this section and the *findings* of the President under paragraph (4) of subsection (d) of this section")  (emphasis added).

        In addition, the same structural and historical factors that call for the application of the finality provision to the *ultra vires* claim provide convincing evidence of Congress's intent to withdraw judicial review over the equal protection claim.

        Moreover, the same separation of powers concerns that support the dismissal of the *ultra vires* claim reinforce the need to dismiss the equal protection claim.  In *El-Shifa,* the Court of Appeals distinguished claims challenging the wisdom of discretionary decisions from claims "presenting purely legal issues such as whether the government had legal authority to act."  607 F.3d at 842 (internal quotation marks omitted).  Here, the equal protection claim is an as-applied challenge that essentially asks the Court to adjudicate the wisdom of the President's decision to prohibit the Terna-Ralls transaction.  The question it presents is discretionary rather than purely legal because it requires an assessment of the rationality of the President's specific factual determination on a matter of national security – a determination committed solely to the President's discretion.

        The fact that the challenge in this case is dressed in constitutional garb is inconsequential.  In the political question context, the D.C. Circuit has found that judicial review of claims that

present political questions is barred, "regardless of how they are styled, [so long as they] call into question the prudence of the political branches in matters of foreign policy or national security constitutionally committed to their discretion."  *El-Shifa*, 607 F.3d at 842.

It is true, as plaintiff points out, that there are cases in which the courts called for a higher burden of proof to show that a finality clause stripped them of jurisdiction over constitutional claims.  In those cases, the courts sought to avoid an interpretation of the finality provision that would raise serious constitutional questions about Congress's power to prevent adjudication of the constitutionality of a statute.  *See, e.g.*, *Webster v. Doe*, 486 U.S. 592 (1988); *Bowen*, 476 U.S. at 667; *Johnson v. Robison*, 415 U.S. 361, 364–74 (1974); *Lepre v. Dep't of Labor*, 275 F.3d 59 (D.C. Cir. 2001).  But the doctrine of constitutional avoidance is not implicated in this instance because the equal protection claim does not question the constitutionality of the statute – it simply questions the fairness of the President's decision.  Thus, the Court's application of the finality provision to dismiss Count V does not raise any serious constitutional questions about Congress's power to remove jurisdiction from the courts.  *See* Defs.' Mem. at 26 n.6 ("Section 2170(e) would not preclude review of a facial challenge to the Defense Production Act . . . as the statute precludes review only of the President's 'findings' and 'actions,' not of the overall statutory scheme.").

Ralls cites *Ralpho v. Bell*, 569 F.2d 607 (D.C. Cir. 1977), and *Ungar v. Smith*, 667 F.2d 188 (D.C. Cir. 1981), for the proposition that this Circuit requires clear and convincing evidence of Congress's intent to preclude judicial review of any constitutional claims, even as-applied claims.  But the cases do not go so far, and they do not require this Court to permit the equal protection claim to proceed.  Both *Ralpho* and *Ungar* posed constitutional challenges to an administrative agency's implementation of a statute; they did not challenge particular actions of

the President in the national security realm, where exercises of discretion are generally unreviewable.  And in both cases, the plaintiffs were complaining about the process they had been afforded rather than the substance of the decisions that were rendered.

In *Ralpho*, the plaintiff was a Micronesian who had filed a claim with a special commission established to compensate victims from the Second World War.  569 F.2d at 612–13.  The plaintiff claimed that the Commission relied on 'secret evidence' to determine the amount of his compensation without affording him the opportunity to examine and rebut it.  *Id.* at 615.  Among other claims, he alleged that this violated the Due Process Clause of the Fifth Amendment.  *Id.*  The government argued that his challenge was barred by a finality clause in the governing statute that stated:  "any such settlements made by such Commission and any such payments made by the Secretary (of the Interior) under the authority of title I or title II . . . shall be final and conclusive for all purposes, notwithstanding any other provision of law to the contrary and not subject to review."  *Id.* at 613.  In rejecting the government's argument, the D.C. Circuit stated:

> [I]f legislation by Congress purporting to prevent judicial review of the constitutionality of its own actions is itself constitutionally suspect, legislation that frees an administrative agency from judicial scrutiny of its adherence to the dictates of the Constitution must pose grave constitutional questions as well . . . If the courts are disabled from requiring administrative officials to act constitutionally, it is difficult to see who would perform that function.

*Id.* at 620.

*Unger* concerned the procedural due process rights of individuals seeking the return of vested assets that were seized during the Second World War.  667 F.2d at 190–93.  Relying on *Ralpho*, the Court found that a clear and convincing evidence standard applies "when the Government asserts that Congress intended a general proscription of judicial review to bar

judicial cognizance of a claim that an administrative agency, in applying the statute, acted unconstitutionally." *Id.* at 193. Thus, in both *Ralpho* and *Unger,* the D.C. Circuit rejected constructions of finality provisions that withdrew all judicial review over the manner in which an administrative agency applies a statute.

But in support of its motion to dismiss Count V, the government is not arguing for such a broad "general proscription" of judicial review. It simply contends that the Court need not apply the doctrine of constitutional avoidance because: 1) the finality provision in section 721 bars judicial review of the President's discretionary actions and his reasons for taking such actions in an individual case; and 2) that is the only sort of review plaintiff is seeking here.[10] While Ralls styles the claim as arising under the Constitution, plaintiff's fundamental grievance – that other foreign owned windfarms have been treated differently than this windfarm – falls squarely under the plain language of the finality provision. Since the Court has found clear and convincing evidence that Congress intended to withdraw jurisdiction over the equal protection claim, it will dismiss Count V for lack of jurisdiction.

> 2. *The Court is not barred from reviewing Ralls's due process challenge to the Presidential Order.*

But in light of these precedents, the Court cannot find that there is clear and convincing evidence to show that Congress intended to divest the courts of their ability to hear the due process challenge to the executive action in this case. Ralls alleges that the Presidential Order deprived it of its property without due process of law. According to the amended complaint, the Due Process Clause of the Fifth Amendment entitles Ralls to an opportunity to be heard and to

---

10 Additionally, in *General Electric Co. v. EPA*, 360 F.3d 188 (D.C. Cir. 2004) – a more recent decision than either *Ralpho* or *Unger* – the D.C. Circuit left open the possibility that as-applied challenges should be treated differently than facial challenges for purposes of the doctrine of constitutional avoidance. *See id.* at 192–93, citing *Johnson*, 415 U.S. at 373–74.

the reasons for the President's decision.  Am. Compl. ¶¶ 144–56.  So, Ralls is asking the Court to determine what procedural protections were due, and whether it was denied those protections.

At the motions hearing in this case, the government argued that through the due process claim, Ralls is actually seeking a more detailed explanation of the President's findings so that Ralls can "attack and undermine" them.  Tr. 10:7–25.  This, the government claimed, amounts to a demand for judicial review of the President's findings, which is expressly barred by the finality provision.  *Id.*  It is true that the finality provision will bar the Court from hearing any attack on the President's findings.  But there is a difference between asking a court to decide whether one was entitled to know what the President's reasons were and asking a court to assess the sufficiency of those reasons.  And the fact that plaintiff may not be able to use the information in a certain way does not answer the question of whether it is entitled to have it.  It may be that the Court will ultimately decide that in the context of a national security decision committed to the President's discretion, the opportunities provided to the plaintiff here comported with due process, or the plaintiff is not entitled to the reasons.  Since the matter has not yet been fully briefed, the Court expresses no opinion on those issues.[11]  The sole question before the Court at this stage is whether the statute clearly bars any consideration of plaintiff's procedural concerns, and the Court finds that it does not.

---

[11]    The government argues that the due process claim is "insubstantial" because Ralls had no property interest in completing its acquisition of the Butter Creek project companies and the Constitution does not require any process beyond what Ralls already received.  Defs.' Mem. at 26–27.  Without deciding that issue for purposes of the merits of the due process claim, the Court does not find the claim to be so frivolous as to obviate any further consideration.  *See Hagans v. Lavine*, 415 U.S. 528, 536–37 (1974) (finding that federal courts lack jurisdiction to hear claims that are "so attenuated and unsubstantial as to be absolutely devoid of merit," "wholly insubstantial," "obviously frivolous," "plainly unsubstantial," or "no longer open to discussion"), *superseded by statute on other grounds*.

In addition, judicial review of the due process claim presented here does not present the same separation of powers concerns that would be raised by consideration of the equal protection claim. Count IV raises a pure legal question that can be answered without second-guessing the President's determinations. *See El-Shifa*, 607 F.3d at 842 (finding that claims "[p]resenting purely legal issues such as whether the government had legal authority to act" do not pose the same separation of powers problems as claims seeking review of discretionary determinations made by the executive branch) (alteration in original) (internal quotation marks omitted).

Since the Court finds no clear and convincing evidence that Congress intended to withdraw jurisdiction over the due process challenge to the Presidential Order, it will proceed to hear that claim on the merits, and the motion to dismiss Count IV for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) will be denied. The order accompanying this opinion will address the schedule for the filing of additional submissions.

## II.   Claims Challenging the CFIUS Order

There is no dispute that the President revoked the CFIUS Order when he issued his Presidential Order, rendering the CFIUS Order inoperative. "It is a basic constitutional requirement that a dispute before a federal court be 'an actual controversy . . . extant at all stages of review, [and] not merely at the time the complaint is filed.'" *Newdow v. Roberts*, 603 F.3d 1002, 1008 (D.C. Cir. 2010) (alteration in original). Because the challenges to the CFIUS Order do not present an actual controversy, the Court will dismiss the portions of all counts raising those challenges as moot.

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of

limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

Article III, Section 2, of the Constitution permits federal courts to adjudicate only "actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317 (1988). "This limitation gives rise to the doctrines of standing and mootness." *Foretich v. United States*, 351 F.3d 1198, 1210 (D.C. Cir. 2003). A case is moot if "'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990). "It has long been settled that a federal court has no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Sierra Club v. Jackson*, 648 F.3d 848, 852 (D.C. Cir. 2011) (internal quotation marks omitted), quoting *Church of Scientology of Cal. v. United States,* 506 U.S. 9, 12 (1992). In light of those principles, this Court must dismiss the challenges to the CFIUS Order.

Ralls argues that its challenges to the CFIUS Order fall within the exception to the mootness doctrine for actions that are capable of repetition yet evading review. This exception applies only in "exceptional situations," *City of L.A. v. Lyons*, 461 U.S. 95, 109 (1983), where "(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." *United States v. Juvenile Male*, --- U.S. ---, 131 S. Ct. 2860, 2865 (2011) (alterations in original), quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998); *see also*

*Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 79 (D.C. Cir. 2011).  Ralls's argument fails on both prongs.

    A.  <u>The CFIUS Order did not "evade review."</u>

"A litigant cannot credibly claim his case 'evades review' when he himself has delayed its disposition."  *Armstrong v. FAA*, 515 F.3d 1294, 1296 (D.C. Cir. 2008).  In this case, the first CFIUS order was issued on July 25, 2012, and the Amended Order was issued on August 2, 2012, yet Ralls waited until 11:16 pm on September 12, 2012 (effectively September 13), to file its Complaint, and until 7:30 pm on September 13, 2012, to file its Motion for Temporary Restraining Order and Preliminary Injunction ("motion for TRO/PI").  So, Ralls let forty-one (if not forty-two) days go by before challenging the CFIUS Order.  When it finally filed the motion for TRO/PI, the deadline for the President to issue any overriding order was a mere fifteen days away.

Nonetheless, the Court created a briefing schedule and set a hearing on the motion that would have allowed for a decision within that fifteen day window.  *See* Minute Order (Sept. 14, 2012); Minute Entry (Sept. 18, 2012).  But, the day before the Court was scheduled to hear argument, Ralls voluntarily withdrew its motion.  Notice of Withdrawal of Mot. for TRO/PI (Sept. 19, 2012) [Dkt. # 14].

The D.C. Circuit has firmly stated that *Armstrong* "requires a plaintiff to make a full attempt to prevent his case from becoming moot, an obligation that includes filing for preliminary injunctions and appealing denials of preliminary injunctions."  *Newdow*, 603 F.3d

at1009, citing *Armstrong*, 515 F.3d at 1294.[12]  This rule "ensures only situations that truly evade review in an exceptional way fall under the doctrine's umbrella."  *Id.*; *see also Missouri ex rel. Nixon v. Craig*, 163 F.3d 482, 485 (8th Cir. 1998) (finding that a challenge did not evade review because there was no reason why judicial processes such as preliminary injunctions, emergency stays, and expedited appeals would not be available to the plaintiff if the need were to arise in the future).  By voluntarily withdrawing its motion for TRO/PI, Ralls failed to meet this obligation.

Ralls cites a general rule applied by courts in this circuit that "orders of less than two years' duration ordinarily evade review," *Burlington N. R.R. Co. v. Surface Transp. Bd.*, 75 F.3d 685, 690 (D.C. Cir. 1996), and it observes that the CFIUS Order was in effect for only fifty-seven days before it was revoked on September 28, 2012, by the Presidential Order.  Pl.'s Opp. at 40–41.  However, given the availability of emergency injunctive relief under Federal Rule of Civil Procedure 65 and this Court's local rules, Ralls had an opportunity to be heard before the September 28 deadline.  Since Ralls's own decisions to delay filing its complaint and to withdraw its motion for TRO/PI prevented the Court from considering its claims before the CFIUS Order was revoked, the Court finds that the claims do not meet the "evading review" component of the mootness exception.  *Cf. Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia ("KKK")*, 972 F.2d 365, 369–71 (D.C. Cir. 1992) (finding that a challenge to an action lasting only six days evaded review, where the plaintiff had filed, and the district court had ruled on, a preliminary injunction motion, because it did not provide sufficient time for appellate proceedings).

---

12    Although the government does not challenge the "evading review" prong of the mootness exception, mootness is a jurisdictional inquiry.  Thus, in the interest of protecting its jurisdiction, the Court is permitted to raise this issue *sua sponte*.  *See Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 24 ("[W]e are obliged to address the issue [of mootness] *sua sponte* because mootness goes to the jurisdiction of this court.") (internal quotation marks omitted).

B.  Ralls has not satisfied its burden of showing that it will be subject to the same action again.

Moreover, Ralls has failed to demonstrate that there is a reasonable expectation that it will be subject to the same action again in the future.  Courts have "interpreted 'same action' to refer to particular agency policies, regulations, guidelines, or recurrent identical agency actions." *Pub. Utils. Comm'n of Cal. v. FERC*, 236 F.3d 708, 715 (D.C. Cir. 2001).  To determine whether the same type of action is sufficiently likely to recur, "the court must first determine 'exactly what must be repeatable in order to save [the] case from mootness.' " *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 322 (D.C. Cir. 2009) (alteration in original), quoting *People for the Ethical Treatment of Animals, Inc. v. Gittens ("PETA")*, 396 F.3d 416, 422 (D.C. Cir. 2005).  In *Del Monte*, the D.C. Circuit adapted a "functional approach" to this inquiry, holding that the court must look at "whether the legal wrong complained of by the plaintiff is reasonably likely to recur."  *Id.* at 323–24, citing *PETA*, 396 F.3d at 422; *KKK*, 972 F.2d at 370; *Clarke*, 915 F.2d at 703–04.

Ralls asserts that it is likely to engage in future "covered transactions" because it will continue to acquire windfarms across the United States.  Am. Compl. ¶ 71; Pl.'s Opp. at 41–42.[13] But in the absence of any information about where the company intends to install its turbines or

---

13  The Court accepts this assertion in the amended complaint as true since at the pleading stage "we presume[e] that general allegations embrace those specific facts that are necessary to support the claim," even when inquiring into subject matter jurisdiction.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (alteration in original) (internal quotation marks omitted).  However, it is worth noting that the declarations Ralls submitted do not support this assertion.  Although Ralls points to its corporate mission of "identify[ing] market opportunities throughout the United States for the development and construction of windfarms in which turbines made by Sany will be used" as evidence that it is likely to engage in future "covered transactions," Pl.'s Opp. at 41, the declaration of Jialiang Wu states that in the past, Ralls has used means that are not subject to review by CFIUS in order to further this mission.  Wu Decl. [Dkt. # 35-7] ¶¶ 4–8.  So if the past is any indication, Ralls's mission does not necessarily lead to the conclusion that it is likely to engage in future covered transactions.

any other details about the future windfarms, the Court cannot conclude that it is reasonable to expect that this circumstance alone will trigger national security concerns.  So the mere fact that Ralls has future plans for the U.S. does not establish a reasonable likelihood that the alleged legal wrongs – CFIUS's alleged overstepping of authority, violation of Ralls's property rights, and failure to provide explanation or evidence when it imposed mitigation conditions – are likely to recur.

Whether the alleged wrongs will recur is "highly dependent upon a series of facts unlikely to be duplicated in the future."  *PETA*, 396 F.3d at 424.  Here, CFIUS stated in its order that it found that the transaction at issue posed national security risks to the United States, and that the only way to mitigate those security risks was through the specific prescribed measures.  According to the Court of Appeals, such "a 'legal controversy so sharply focused on a unique factual context' would rarely 'present a reasonable expectation that the same complaining party would be subjected to the same actions again,'" *id.*, quoting *Spivey v. Barry*, 665 F.2d 1222, 1234–35 (D.C. Cir. 1981) (internal quotation marks omitted).

By contrast, in the cases Ralls relies upon, the plaintiffs showed not just that they were likely to engage in similar conduct again, but that the conduct was likely to elicit the same allegedly illegal reaction.  In *Del Monte*, the plaintiff challenged the Office of Foreign Assets Control's delay in processing its application for license to export agricultural commodities to entities in Iran.  570 F.3d at 319–20.  There, the company made a showing not only that it would continue to apply for the same type of licenses in the future, but also that its applications were likely to elicit the same delay.  *Id.* at 325–26.  It pointed to an announcement by the agency that due to the volume of license requests, the agency's processing "may take longer than the time periods suggested at the inception of the [licensing] program."  *Id.* at 320.  Similarly, in *KKK*, the

Ku Klux Klan challenged the District of Columbia's decision to restrict the route that the group had proposed for a march, for fear of a violent response from onlookers. 972 F.2d at 368. The District Court granted an emergency injunction, and the group marched the entire proposed route. In determining, after the march, that the case presented a claim that was capable of repetition, the Court of Appeals found not just a likelihood that the Klan would again seek a permit to march in the District, but also that such a march would be likely to lead to the same considerations by the District that originally led it to restrict the route. *Id.* at 371 ("We are confident that eventually [the Klan] will make its way into the city again and we are just as confident that the potential of violence will attend its 'street walk.'").

Similarly, in *Performance Coal Co. v. Federal Mine Safety & Health Review Commission*, 642 F.3d 234 (D.C. Cir. 2011), the plaintiff – a mining company – sought temporary relief from the Mine Safety and Health Administration's amendment to an agency order, which changed the protocols that the company would have to comply with in order to investigate a recent mine disaster. *Id.* at 236. The challenged amendment occurred after the plaintiff had already begun preparations for the costly and extensive formal investigation, and after the agency had already modified the order more than sixty times. *Id.* An Administrative Law Judge and the Federal Mine Safety and Health Review Commission, acting as a judicial body, both determined that the statutory temporary relief provision did not apply to the plaintiff's situation. *Id.* at 236–37. Before the plaintiff's appeal reached the Circuit Court, the agency again modified the order, reversing the challenged changes to the protocol. *Id.* at 237. The court held that the action was capable of repetition not just because the plaintiff would continue to be subject to the order, but also because given the agency's history of frequent amendments to the

order, it was "nearly certain" that the agency would amend the investigation protocols again, which would affect the plaintiff in the same way. *Id.* at 237–38.[14]

It is true that what ultimately prompted CFIUS to take action is unknown, but it is clear that CFIUS's action was taken within a particular factual context. As Ralls itself notes, numerous other foreign corporations have purchased windfarms in various locations without triggering CFIUS action. *See* Am. Compl. ¶¶ 44–57. So, the court cannot conclude that there is a reasonable likelihood that Ralls's purchase of a different windfarm in a different location will necessarily give rise to the same response that the Terna-Ralls transaction did. Moreover, nothing will prevent Ralls from promptly filing a complaint accompanied by a motion for emergency relief if the legal wrongs alleged in this case do recur. *See Missouri*, 163 F.3d at 485 ("We see no reason why [the] processes [such as preliminary injunctions, emergency stays, and expedited appeals] would not be available to [the plaintiff] if the need arises in the future.").

Accordingly, the Court finds that Ralls's challenges to the CFIUS Order are moot, and do not fall under the exception to mootness for actions that are capable of repetition yet evading review.

## CONCLUSION

For the reasons stated above, the Court will grant defendants' motion to dismiss Counts I, II, III, and V of the amended complaint. Count IV will be dismissed to the extent that it challenges the CFIUS Order. The Court will deny defendants' motion to dismiss Count IV to the extent it alleges that the President's Order violates the Due Process Clause of the Fifth

---

14    Plaintiff also invokes *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007), but the Supreme Court expressly limits its interpretation of "capable of repetition" in that case to "the context of election cases." *Id.* at 463. Moreover, in that case, the Court found both a reasonable likelihood that the plaintiff would engage in future conduct that was "materially similar" to its past conduct, and that the agency would prosecute the plaintiff for engaging in that conduct – the legal wrong the plaintiff was challenging in that case. *Id.* at 463–64.

Amendment by depriving Ralls of property without providing adequate opportunity to be heard or an adequate explanation of the reasons for the decision.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  February 22, 2013