# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
_____
                                )
RALLS CORPORATION,              )
                                )
              Plaintiff,        )
                                )
      v.                        )        Civil Action No. 12-1513 (ABJ)
                                )
COMMITTEE ON FOREIGN            )
INVESTMENT IN THE               )
UNITED STATES, et al.,          )
                                )
              Defendants.       )
_____)
```

## MEMORANDUM OPINION

This action is before the Court on defendants' second motion to dismiss.

Plaintiff Ralls Corporation ("Ralls") is a Delaware corporation owned by two Chinese nationals. In March 2012, Ralls entered into a transaction involving the acquisition of several windfarm projects located in the vicinity of a U.S. Naval installation in Oregon, where Ralls planned to install wind turbines manufactured by the Chinese company with which it is affiliated. Ralls filed its original complaint and motion for temporary restraining order to challenge an order issued by the Committee on Foreign Investment in the United States ("CFIUS") on August 2, 2012, under the Defense Production Act of 1950, also known as the "Exon-Florio Amendment." On July 25, 2012, CFIUS found that the transaction posed a national security risk to the United States, and on August 2, it issued an amended order establishing mitigation measures Ralls was required to follow pending further action by the President. President Barack Obama then issued an order under section 721 of the Defense Production Act of 1950 ("section 721") "prohibiting" the transaction.

Ralls withdrew its motion for temporary restraining order and filed an amended complaint, challenging both the CFIUS amended order and the President's order on the grounds that they were ultra vires, issued in violation of the Administrative Procedure Act, an unconstitutional violation of Ralls's right to equal protection under the Fifth Amendment of the Constitution of the United States, and an unconstitutional deprivation of property without due process under the Fifth Amendment.

In its order dated February 22, 2013, the Court dismissed all of Ralls's claims challenging the CFIUS amended order as moot because the CFIUS order was expressly revoked by the President's order. Order (Feb. 22, 2013) [Dkt. # 45]. The Court also dismissed the ultra vires, Administrative Procedure Act, and equal protection challenges to the President's order for lack of subject matter jurisdiction because the finality provision in section 721 bars judicial review of the merits of the President's decision. *Id.*; *see generally* Am. Mem. Op. (Feb. 26, 2013) [Dkt. # 48]. But the Court found that the finality clause in section 721 did not bar judicial review of Ralls's claim that the issuance of the President's order violated the due process clause, and the Court permitted that portion of Ralls's complaint to proceed to the merits. Am. Mem. Op. (Feb. 26, 2013) at 33–35.

Defendants have now filed a motion to dismiss the remaining claim, and that motion has been fully briefed by the parties. Because Ralls has not alleged that it was deprived of a protected interest and because, even if the Court were to find a protected interest, Ralls received sufficient process before the deprivation took place, the Court will grant defendants' motion to dismiss.

# BACKGROUND

The statutory background and the facts alleged in the Amended Complaint were set out in detail in the Court's previous Memorandum Opinion, *Ralls Corp. v. Comm. on Foreign Inv. in the United States*, 926 F. Supp. 2d 71, 76–82 (D.D.C. 2013), so what follows is simply a brief summary of the background that is relevant to the currently pending motion.

## I.      Statutory Background

Section 721 of the Defense Production Act of 1950, also known as the "Exon-Florio Amendment," established CFIUS. Section 721 gives CFIUS and the President the authority to take action in connection with a "covered transaction," which is defined as "any merger, acquisition, or takeover . . . by or with any foreign person which could result in foreign control of any person engaged in interstate commerce in the United States." 50 U.S.C. app. § 2170(a)(3) (2012).

CFIUS is a committee comprised of the Secretaries of Treasury, Homeland Security, Commerce, Defense, State, Energy, and Labor; the Attorney General of the United States; the Director of National Intelligence; and the heads of any other executive department, agency, or office the President determines to be appropriate; or their designees. 50 U.S.C. app. § 2170(k)(2).[1] CFIUS review of a covered transaction can be initiated in two ways. First, any party or parties to the transaction may initiate a review by submitting a written notice to the chairperson of the committee. *Id.* § 2170(b)(1)(C)(i). Alternatively, the President or CFIUS itself may initiate a review. *Id.* § 2170(b)(1)(D). Once review has been initiated, the statute grants the committee thirty days to review the transaction to determine its effects on the national security of the United States. *Id.* § 2170(b)(1)(A), (E). If the review results in a determination

---

1       The Secretary of Labor and Director of National Intelligence are nonvoting, *ex officio* members. 50 U.S.C. app. § 2170(k)(2).

that the transaction threatens to impair the national security of the United States and that the threat has not yet been mitigated, the committee must conduct an investigation of the effects of the transaction on national security and "take any necessary actions in connection with the transaction" to protect national security. *Id.* § 2170(b)(2)(A)–(B). The statute expressly grants CFIUS the authority to "negotiate, enter into or impose, and enforce any agreement or condition with any party to the covered transaction in order to mitigate any threat to the national security of the United States that arises as a result of the covered transaction." *Id.* § 2170(l)(1)(A). The investigation must be completed within 45 days. *Id.* § 2170(b)(2)(C).[2]

After CFIUS completes its investigation, it is required to submit a report to Congress on the results of the investigation or submit the matter to the President for decision. 50 U.S.C. app. § 2170(b)(3)(B). Section 721 grants the President the authority to "take such action for such time as the President considers appropriate to suspend or prohibit any covered transaction that threatens to impair the national security of the United States," so long as he finds that: (1) there is credible evidence that leads him to believe the foreign interest exercising control might take action that threatens to impair the national security; and (2) other provisions of the law do not provide adequate and appropriate authority to enable him to protect the national security. *Id.* § 2170(d)(1), (4). The President is required to announce his decision no later than fifteen days after the CFIUS investigation is completed. *Id.* § 2170(d)(2).

The statute also provides that "[f]or purposes of determining whether to take action under paragraph (1), the President shall consider, among other factors, each of the factors described in

---

2       Once a covered transaction has been reviewed or investigated by CFIUS, CFIUS may only initiate another review if one of the parties to the transaction submitted false or misleading material information to the committee or, under certain conditions, if a party intentionally and materially breaches a mitigation agreement or condition that CFIUS had imposed. *Id.* § 2170(b)(1)(D).

subsection (f) of this section, as appropriate." *Id.* § 2170 (d)(5). Subsection (f), in turn, lists the factors that "[f]or purposes of this section, the President or the President's designee may, taking into account the requirements of national security, consider." *Id.* § 2170(f).

Importantly, the statute contains a finality provision which states: "The actions of the President under paragraph (1) of subsection (d) of this section and the findings of the President under paragraph (4) of subsection (d) of this section shall not be subject to judicial review." *Id.* § 2170(e).

## II.    Factual Background

Ralls is a Delaware corporation that is privately owned by two Chinese nationals. Am. Compl. [Dkt. # 20] ¶ 14. In March 2012, Ralls acquired from Terna Energy USA Holding Corporation ("Terna") – a Delaware corporation owned by a publicly traded Greek company – membership interests in four companies that each corresponded to the development of a windfarm project in Oregon (collectively, "Project Companies"). Am. Compl. ¶¶ 36, 59–60. Ralls did not file a voluntary notice with CFIUS before engaging in the transaction. At the time that Ralls purchased the Project Companies from Terna, the companies' assets consisted of:

> [E]asements with local landowners to access their property and construct windfarm turbines; power purchase agreements with the local utility, PacifiCorp; generator interconnection agreements permitting connection to PacifiCorp's grid; transmission interconnection agreements and agreements for the management and use of shared facilities with other nearby windfarms; and necessary government permits and approvals to construct windfarm turbines at particular locations.

Am. Compl. ¶ 61.

After the transaction between Terna and Ralls closed, the United States Navy, which operates a military base nearby the Project Company sites, expressed concerns regarding the

location of one of the windfarms Ralls had acquired. Am. Compl. ¶ 62. Ralls agreed to move the windfarm in question to a different site to ease the Navy's concerns. Am. Compl. ¶ 64.

Shortly thereafter, CFIUS contacted Ralls and invited Ralls to file a voluntary notice of the transaction under 50 U.S.C. app. § 2170(b)(1). Marisa Lago Decl. ("Lago Decl.") [Dkt. # 11-1] ¶ 5. The CFIUS representative informed Ralls's representative that, if Ralls did not file a voluntary notice, the Department of Defense would file an "agency notice" that would trigger the committee's review of the transaction. *Id.* Ralls filed the voluntary notice on June 28, 2012, which included an argument for why its acquisition of the Project Companies did not pose any national security concerns. Am. Compl. ¶ 72; Voluntary Notice, Ex. F to Mot. for TRO and Prelim. Inj. [Dkt. # 7-7] at 5–6. In the weeks that followed, CFIUS asked Ralls and Terna a number of follow-up questions, and Ralls was provided with an opportunity to meet with CFIUS about the review. Am. Compl. ¶¶ 73–74.

On July 25, 2012, CFIUS issued an Order Establishing Interim Mitigation Measures, in which it reported its determination that "there are security risks to the United States that arise as a result of the Transaction." The order prescribed measures that Ralls was required to implement in order to "mitigate those risks pending any further action by the President, or by CFIUS on his behalf." Order Establishing Interim Mitigation Measures, Ex. 4 to Am. Compl. [Dkt. # 20-4] at 2. On August 2, 2012, CFIUS issued an amended order that included additional mitigation measures with which Ralls was required to comply. Am. Order Establishing Interim Mitigation Measures, Ex. 5 to Am. Compl. [Dkt. # 20-5].

After completing the initial review, CFIUS determined that a further investigation should be conducted under 50 U.S.C. app. § 2170(b)(2). Am. Compl. ¶ 89. At the end of the investigation, CFIUS transmitted a report to the President. Am. Compl. ¶ 90. On September 28,

2012, the President issued an order entitled, "Order Regarding the Acquisition of Four U.S. Wind Farm Project Companies by Ralls Corporation."  Order Regarding the Acquisition of Four U.S. Wind Farm Project Companies by Ralls Corp., Ex. 6 to Am. Compl. ("President's Order") [Dkt. # 20-6].  The President's Order, which expressly revoked the CFIUS Amended Order, stated that there is credible evidence that leads the President to believe that Ralls, through exercising control of the four Project Companies "might take action that threatens to impair the national security of the United States . . . ."  President's Order at 1.  On that basis, the Order decrees:

- The Terna-Ralls transaction is prohibited, and ownership of the Project Companies by Ralls is prohibited, whether directly or indirectly through owners, subsidiaries, or affiliates;

- In order to effectuate the order, within ninety days, Ralls shall divest all interests in the Butter Creek project companies, their assets, and any operations developed, held, or controlled by them;

- Within fourteen calendar days of the order, the companies are required to remove all structures or other physical objects or installations from the project sites and any alternate sites.

President's Order at 1–2.

The President's Order also:  (1) prohibits the companies and persons acting on behalf of them from accessing the project sites; (2) prohibits the companies from selling or otherwise transferring, proposing to sell or transfer, or facilitating the sale or transfer of any items produced by the Sany Group – a Chinese turbine manufacturer run by the two Chinese nationals that own Ralls – to any third party for use at the project sites; (3) prohibits Ralls from completing a sale or transfer of the Project Companies or their assets to any third party until the same conditions are satisfied; (4) requires that, from the date of the order until Ralls provides a certification of divestment to CFIUS, the companies must certify to CFIUS on a monthly basis that they are in

compliance with the order; and (5) authorizes CFIUS, until divestment is completed and verified to its satisfaction, to implement measures it deems necessary and appropriate to verify that operations of the Project Companies are "carried out in such a manner as to ensure protection of the national security interests of the United States." President's Order at 2–3.

Ralls filed a complaint, accompanied by a motion for a temporary restraining order, in this Court after CFIUS issued its May and August orders, but before the President had issued his order. Compl. [Dkt. # 1]; Mot. for TRO and Prelim. Inj. [Dkt. # 7], withdrawn on Sept. 19, 2012 [Dkt. # 14]. That complaint has been superseded by an amended complaint, which challenges both of the CFIUS orders as well as the President's Order. *See generally* Am. Compl.

In its previous order, the Court dismissed all of Ralls's substantive claims against the President for lack of subject matter jurisdiction in light of the finality provision in section 721. The Court also dismissed the claims challenging the CFIUS orders as moot. Order (Feb. 22, 2013) [Dkt. # 45].

The only claim in the amended complaint that is still pending alleges that the issuance of the President's Order violated the due process clause of the Fifth Amendment to the United States Constitution because it deprived Ralls of its property without providing it with an adequate opportunity to be heard or revealing the reasons behind the President's decision. As the case was refined through briefing and oral argument, it became clear that the gravamen of Ralls's complaint is its contention that it was entitled to a detailed explanation.

## STANDARD OF REVIEW

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *accord Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. at 679.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id*., quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

When considering a motion to dismiss under Rule 12(b)(6), the complaint is construed liberally in plaintiff's favor, and the Court should grant plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *See id.*; *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citations omitted).

**ANALYSIS**

The Fifth Amendment of the United States Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. V. To succeed in asserting a procedural due process claim, the plaintiff must allege both that the government has deprived it of a protected interest and that the government did not afford it constitutionally sufficient procedure. *See Amer. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). The Court finds that Ralls has failed to successfully allege either of those two required elements.

**I.     Ralls has not alleged a protected interest.**

The threshold requirement in a due process claim is that plaintiff must plead "that the government has interfered with a cognizable liberty or property interest." *Hettinga v. United States*, 677 F.3d 471, 479–80 (D.C. Cir. 2012) (per curiam); *see also Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972) ("The requirements of procedural due process apply only to the deprivation of interests encompassed by the [Fifth Amendment's] protection of liberty and property."). While the underlying substantive interest may derive from an independent source such as state law, one looks to federal constitutional law to determine "whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978), quoting *Perry v. Sindermann*, 408 U.S. 593, 602 (1972).

Count IV of the amended complaint asserts that Ralls possesses property interests and property rights that it obtained by virtue of its acquisition of the Project Companies, including, but not limited to:

> the Project Companies themselves; easements with local landowners to
> access their property and construct windfarm turbines; power purchase

10

agreements with the local utility, PacifiCorp; generator interconnection agreements permitting connection to PacifiCorp's grid; transmission interconnection agreements and agreements for the management and use of shared facilities with other nearby windfarms; and necessary government permits and approvals to construct windfarm turbines at particular locations.

Am. Compl. ¶ 146.  Plaintiff goes on to allege under the same count that the President's Order has "eviscerated these property rights," without due process.  Am. Compl. ¶¶ 148–150.

Consistent with the allegations in the complaint, Ralls spends a large part of its brief in opposition to the motion to dismiss arguing that the government deprived it of the property rights it acquired when it entered into the transaction to acquire the Project Companies.[3]  There is no dispute that plaintiff Ralls entered into a transaction in March 2012 through which it obtained certain property rights under state law.  *See* Am. Compl. ¶ 60 (alleging that in March 2012, Terna Energy USA Holding Corporation sold its membership interests in the companies making up the Butter Creek projects to Intelligent Wind Energy, LLC – a company owned by U.S.

---

3       Ralls argues in its opposition to the motion to dismiss that it has also been deprived of its protected liberty interest in contracting, and of various interests in the property it held *before* the transaction with Terna.  Pl. Ralls Corp. Mem. in Opp. to Def.'s Mot. to Dismiss ("Pl.'s Opp.") [Dkt. # 52] at 24–25, citing President's Order (stating that CFIUS may implement measures it deems necessary and appropriate to verify that operations of the Project Companies are carried out in such manner as to ensure protection of the national security interests of the United States, and providing the example that CFIUS could access all of Ralls premises located in the United States for the purposes of verifying compliance with the order).  These interests, however, were not pled in the complaint, so the Court need not address them.  *See Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) ("It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss."), quoting *Coleman v. Pension Benefit Guar. Corp.*, 94 F. Supp. 2d 18, 24 n.8 (D.D.C. 2000).  Moreover, any due process challenge claiming that Ralls was deprived of property interests other than the interests it held in the Project Companies would not be ripe because Ralls does not allege that the government has ever exercised any control over Ralls's turbines or set foot on Ralls's headquarters property without Ralls's consent.  *See Dames & Moore v. Regan*, 453 U.S. 654, 688–89 (1981) (finding the question of whether the government's suspension of claims by Executive Order, which led to the suspension of the petitioner's claim against Iran, constituted an unconstitutional taking under the Fifth Amendment to be not ripe for review because the plaintiff still had the opportunity to present its claims before an arbitral tribunal).

Innovative Renewable Energy, LLC ("USIRE") – and that USIRE then sold Intelligent Wind Energy, LLC to Ralls.)

But Ralls undertook the transaction and voluntarily acquired those state property rights subject to the known risk of a Presidential veto. And Ralls's claim cannot be squared with the fact that Ralls waived the opportunity – provided by the very statute that it claims lacks the necessary process – to obtain a determination from CFIUS and the President before it entered into the transaction.

Under subsection (b)(1)(C), any party to a "covered transaction" – which section 2170(a)(3) defines as "any merger, acquisition, or takeover that is proposed or pending after August 23, 1988, by or with any foreign person which could result in foreign control of any person engaged in interstate commerce in the United States" – may initiate a review of the transaction by submitting written notice to the chairperson of CFIUS. 50 U.S.C. app. § 2170(b)(1)(C). If a company provides the written notice, the covered transaction undergoes a good-faith review or investigation.[4] If the review concludes that the transaction is not a threat to the national security of the United States, the President and committee may not initiate another review of the transaction. 50 U.S.C. app. § 2170(b)(1)(D). This provision is designed to create a powerful incentive for foreign-owned companies to file the voluntary notice before entering into a transaction. *See H.R. 5337, the Reform of National Security Reviews of Foreign Direct Investments Act: Hearing Before the Subcomm. on Domestic & Int'l Monetary Policy, Trade, & Tech. of the H. Comm. on Fin. Servs.*, 109th Cong. 31 (2005) (testimony of David Marchick, Attorney, Covington & Burling) ("[T]here are very, very strong incentives for those companies

---

4       Counsel for Ralls acknowledged that the statute permits review and investigation either before or after a transaction closes. Transcript of July 11, 2013 Motions Hearing, Ralls Corp. v. Comm. on Foreign Inv. in the Unites States, No. 12-1513 ("Tr.") 24:4–12.

for which acquisitions could potentially affect national security to file. The potential negative ramifications of not filing are very, very severe. There is no statute of limitations, the transaction can be unwound at any time. There are very strong incentives and I think the voluntary filing system works."); *A Review of the CFIUS Process for Implementing the Exon-Florio Amendment: Hearings Before the Comm. on Banking, Housing, and Urban Affairs*, 109th Cong. 114 (2005) (testimony of Robert M. Kimmett, Deputy Secretary, U.S. Dep't of Treasury) ("[H]aving sat on boards of directors both at home and abroad, I cannot imagine in the post-Sarbanes-Oxley world . . . how any director could give the go-ahead on a transaction [that had not been completed], because the President's authority to unwind that transaction is without limit if the person has not received approval of the process. . . . [T]hat very powerful nonjudicially reviewable authority of the President to stop or unwind transactions acts as a real leavener on the process . . . ."); *Committee on Foreign Investment in the United States (CFIUS), One Year After Dubai Ports World: Hearing before H. Comm. on Fin. Servs.*, 110 Cong. 26 (2007) (statement of Rep. Barney Frank, Chairman, H. Comm. on Fin. Servs.) ("There is no right to buy. You do not have to file, but by not filing, you do not immunize yourself from a finding that the transaction could be canceled on security grounds.").

Despite the availability of this pre-acquisition review, Ralls did not choose to submit written notice of its transaction to CFIUS before embarking on the transaction. That pre-acquisition review would have enabled Ralls to obtain, *before* it acquired the Project Companies and any corresponding property rights under state law, either a determination that the transaction threatened the national security of the United States and would be prohibited, or a determination that no threat existed, coupled with the assurance that CFIUS and the President could not prohibit the transaction later. So under those circumstances, it is inappropriate to apply the same

due process analysis that would have applied if Ralls had acquired the Project Companies without this opportunity for pre-acquisition review. Because Ralls had the ability to obtain a determination about whether the transaction would have been prohibited before it acquired the property rights allegedly at stake, but it chose not to avail itself of that opportunity, Ralls cannot predicate a due process claim now on the state law rights it acquired when it went ahead and assumed that risk. *Parker v. Bd. of Regents of Tulsa Junior College*, 981 F.2d 1159, 1163 (10th Cir. 1992) (finding that the defendant had not violated the plaintiff's due process rights because plaintiff chose not to avail herself of the available due process procedures embodied in the termination proceedings); *cf. Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000) ("If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants.").[5]

Moreover, even though Ralls argued in its written opposition that the Court should consider the property rights it obtained when it acquired the Project Companies to be part of the protected interest for due process purposes, Ralls took the position at the motion hearing that the Court's due process inquiry should be the same whether the transaction was blocked by the President *before* or *after* it occurred. Tr. 45:4–6 (Counsel for Ralls: "I don't think the procedural due process argument from me would differ if we had come in and sought pre-acquisition review . . . ."). Since Ralls possessed no property rights in the Project Companies before it entered into the transaction with Terna, that concession supports the Court's view that those property rights should not be factored into the due process protected interest analysis.

---

5       Ralls also laments that if the Court were to find that no cognizable property interest exists, this would lead to the conclusion that any "covered transaction" that closes without the submission of a voluntary notice to CFIUS would be subject to an indefinite risk of being unwound by the President at any time without any process. Pl.'s Opp. at 19–20. But this is just what the statute provides, and the parties to a transaction can avoid this uncertainty by filing the voluntary notice before consummating the deal.

Ralls also argued at the hearing on this motion that apart from any actual property rights it lost when the President prohibited its transaction with Terna, it was also deprived of the type of expectation interest that gives rise to due process under *Board of Regents v. Roth*, 408 U.S. 564 (1972). Tr. at 19 ("[T]he whole entire line of the *Roth v. Board of Regents* cases show that there are non-property property interests, what I call *Roth*-type property, that gives rise to expectations of due process."). Ralls argued that it would have held this expectation with the same force whether the President reviewed the transaction before or after the transaction closed, because the President's discretion to prohibit the transaction at either point in time was circumscribed, or "cabined," and not "unfettered." *See* Tr. 19:11–20:3, 24:8–20 ("[W]hether it made a difference in terms of due process, had we come in before or after if we're faced with the same arbitrary decision, I don't think so."); Tr. 26:1–6 ("[T]he effect of the President's order is that the transaction is void *ab initio*, we still have a *Roth*-style property interest, as I said before. A *Roth*-style property interest in protecting against the President's action without due process because – because he did not adhere to the statutory criteria that is mandated by Congress.").

But this argument goes far beyond anything the Supreme Court said in *Roth*. And there is nothing about this statute, which gives the President absolute, unreviewable discretion to prohibit a covered transaction, that could give rise to any expectation that a particular transaction will be approved, much less an expectation that rises to the level of an entitlement that warrants due process protection under the Constitution. It is well understood that, under the Fifth Amendment Due Process clause, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it. He must, instead have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (internal quotation marks omitted).

In *Roth*, the Supreme Court considered whether a teacher who had been hired for a fixed term of one academic year had a protected interest in being rehired when the year was over. 408 U.S. at 566. The applicable state law provided process for any teacher whom university officials sought to terminate during his or her one-year term. It also provided process for the termination of any tenured permanent employees – an employee that had completed four years of year-to-year employment. *Id.* However, the law left the decision of whether to rehire a non-tenured teacher for a second term entirely to the unfettered discretion of university officials. *Id.* at 567. Acknowledging that a cognizable property interest requires "more than an abstract need or desire for it," or a mere "unilateral expectation of it," but instead requires "a legitimate claim of entitlement to it," the Court found that the plaintiff's reemployment did not rise to the level of a property interest, the deprivation of which required constitutional process. *Id.* at 577–79. Cases that followed *Roth* have clarified that "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock v. Gonzales*, 545 U.S. at 755 (2005).

The first problem with Ralls's *Roth* argument is that the statute involved does not make a benefit available or create any kind of entitlement to a benefit – it simply authorizes the President to stop a transaction from going forward.[6]

In addition, Ralls's argument that it had an expectation interest in acquiring the property fails because the President's determination about whether to prohibit the transaction is entirely discretionary. Section 721 vests broad, unreviewable authority in the President to prohibit a transaction. The statute as a whole puts foreign-owned companies on notice that they do not have an entitlement to engage in mergers, acquisitions, or takeovers in the United States: they are subject to Presidential review.[7]

Section 721 places no conditions on the President's discretion. Section 2170(d)(1) provides: "[s]ubject to paragraph (4), the President may take such action for such time as the President considers appropriate to suspend or prohibit any covered transaction that threatens to impair the national security of the United States." 50 U.S.C. app. § 2170(d)(1). As the Court explained in detail in its previous opinion in this case, that is a broad grant of discretion and it

---

6    Thus, this case is distinguishable from *Wilmina Shipping AS v. U.S. Dep't of Homeland Sec.*, -- F. Supp. 2d --, No. 11-2184 (ABJ), 2013 WL 1225382 (D.D.C. Mar. 27, 2013), an opinion cited by the plaintiff. In *Wilmina*, the factor that drove the Court's decision that the plaintiffs were entitled to due process was that they had already been granted a license that was within the government's discretion to grant, but then it had been revoked. The Court cited a line of cases that distinguish between permit applicants and permit holders. *Id.* at *14, citing *3883 Connecticut LLC v. Dist. of Columbia*, 336 F.3d 1068, 1072–73 (D.C. Cir. 2003); *Barry v. Barchi*, 443 U.S. 55, 64 n.11 (1979). But the plaintiff here is more analogous to a permit applicant than a permit holder, because it was on notice that until it submitted a voluntary notice to CFIUS, or CFIUS decided to initiate its own review, and the project was cleared for approval, the President had the authority to prohibit any covered transaction at any time.

7    The government also argues that plaintiff cannot succeed because "'[n]o one can be said to have a vested right to carry on foreign commerce with the United States.'" Def.'s Mem. in Supp. of Mot. to Dismiss [Dkt. #50-1] at 11, quoting *Ganadera Indus., SA v. Block*, 727 F.2d 1156, 1160 (D.C. Cir. 1984). But whether a foreign entity has a protected property interest involving foreign commerce depends on the particular statutory scheme involved. *See Wilmina*, 2013 WL 1225382, at *14 n.9 (compiling cases).

contains no mandatory language. *See Ralls Corp. v. Comm. on Foreign Inv. in the United States*, 926 F. Supp. 2d 71, 76–82 (D.D.C. 2013). Plaintiff points to the limitation, "subject to paragraph (4)," and it notes that subsection (d)(4) states that the President may exercise the authority conferred in paragraph (1) "only if" he finds "there is credible evidence that leads [him] to believe that the foreign interest exercising control might take action that threatens to impair the national security." Pl.'s Opp. at 6. But even that provision does not require that the President base his decision on evidence that meets some objective threshold; it only requires the President to make a finding that credible evidence leads him to believe that the foreign interest might take action that threatens to impair the national security. 50 U.S.C. app. § 2170(d)(4)(A).

Nor does section 721 mandate the factors that the President must consider in reaching his decision; while subsection (d)(5) does state that the President "shall" consider the factors enumerated in subsection (f), he is simply directed to do that "as appropriate." 50 U.S.C. app. § 2170(d)(5). And subsection (f) – which sets out the factors – uses language that is even more discretionary: it states that "the President or the President's designee *may*, taking into account the requirements of national security, consider" the enumerated factors, and it adds that the President may also consider "such other factors as the President or the Committee may determine to be appropriate." 50 U.S.C. app. § 2170(f) (emphasis added).

Even if the Court were to find that the language in section 721 circumscribes the President's discretion to some degree, "a statutory requirement that certain procedures be observed before a benefit can be withdrawn does not in itself create a protected property interest." *Specter v. Garrett*, 971 F.2d 936, 955 (3d Cir. 1992), *judgment vacated on other grounds by O'Keefe v. Specter*, 506 U.S. 969 (1992), citing *Olim v. Wakinekona*, 461 U.S. 238, 249–51 (1983). "Rather, the dispositive question in deciding whether the statute creates a

protectable property interest is whether it places substantive limits on official discretion . . . ." *Specter*, 971 F.2d at 955, citing *Stephany v. Wagner*, 835 F.2d 497, 500 (3rd Cir. 1987). The statute must contain "'explicitly mandatory language,' *i.e.*, specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow . . . ." *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 463 (1989) (discussing a liberty interest); *see also Specter*, 971 F.2d at 955 (applying the same requirement for a *Roth*-style property interest). And a statute that "specifies a particular process but does not guarantee a particular outcome," does not entitle the subject of that statute to a legitimate claim of entitlement to a cognizable property interest. *Specter*, 971 F.2d at 955.

Even if section 721 can be read to specify a particular process, it certainly does not guarantee any particular outcome. None of subsections (d)(1), (d)(5), or (f) set out specific criteria or particular predicates that mandate specific results. And the requirement that the President make a finding that credible evidence "leads the President to *believe* that the foreign interest . . . *might* take action that *threatens* to impair the national security" can hardly be characterized as a particularized standard. 50 U.S.C. app. § 2170(d)(4)(A). Therefore, there is simply no basis for the Court to find that there is a *Roth*-like property interest here.

## II.     Ralls received sufficient process.

Even if the Court were to find that the President's Order deprived Ralls of some protected interest, based on either the state law property rights or the *Roth* theory, plaintiff's due process claim fails because Ralls received sufficient process.

All that is required before the deprivation of a protected interest is "notice and opportunity for hearing *appropriate to the nature of the case.*" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (emphasis added). "[D]ue process is flexible and calls for

such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). The process that is due is determined by balancing three criteria: (1) the private interest affected by the governmental action; (2) the risk of an erroneous deprivation of such interest and the probable value of additional procedural safeguards; and (3) the government's interest in the existing procedure. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The balance of these factors shows that plaintiff was provided the process that was due.

Ralls complains that it did not receive pre-deprivation notice from the President laying out the actions that he intended to take and his reasons, and that it was not afforded an opportunity to rebut the President's reasons. Pl.'s Opp. at 10. Ralls also notes that it received no post-deprivation hearing. Pl.'s Opp. at 7. But the allegations in the amended complaint do not entirely support this characterization of the facts. According to the amended complaint, Ralls and Terna submitted a voluntary notice to CFIUS on June 28, 2012 – after their transaction had already closed. Am. Compl. ¶ 72. In the weeks that followed, CFIUS asked Ralls and Terna a number of follow-up questions, and Ralls was provided with an opportunity to meet with CFIUS before CFIUS issued its first order establishing interim mitigation measures. Am. Compl. ¶¶ 73–74. At the hearing on the instant motion, counsel for Ralls conceded that Ralls submitted its voluntary notice after being informed by CFIUS in June of 2012 that if it did not file the voluntary notice, the Department of Defense was going to file a notice that would trigger committee review. Tr. at 38:21–39:1. Counsel agreed that at that point, Ralls was told that it assumed the risk if any further construction was undertaken. *Id.* In the notice that Ralls filed, it set forth its reasons why the acquisition did not raise national security concerns. *Id.* at 39:2–11. Following the submission of its notice, Ralls attended a meeting with CFIUS, as provided for in the committee's regulations, and it made a presentation on July 11, 2012. *Id.* at 39:12–18; *see* 31

C.F.R. § 800.501(b) (2013). Moreover, counsel for Ralls received notice from CFIUS, after CFIUS had issued the interim order, that informed Ralls that if it did not voluntarily divest, CFIUS would recommend to the President that he order Ralls to do so. Tr. at 40:1–7.[8]

So while Ralls alleged that it received neither notice nor an opportunity to be heard, an analysis of the undisputed facts reveals that Ralls was given notice before the decision was made, and that it was heard, so its constitutional claim is predicated solely on its assertion that it was entitled to know the President's reasons for prohibiting the transaction – or at least the non-classified reasons[9] – and to have an opportunity to rebut those reasons specifically. *See* Tr. at 39:9–11 (stating that the notice set forth Ralls's general reasons why the acquisition should not be prohibited because they "[did] not know what the national security concerns were of interest to CFIUS"); *id.* at 39:17–18 ("[W]e had no meaningful opportunity to be heard regarding the basis of the [President's] decision."); *id.* at 43:3–7 ("The Court: . . . [Y]our concern is not that you didn't know before it was going to happen that it happened. You were told before it was going to happen that it happened; that's correct? [Counsel for Ralls]: Yes. The Court: And you had an opportunity to go in and speak. You don't deny that you had an opportunity to go in and

---

8       While counsel for Ralls argued at the hearing on the instant motion that, to the extent the Court's decision relied on facts not alleged in the complaint, discovery and summary judgment briefing were necessary, he also conceded that if the Court were to rest only on these facts that Ralls conceded – and not on disputed facts about what was said at the meetings between Ralls and CFIUS – Ralls would be content to rest on its complaint. Tr. at 49:17–50:5. Since the Court rests only on the uncontested facts, it may properly grant defendant's motion to dismiss, construed as a motion for summary judgment. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.").

9       In its opposition to defendant's motion, Ralls argues that due process required the President to disclose to Ralls all unclassified items upon which he proposed to rely in prohibiting the transaction, as well as all material that the government believes can be safely declassified. Pl.'s Opp. at 12–13. However, at the hearing on this motion, counsel for Ralls did not distinguish between the classified and unclassified grounds for the President's determination.

speak. [Counsel for Ralls]: Absolutely. The Court: What you're saying is that you didn't have sufficient information to do that as effectively as you would have liked to have done it? [Counsel for Ralls]: Yes."); *id.* at 48:3–7 ("The Court: . . . But you're conceding that they had notice. They were heard. What we're talking about is whether they had a right to be informed of what underlies the President's concerns. [Counsel for Ralls]: Right.").

In light of the process that Ralls already received, and the limited nature of the additional process that Ralls seeks, the *Mathews* factors in this case weigh overwhelmingly in favor of the government. Even if the Court were to find that Ralls was deprived of some kind of property interest, that property interest is relatively weak in the face of the strong governmental interest in protecting the national security. *See Haig v. Agee*, 453 U.S. 280, 307 (1981) ("[N]o governmental interest is more compelling than the security of the Nation."). And while Ralls argues that the national security interest is speculative, the Court emphasizes that the only additional process Ralls is seeking here is to be informed of the grounds for the President's finding that, in his belief, Ralls might take action that threatens national security through exercising control over the Project Companies.

In this case, involving the application of this particular statutory scheme, the President has a valid interest, grounded in the national security of the United States, to withhold the particular evidence that gave rise to his concern about a national security threat from the entity that he believes might pose the threat. And that conclusion is bolstered by the fact that Congress specified that the President's determination would not be subject to review. *See People's Mojahedin Org. of Iran v. United States Dep't of State*, 182 F.3d 17, 21 (D.C. Cir. 1999) (finding that the Secretary of State's finding that "the terrorist activity of [an] organization threatens the

security of United States nationals or the national security of the United States" is not reviewable).

Ralls cites *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), but that case involved weighing the governmental interest against an individual's liberty interest in freedom from bodily detention. *See Hamdi*, 542 U.S. at 529–30 (describing the interest in "being free from physical detention from one's own government" as "the most elemental of liberty interests" and is "at the core of the liberty protected by the Due Process Clause"). The property interests allegedly at stake here are much less compelling. This is also why counsel's attempt to equate the Ralls meeting with CFIUS to the situation of a hypothetical criminal defendant facing a trial without any notice of the charges against him, *see* Tr. at 39:22–25, is not an apt comparison. A criminal defendant risks deprivation of the strongest possible private interest – his liberty interest in freedom from detention – and the government interest being advanced during a criminal proceeding is not as strong as the interest advanced in section 721. This Court is bound to follow the decisions of the D.C. Circuit, and in the same line of cases that Ralls relies upon in its pleadings, that court has specifically rejected the notion that the level of due process required in a criminal trial should be the model for the national security context. *See Nat'l Council of Resistance of Iran v. Dep't of State* ("*NCRI I*"), 251 F.3d 192, 209 (D.C. Cir. 2001); and *Nat'l Council of Resistance of Iran v. Dep't of State* ("*NCRI II*"), 373 F.3d 152, 159–60 (D.C. Cir. 2004).

Moreover, the probable added value of providing Ralls with the reasons for the President's proposed determination would be minimal in this case. Ralls was afforded an opportunity to present all of the reasons why it believed its involvement in the Project Companies did not pose a threat to the national security at a meeting with representatives from

CFIUS.[10]   And, the statute expressly bars the courts from reviewing the actions and the findings of the President, which can be based on any factor that he deems appropriate.   So even if Ralls had an opportunity to respond to the President's specific concerns, the President still retained full discretion to make his decision based on any evidence that he considered credible, whether or not a neutral third-party would be persuaded by Ralls's rebuttal.

In the end, Ralls's claim that it was denied due process on these grounds is predicated almost entirely on the line of cases involving the designation of organizations as "foreign terrorist organizations" under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 8 U.S.C. § 1189 (2012).   But a close reading of those cases does not support Ralls's contention that due process necessarily requires the executive to disclose the reasons for his decision.

The cases on which Ralls relies recite the principle that due process is a flexible concept, and the level of process due varies with the circumstances and the particular statutory scheme involved.   *See NCRI I*, 251 F.3d at 205–06.   Ralls has excerpted a few quotations from each

---

10      Ralls also claims that the Court should not consider any process that Ralls obtained from CFIUS because "any process afforded during the CFIUS proceedings is no substitute for process during the presidential proceedings."  Pl.'s Opp. at 14.  However, by statute, the President makes his decision only after receiving a recommendation from CFIUS and after CFIUS conducts a review and investigation, so the notice that Ralls received of potential action by CFIUS also put it on notice that, should CFIUS make a determination that a threat did exist, the President could then permanently prohibit the transaction if he makes the same finding.  Accordingly, Ralls was aware that its opportunity to persuade CFIUS that it did not pose a threat to national security also served as an opportunity to prevent permanent action on the part of the President.  In addition, the statute expressly provides that the national security review is conducted by "the President, acting through the Committee," 50 U.S.C. app. § 2170(b)(1)(A), so the statute contemplates that process provided by the committee constitutes process provided by the President.  Finally, if Ralls is asking the Court to directly enjoin the President, that poses serious separation of powers problems, which the Court only avoided in its previous memorandum opinion because it interpreted Ralls's complaint as seeking injunctive relief against only the subordinate executive officials who would otherwise enforce the President's Order, not against the President himself. *See* Am. Mem. Op. at 14–16.

opinion to support its position, but it ignores the fact that those statements were grounded in a specific statutory context that differentiates the situation presented in those cases from the one the Court is dealing with here. In particular, the AEDPA has a judicial review provision, and it requires the creation of an administrative record for the purpose of that review, and those circumstances clearly underlie the rulings of the Court of Appeals. Plaintiff also ignores clear language in the opinions that demonstrate that the rulings in those cases were quite narrow and do not stand for the broad principle being advanced in this case. The Court will summarize each of the AEDPA cases individually:

A. **_People's Mojahedin Organization of Iran v. Dep't of State ("PMOI I"),_ _182 F.3d 17 (D.C. Cir. 1999)_**

In the first case in the series, two organizations, the People's Mojahedin Organization of Iran ("PMOI") and the Liberation Tigers of Tamil Eelam, claimed that they were denied due process when the United States Secretary of State designated them to be Foreign Terrorist Organizations ("FTOs") under AEDPA. *PMOI I*, 182 F.3d at 18–19. To address that claim, the court went to some length to describe the unique nature of the governing statute. *See id.* at 19 ("The statute before us is unique, procedurally and substantively."). It explained that the statute requires the Secretary of State to make three findings based on a public "administrative record" before he or she designates an entity as an FTO, but that the third finding – that the activity of the organization threatens national security – is a non-justiciable, unreviewable finding. *Id.* at 23. The case goes on to explain that the judicial review which is provided for in the statute is confined to the materials assembled before the Secretary of State publishes the designation. *Id.*, citing 8 U.S.C. § 1189(b)(1). And that material, as later cases describe, includes both unclassified information and classified information that the court reviews *ex parte*. *See NCRI I*, 251 F.3d at 196. But all of the discussion about due process that follows – both in *PMOI I* and in

the AEDPA cases that came later – was limited to the two reviewable findings under the statute, and not the national security finding.

In this case, unlike the AEDPA cases, the only finding at issue concerns the threat to national security, and that finding is entirely unreviewable. For that reason, the due process holdings in the AEDPA cases arguably have no bearing on this case whatsoever.

**B.** *Nat'l Council of Resistance of Iran v. Dep't of State ("NCRI I"), 251 F.3d 192 (D.C. Cir. 2001)*

In the second of the AEDPA cases, the Court of Appeals articulates what process the plaintiffs were due: notice by the time the Secretary has made a tentative decision that the designation is impending, and an opportunity to present, at least in written form, evidence that the organizations might have that would negate the proposition that they are FTOs.[11] *See generally NCRI I*, 251 F.3d 192 (discussing that there is no due process right to negate the finding that the organization's activities have an impact on the national security). The court also emphasized that "no governmental interest is more compelling than the security of the nation," so the government's strong interest in national security "clearly affects" the nature of the process to be afforded. *Id.* at 207. Much of the opinion deals with the question of *when* the process is due, *id.* at 205–08, and that is not an issue in this case because Ralls was put on notice when the decision was impending and it weighed in before the decision was made.

When the Court of Appeals reached the *what*-process-is-due portion of its opinion, it held that the notice must include the action sought, but that it need <u>not</u> disclose the classified information upon which it relied, even though that evidence would be presented to the court *ex*

---

11      In this case, Ralls received more process than that described in *NCRI I* since it was permitted to make both a written and an oral submission.

*parte* when the action is later reviewed. *Id.* at 208. That decision would seem to govern Ralls's claim that it is entitled to the classified grounds for the President's determination.

As for the non-classified grounds for the Secretary's findings, the court in *NCRI I* stated:

> However, *the Secretary has shown no reason not to offer the designated entities notice of the administrative record which will in any event be filed publicly*, at the very latest at the time of the court's review. We *therefore* require that as soon as the Secretary has reached a tentative determination that the designation is impending, the Secretary must provide notice of those unclassified items upon which he proposes to rely to the entity to be designated.

*Id.* at 209 (emphasis added).

Ralls has consistently characterized the *NCRI I* court's decision as holding that due process *requires* the government to provide the nonclassified evidence that supports its determination, but it ignores the critical qualifying language. *See, e.g.*, Pl.'s Opp. at 12–13. This selective approach is misleading, and it overstates the holding and the precedential effect of the opinion. The court did not hold that disclosing the decision maker's nonclassified reasons is necessary so that the opportunity to be heard will be meaningful; it court simply found that there was no justification for withholding the reasons in the particular case before it, *where the reasons were going to be public anyway*.

That circumstance is utterly absent in the case before this Court. Moreover, since the only finding involved here is some sort of national security finding that was noted to be unreviewable and therefore not even covered by the AEDPA cases, the *NCRI I* holding – even as it was repeated in later cases – does not compel the conclusion advanced by Ralls.

### C. *People's Mojahedin Organization of Iran v. Dep't of State ("PMOI II")*, 327 F.3d 1238 (D.C. Cir. 2003)

This case is largely inapposite, but the court does repeat the point it made in prior opinions that the Secretary of State's national security finding is beyond review by the courts. *PMOI II*, 327 F.3d at 1244.

### D. *Nat'l Council of Resistance of Iran v. Dep't of State ("NCRI II")*, 373 F.3d 152 (D.C. Cir. 2004)

In this case – the fourth of the AEDPA cases – the court upheld the Secretary of State's designation and found it to be in compliance with the requirements of due process. The court held that the plaintiffs were not entitled to any of the classified grounds for the agency's decision or to an adversary hearing before the agency at which it could confront witnesses against it. *NCRI II*, 373 F.3d at 159–60.

### E. *People's Mojahedin Organization of Iran v. Dep't of State ("PMOI III")*, 613 F.3d 220 (D.C. Cir. 2010)

Ralls relies heavily on this fifth AEDPA case, in which the court reiterated the requirements set out in *NCRI I*. *PMOI III*, 613 F.3d at 228 ("[W]e have held due process requires that the PMOI be notified of the unclassified material on which the Secretary proposes to rely and an opportunity to respond to that material *before* its redesignation . . . ."). But that was simply a restatement of the fact that the court had already issued the prior order – the question before the court in *PMOI III* was simply whether the amendment of the AEDPA during the period between the two cases could justify the Secretary's failure to comply with the procedure that had previously been imposed by the court: "[W]e cannot uphold the designation absent the procedural safeguards required by our precedent." *Id.* at 227. In other words, the 2010 opinion is not a statement about what due process requires generally, and it does not contain any substantive due process analysis; the case was about whether the Secretary had to

comply with the order that had already been entered in the case, and the court did not go behind that order in any way.

*     *     *

In sum, the Court concludes that the *Mathews* factors do not require the President to provide to Ralls the "credible evidence" on which his determination was based. Before any alleged deprivation of its property interests, Ralls received all of the fundamental requirements of due process: notice of the impending action and an opportunity to be heard, appropriate to the nature of its case. *Cleveland Bd. of Educ.*, 470 U.S. at 542. Neither *Mathews* nor the cases that followed it support Ralls's contention that it was entitled to be informed of the specific grounds for the President's decision.

**CONCLUSION**

For all of the reasons set forth above, the Court will grant defendants' motion to dismiss the amended complaint. A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: October 9, 2013